IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | Case No. 13-90942 |
| | ) | |
| EARL GAUDIO & SON, INC., | ) | Judge Mary P. Gorman |
| | ) | |
| Debtor. | ) | Chapter 11 |

---

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF LIQUIDATION OF EARL GAUDIO & SON, INC.

---

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES. INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT

Victoria E. Powers
Tyson A. Crist
ICE MILLER LLP
250 West Street
Columbus, OH 43215
614-462-2700 – Telephone
614-222-3478 – Facsimile
Email: victoria.powers@icemiller.com
        tyson.crist@icemiller.com

*Counsel to Debtor and Debtor in Possession*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 3

    A.    Purpose of the Disclosure Statement. ................................................. 3

    B.    Summary of Classification and Treatment of Claims and Interests Under
        the Plan. ................................................................................................ 4

II.    VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION ............... 5

    A.    Ballots and Voting Deadline ................................................................ 5

    B.    Creditors Entitled to Vote; Impairment ............................................... 6

    C.    Requirements for Confirmation. ........................................................... 7

        1.    Good Faith. .............................................................................. 7
        2.    Classification of Claims; Acceptance. ..................................... 7
        3.    Best Interests Test. .................................................................. 8
        4.    Feasibility. ................................................................................ 8

    D.    Cramdown: Confirmation Without Acceptance by All Impaired Classes. ............ 8

        1.    Fair and Equitable. .................................................................. 9
        2.    Unfair Discrimination. .............................................................. 9

    E.    Confirmation Hearing. ........................................................................ 10

III.    EFFECT OF CONFIRMATION ............................................................................ 10

IV.    GENERAL INFORMATION CONCERNING THE DEBTOR ..................................... 11

    A.    General. .............................................................................................. 11

    B.    Pre- and Post-Petition Management of the Debtor. ............................. 11

V.    CAUSES OF BANKRUPTCY ............................................................................... 11

VI.    THE DEBTOR'S BANKRUPTCY .......................................................................... 12

    A.    Sale of Core Business Assets to Skeff. .............................................. 12

    B.    Sale of Other Assets. .......................................................................... 13

    C.    Adversary Proceedings. ...................................................................... 14

VII.    SELECTED FINANCIAL DATA ........................................................................... 16

VIII.    DESCRIPTION OF CLAIMS AND SUMMARY OF TREATMENT UNDER THE
        PLAN .................................................................................................. 17

        1.    Administrative Expense Claims and Governmental Unit Claims. ............ 17
        2.    Treatment of Administrative Expense and Governmental Unit
            Claims. ................................................................................... 20

CO\5775599.4

|  | 3. | Unimpaired Secured Claims. | 21 |
|---|---|---|---|
|  | 4. | Unimpaired Priority Claims. | 21 |
|  | 5. | Impaired Claims. | 22 |

| IX. | MEANS OF EXECUTION OF THE PLAN | 23 |
|---|---|---|
|  | A. General Provisions. | 23 |
|  | B. Objections to Claims; Estimation of Claims. | 23 |
|  | C. Post Confirmation Fees and Reports. | 24 |
|  | D. Executory Contracts and Unexpired Leases | 24 |
|  | E. Finalization of all Outstanding Matters by Custodian | 24 |
|  | F. Statutory Committee and Cessation of Fee and Expense Payment | 25 |
|  | G. General Provisions | 25 |

| X. | RETENTION OF JURISDICTION | 26 |
|---|---|---|
| XI. | MODIFICATION OF THE PLAN | 26 |
| XII. | COMPARISON OF PLAN TO ALTERNATIVES | 26 |
| XIII. | DESCRIPTION OF DEBTOR AFTER CONFIRMATION | 27 |
| XIV. | PAYMENT OF FEES | 27 |
| XV. | TAX CONSEQUENCES OF THE PLAN | 27 |
| XVI. | RELEASE, INJUNCTION, AND BINDING NATURE OF THE PLAN | 29 |
|  | A. Compromise of Claims. | 29 |
|  | B. No Liability for Solicitation or Participation. | 30 |
|  | C. Creditor Release. | 30 |
|  | D. Binding Effect of the Plan. | 30 |
|  | E. Injunction. | 31 |
| XVII. | CONCLUSION | 31 |

**EXHIBITS:**

**Exhibit A:** The Debtor's proposed Plan of Liquidation
**Exhibit B:** Ballot for Voting on proposed Plan of Liquidation
**Exhibit C:** Debtor's most recent Operating Reports
**Exhibit D:** Debtor's Schedule E Showing Priority Wage Claims

CO\5775599.4

## <u>DISCLAIMER</u>

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") FOR THE CHAPTER 11 PLAN OF LIQUIDATION OF EARL GAUDIO & SON, INC. (THE "PLAN") DESCRIBES THE TERMS AND PROVISIONS OF THE PLAN FILED _____, 2018 IN THE CASE CAPTIONED ABOVE (THE "CASE"), PENDING BEFORE THE UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF ILLINOIS (THE "COURT"), UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, AS AMENDED (THE "CODE"). THE DEBTOR IS REQUESTING THAT THE COURT CONFIRM THE PLAN PURSUANT TO CHAPTER 11 OF THE CODE. YOU SHOULD NOT RELY ON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN MAKING AN INFORMED JUDGMENT ABOUT VOTING TO EITHER ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS DETERMINED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE ANALYSES, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS

1

DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS OR INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND/OR OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS BEFORE AND AFTER THE CONFIRMATION OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTOR, FIRST MIDWEST BANK AS CUSTODIAN (THE "CUSTODIAN") AND ICE MILLER LLP AS COUNSEL TO THE DEBTOR ("DEBTOR'S COUNSEL") ARE NOT ABLE TO REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL OR NON-MATERIAL INACCURACY OR OMISSION. ALTHOUGH THEY HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE DEBTOR, THE CUSTODIAN AND DEBTOR'S COUNSEL HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT. THE DEBTOR, CUSTODIAN AND DEBTOR'S COUNSEL HAVE NO ACTUAL KNOWLEDGE OF ANY INACCURACIES.

THE STATEMENTS MADE AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ARE PROVIDED AS OF THE DATE HEREOF, UNLESS

OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY SUBSEQUENTLY BE UPDATED, THERE IS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM OR INTEREST MUST RELY ON ITS OWN EVALUATION OF THE DEBTOR AND ITS OWN ANALYSIS OF THE TERMS OF THE PLAN IN ORDER TO MAKE AN INFORMED JUDGEMENT ABOUT THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ESTATE PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT IN ORDER TO MAKE AN INFORMED JUDGMENT ABOUT VOTING TO EITHER ACCEPT OR REJECT THE PLAN.

A BALLOT HAS BEEN SENT WITH THIS DISCLOSURE STATEMENT FOR USE IN VOTING BY CREDITORS ENTITLED TO VOTE ON THE PLAN.

## I.   **INTRODUCTION**

### A.   **Purpose of the Disclosure Statement.**

Earl Gaudio & Son, Inc., debtor and debtor in possession, by and through First Midwest Bank as Custodian (the "Debtor"), hereby submits this Disclosure Statement pursuant to §1125 of the Code.  This Disclosure Statement is filed for the Court's approval for submission to all of the known Holders of Claims with respect to the Debtor to solicit the acceptance of the *Chapter 11 Plan of Liquidation for Earl Gaudio & Son, Inc.* dated _____ __, 2018 (the "Plan"). The purpose of this Disclosure Statement is to provide to creditors of the Debtor adequate information of a kind and in sufficient detail about the Debtor and the Plan so that creditors may make an informed judgment with respect to accepting or rejecting the terms of the Plan.  If the Plan is confirmed by the Court, it will govern the distribution of the Estate Assets to creditors.

Capitalized terms used in this Disclosure Statement without definition shall have the meaning assigned to such terms in the Plan unless the context otherwise requires.

Each Holder of a Claim is encouraged to read the contents of this Disclosure Statement in connection with the proposed Plan.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated by reference as if fully rewritten herein.

3

B.    <u>Summary of Classification and Treatment of Claims and Interests Under the Plan</u>.

| UNPAID CLAIMS/INTERESTS & DESCRIPTION | ESTIMATED UNPAID ALLOWED CLAIMS | TREATMENT | ESTIMATED RECOVERY |
|---|---|---|---|
| Administrative Claims *other than* the Administrative Claims of the Custodian and Debtor's Counsel (unclassified) | $136,750.52 – plus additional claim amounts of e.g. Committee counsel and an estimated additional $6,000 for WRDR | Unimpaired | Estimated Recovery Percentage: 100% Form of Recovery: Cash |
| Administrative Claims of the Custodian and Debtor's Counsel, the unpaid portion of which is subject to subordinated payment as described below (unclassified) | Custodian's requested but unpaid Professional Fees through December 30, 2017: $473,123.20; the interim paid amount is $687,447.37. Debtor's Counsel's requested but unpaid Professional Fees through December 15, 2017: $1,721,984.69; the interim paid amount is $419,173.16 | Impaired | Estimated Recovery Percentage: **Unknown** Form of Recovery: Cash |
| Governmental Unit Priority Claims IL Dept. of Employment Security 507(a)(8) Claim **$7,152.36**; IL Dept. of Revenue ("IDOR")[1] Claim 14-1 507(a)(8) (per Agreed Order (Dkt. 659) **$73,359.78**; IDOR Claim 13-2 (per Agreed Order (Dkt. 659) **$115.00**; IRS Claim 9-2/9-3 (per Agreed Order (Dkt. 670) **$131,789.72** (unclassified) | $212,416.86 | Unimpaired | Estimated Recovery Percentage: 100% Form of Recovery: Cash |

---

[1] IDOR has reserved the right to assert that an Illinois bulk sales law interest has superpriority in the distribution of the proceeds of the sale of the Debtor's Warehouse Property, and the Debtor, on its behalf and on behalf of all parties in interest has reserved the right to object to such assertion and interest.

4

| UNPAID CLAIMS/INTERESTS & DESCRIPTION | ESTIMATED UNPAID ALLOWED CLAIMS | TREATMENT | ESTIMATED RECOVERY |
|---|---|---|---|
| Allowed Secured Claims other than the SBA Allowed Secured Claim (IRS Allowed Claim 9-2 per Agreed Order, Dkt. 670) (Class A) | $197,017.36 | Unimpaired | Estimated Recovery Percentage: 100% Form of Recovery: Cash |
| SBA Allowed Secured Claim (Class B) | PAID | Unimpaired | Estimated Recovery Percentage: 100% Form of Recovery: Paid in Full |
| Employee Benefit Claims (Class C) | $130,512.00 | Unimpaired | Estimated Recovery Percentage: 100% Form of Recovery: Cash |
| Priority Wage Claims (Class D) | $31,199.93 | Unimpaired | Estimated Recovery Percentage: 100% Form of Recovery: Cash |
| General Unsecured Claims (Class E) | Approximately $1,360,000.00 | Impaired – Entitled to Vote | Estimated Recovery Percentage: 8% Form of Recovery: Cash |
| SBA Unsecured Claim (Class F) | $600,000.00 | Impaired – Entitled to Vote | Estimated Recovery Percentage: 8% Form of Recovery: Cash |
| General Unsecured Subordinated Claims (Class G) | N/A | Impaired – Deemed to Reject | Estimated Recovery Percentage: 0% Form of Recovery: None |
| Interests, Including by means of Recharacterization (Class H) | N/A | Impaired – Deemed to Reject | Estimated Recovery Percentage: 0% Form of Recovery: None |

## II.   VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION

### A.   Ballots and Voting Deadline.

The Court will consider whether to confirm the Plan.  Certain Creditors may vote on the Plan, and if you are entitled to vote, your vote will be important.  If a class is Unimpaired, it is NOT entitled to vote.  IF YOU HAVE A DOUBT, YOU SHOULD VOTE.  A Ballot to be used for voting to accept or reject the Plan is enclosed as **Exhibit B** to this Disclosure Statement mailed to creditors entitled to vote.  To vote, creditors should (1) carefully review the Ballot and

CO\5775599.4

instructions thereon; (2) complete and sign the Ballot; and (3) return it to Debtor's Counsel at the address indicated on the ballot by the Court-established deadline in order for the Ballot to be considered for voting purposes.  THE DEBTOR URGES CREDITORS TO VOTE IN FAVOR OF THE PROPOSED PLAN.

**B.**    **Creditors Entitled to Vote; Impairment.**

Pursuant to the requirements of §1126 of the Code, each holder of a claim or interest in a class of claims which is impaired and is entitled to receive or retain property under a plan is entitled to vote to accept or reject the plan.  Under §1124 of the Code, a class is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan:

1.    leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

2.    notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default:

(a)    cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in §365(b)(2) of the Code or of a kind that §365(b)(2) expressly does not require to be cured.

(b)    reinstates the maturity of such claim or interest as such maturity existed before such default;

(c)    compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(d)    if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section §365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(e)    does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Under the Plan, as more fully described in Section VIII below, Classes A, B, C, and D are Unimpaired, and Classes E, F, G and H are impaired.  Holders of Allowed Secured Claims classified in Classes A and B, Employee Benefit Claims classified in Class C, and Wage Claims classified in Class D, will receive payment of their Claims in full under the Plan, and are therefore deemed to accept the Plan and accordingly not entitled to vote. Only Holders of Claims

6

classified in Class E, General Unsecured Claims that are not Subordinated Claims, and in Class F, the SBA Unsecured Claim, are entitled to vote on the Plan. Holders of Claims classified in Class G and Holders of Interests classified in Class H are impaired and are deemed to reject the Plan because the Plan does not propose to make any distribution to those Holders.

The Holder of any Claim as to which an objection has been filed and remains unresolved or which is the subject of an unresolved Adversary Proceeding is not entitled to vote, unless the Court temporarily allows the Claim, upon motion by the Holder, in an amount which the Court deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Court prior to the date established by the Court to confirm the Plan. A creditor's vote may be disregarded if the Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the Code.

C.    **Requirements for Confirmation.**

In order to confirm the Plan, the Court will determine whether the requirements of §1129 of the Code have been satisfied with respect to the Plan. To be confirmed, the Plan must, among other things, meet the requirements listed in §1129(a) and (b) of the Code. The requirements include (i) the Plan must be proposed in good faith, (ii) each impaired class of claims must vote to accept the Plan without counting votes of Insiders, subject to the exceptions described below, (iii) the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a Chapter 7 liquidation case unless the creditor or equity interest holder votes to accept the Plan (sometimes referred to as the "best interests of creditors" test, and (iv) the Plan must be feasible. These requirements are not the only requirements listed in §1129, and they are not the only requirements for Confirmation of the Plan.

1.    Good Faith.

The Debtor submits that the Plan has been proposed in good faith, believes the Plan satisfies all the statutory requirements for Confirmation subject to evaluation prior to voting, and believes that all of the requirements of the Code for Confirmation of the Plan have been or will have been complied with at the time of the Confirmation Hearing, as defined below.

2.    Classification of Claims; Acceptance.

Section 1123 of the Code requires that a plan designate classes of claims (other than certain priority claims, which are unclassified). Section 1122 of the Code provides that a creditor's claim may be placed in a class with other claims only if such claims are "substantially similar" in any such class. The Debtor believes that the classification system in the Plan satisfies the Code's standards.

The Plan divides Claims against the Debtor into classes as described in Section VIII, below. A single Claim may be divided into different parts for classification and treatment under the Plan, in that a Claim is in a particular class only to the extent that it fits within the description of such other class.

7

Section 1126 of the Code defines acceptance of the plan by a class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims of that class. Only those who actually vote to accept or reject the plan count in determining such ratio. Holders of claims which fail to vote are not counted as either accepting or rejecting the plan.

 3. <u>Best Interests Test</u>.

The "best interests of creditors" test requires the Court to find that all creditors will receive at least as much under the plan as they would receive if the debtor were liquidated under Chapter 7 of the Code.

In the event the Case moved forward under Chapter 7 of the Code, there would be added costs of a Chapter 7, which would be expected to include the fees of a Chapter 7 trustee (as well as those of counsel and other professionals that the trustee would employ) and the potential costs of the further delay of the conversion. Under the Plan, all of the Estate Assets will be distributed, and the Debtor proposes a subordination of payment of certain Professional Fees of the Custodian and Debtor's Counsel which subordination will permit the payment in full of Allowed administrative and priority claims after payment of Allowed Secured Claims, assuming the Effective Date occurs. Without that proposed subordination, there would not be enough Estate Assets as of the Effective Date to make payments on account of any Priority Claims. Accordingly, the best interests test is met.

 4. <u>Feasibility</u>.

Section 1129(a)(11) of the Code requires the Bankruptcy Court to find, as a condition to Confirmation, that Confirmation is not likely to be followed by the Debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan provides for the liquidation or distribution of all Estate Assets. Since no further reorganization of the Debtor will be possible or necessary, the Debtor believes that the Plan meets the financial feasibility requirement.

 **D. <u>Cramdown: Confirmation Without Acceptance by All Impaired Classes</u>.**

The Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, provided that at least one impaired class of claims has accepted it. These "cramdown" provisions for confirmation of a plan despite the non-acceptance of one or more impaired classes of claims are set forth in § 1129(b) of the Code.

Classes E and F are the only impaired and voting classes under the Plan. In the event that Class E or F votes to accept Plan, the Debtor will request Confirmation of the Plan under §1129(b) of the Code. Cramdown requires the Debtor to demonstrate, with respect to the non-accepting impaired Classes that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to those classes. If the Debtor is able to demonstrate these factors, the Court shall confirm the Plan. The Debtor submits that Plan is fair and equitable and does not discriminate unfairly.

 ***You should consult your own attorney if a cramdown confirmation will affect your Claim, as the variations on this general rule are numerous and complex.***

1.      Fair and Equitable.

Under the Code, the Plan is considered "fair and equitable" with respect to a class of claims if the following conditions are met:

a.      Secured Claims.

To be fair and equitable to a non-accepting class of secured claims, either (a) the plan must provide each impaired secured creditor retains the liens securing such claims to the extent of the allowed amount of such claim and receives on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; or (b) the plan must provide for the sale, subject to §363(k) of the Code of any property free and clear of any liens in favor of creditors of the Debtor, then such liens shall attach to the proceeds of such sale and the treatment of such liens on proceeds shall satisfy the requirements of either clauses (a) or (c) herein; or (c) the secured creditor receives under the plan the "indubitable equivalent" of its claim.

b.      Unsecured Claims.

To be fair and equitable to a non-accepting class of unsecured claims, either

i.      the plan must provide that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan equal to the allowed amount of such claim; or

ii.      the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

c.      Interests.

To be fair and equitable to a non-accepting class of equity interests, either:  (i) the plan must provide that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

2.      Unfair Discrimination.

The test that the Plan not discriminate unfairly applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.,* classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and,

CO\5775599.4

accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The Debtor believes that the Plan does not discriminate unfairly with respect to any impaired classes and meets the "fair and equitable" test with respect to all impaired classes. Therefore, if the Holders of Claims in Classes E and/or F vote in favor of the Plan, the Debtor will request that the Plan be confirmed.

### E.    Confirmation Hearing.

Section 1128(a) of the Code requires the Court, after notice, to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing").  THE CONFIRMATION HEARING FOR THIS PLAN IS SCHEDULED TO BEGIN ON _____, 2018 AT _____ _.M.

Section 1128(b) provides that any party in interest for the Debtor may object to Confirmation of the Plan.  Any objection to Confirmation of the Plan, together with proof of service, must be made in writing, explaining your position, and filed, on or before _____, 2018, with the Clerk of the Bankruptcy Court, by mail or electronically, at:

201 South Vine Street
Urbana, IL 61802
or
www.ilcb.uscourts.gov

Electronically filed objections must be in compliance with the Court's ECF Procedures available at the Court's website at http://www.ilcb.uscourts.gov.  A copy of any such objection must be served upon Ice Miller in accordance with the ECF Procedures, or by ordinary U.S. mail, on or before _____, 2018 at the following address:

Ice Miller LLP
ATTN:  Victoria E. Powers
250 West Street, Suite 700
Columbus, OH  43215

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE COURT.

## III.    EFFECT OF CONFIRMATION

Except as otherwise provided in the Plan or Confirmation Order, and in addition to other consequences of Confirmation as disclosed herein, entry by the Court of the Confirmation Order will constitute authorization for the Debtor's use of funds of the Estate to meet any cash requirement in the Case, and will release all Claims against the Debtor that arose at any time before the entry of the Confirmation Order.

CO\5775599.4

Except as otherwise provided in the Plan and the Confirmation Order, upon the Effective Date, all property of the Debtor shall vest in the Debtor free and clear of all liens, claims and interests of all creditors.

## IV.   GENERAL INFORMATION CONCERNING THE DEBTOR

### A.   General.

The Debtor was a long-time Anheuser-Busch beer distributor serving East Central Illinois and portions of Indiana and Ohio.  With the formal relationship having commenced in 1904, the Debtor was one of the very first beer distributorships of Anheuser-Busch.

Historically, the Debtor also had additional operational components including snack foods and two (2) UPS Store Franchises (one located in Danville, IL and one located in Champaign, IL).  The Debtor discontinued its snack food distribution business on July 18, 2013, sold one of the UPS Store Franchises in December 2015, and closed the other effective February 29, 2016.

### B.   Pre- and Post-Petition Management of the Debtor.

Beginning in 1956, Earl Gaudio served as president of the Debtor.  The company operated on a profitable basis with no debt for decades.  Dennis Gaudio, son of Earl Gaudio, served as Vice President, and in 2001, Dennis's son and Earl's grandson, Eric Gaudio, joined the company as operations manager when he graduated from college. Eric was promoted to general manager, overseeing the entire operation in 2006.  Earl, Dennis and Eric comprised the Debtor's board of directors, and as of July 2010, when Earl Gaudio resigned from the business, Eric became President, and Dennis became CEO.

On June 12, 2013, the Debtor's largest shareholder, Helen Gaudio, as guardian of the estate of Earl Gaudio, filed a complaint in Vermillion County, Illinois Circuit Court, requesting a preliminary injunction to remove Dennis Gaudio and Eric Gaudio as directors and officers of the corporation, on the grounds that they violated their fiduciary duties to the business.  On June 27, 2013, the Circuit Court for the Fifth Judicial Circuit of Illinois, Vermilion County appointed First Midwest Bank as Custodian of Earl Gaudio and Son, Inc. and vested the Custodian with all powers, authorities, rights, and privileges previously possessed by the directors and officers of Earl Gaudio and Son, Inc.  Shortly thereafter, on July 19, 2013 (the "Petition Date"), the Debtor filed its bankruptcy case.

On August 29, 2013, the Court entered an Order confirming and adopting the powers granted to the Custodian by the Circuit Court, and further providing that the Custodian was vested with all powers, rights, and duties that management of a debtor corporate entity would have in a Chapter 11 proceeding.  Throughout the Case, the Debtor managed its business and property as a Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Code.

## V.   CAUSES OF BANKRUPTCY

In 2007, the Debtor branched out into other beverage segments including both alcoholic and non-alcoholic products and entered into a phase of rapid growth.  In April, 2008, the Debtor

moved into a newly-constructed 69,000 square foot state of the art facility located at 1803 Georgetown Road in Tilton, Illinois. By the late 2000's, the company's profitability had changed dramatically. Beer distribution tends to be a conservative and profitable business. The Custodian is aware of no other situation in the history of Anheuser-Busch distributorships in which a distributorship filed for bankruptcy relief. The Debtor, however, on more than 50 occasions, bounced checks or failed to pay for product delivered by Anheuser-Busch, incurred significant debt to Anheuser-Busch (and a number of other creditors, resulting in an over-leveraged entity), allowed insurance and benefits to lapse, and failed to pay significant tax obligations. Creditors of the Estate went unpaid, employees lost their jobs, and the Custodian was left with a company in shambles.

## VI.   THE DEBTOR'S BANKRUPTCY

### A.   Sale of Core Business Assets to Skeff.

Just prior to the Petition Date, the Debtor had begun to identify possible purchasers of its core business. The Debtor's primary business asset was a Distributorship Agreement with Anheuser-Busch InBev, Inc. After an extensive marketing process (administered by former management of the Debtor until the appointment of the Custodian and then by the Custodian following its appointment) and after good faith, arms-length negotiations, the Debtor and the Custodian identified Skeff Distributing Company, Inc. ("Skeff") as a buyer for the Distributorship Agreement and related business assets. Through these efforts, the Debtor and Skeff entered into an Asset Purchase Agreement prior to the Petition Date, and following the commencement of the Case, on August 15, 2013, the Debtor sought Court approval to complete the sale (the "Skeff Sale"). The Court considered the sale on an expedited basis, and on September 6, 2013, the Court entered an Order (the "Sale Order") approving the Skeff Sale. The Skeff Sale closed on September 20, 2013 and resulted in a total purchase price of $9,569,700.73 (the "Skeff Sale Proceeds") comprised of: (i) $9,113,886.25 for the distribution rights acquired by the purchaser from Anheuser-Busch InBev, Inc. via assumption, assignment and cure of the Wholesaler Equity Agreement with the Debtor; (ii) $290,000 for vehicles and equipment; and (iii) $165,814.48 for inventory.

On September 12, 2013, the Debtor submitted a Motion to Establish Procedure for Disbursement of Sale Proceeds to Purported Lienholders. An unopposed Order Granting, in Part, Motion to Establish Procedure for Disbursement of Sale Proceeds to Purported Lienholders was entered on October 24, 2013 (Dkt. 160) (the "Disbursement Order"). Pursuant to the Disbursement Order, among other things, all parties were allowed a forty-five (45) day period to provide notice of certain objections to claims of purported lienholders. Pursuant to the terms of the Disbursement Order, claims of a number of purported lienholders were paid on an interim basis from the proceeds of the Skeff Sale. The Disbursement Order provided that distributions of the Skeff Sale Proceeds by the Debtor were "deemed interim distributions only and made without prejudice to the rights of the Debtor, the Committee, or any future trustee to object to secured claims at a later date or to cause an adversary proceeding to be filed, if one is required, seeking a determination as to the extent, validity and priority of any secured claim and any other relief related to a claim of any of the Purported Lienholders."

CO\5775599.4

Pursuant to the terms of the Sale Order, Anheuser-Busch was paid $235,091.68 from the Skeff Sale Proceeds on November 29, 2013, and approximately $222,517.65 was paid from the Skeff Sale Proceeds to holders of liens on company vehicles.  Pursuant to the terms of the Disbursement Order, in December, 2013, the Debtor made interim distributions from the Skeff Sale Proceeds as follows:

|   | Party | Date of Disbursements | Amount |
|---|---|---|---|
| 1. | Ally Financial | 12/11/13 | $17,675.52 |
| 2. | GE Capital | 12/11/13 | $60,874.65 |
| 3. | Earl & Helen Gaudio Trust #414141010 | 12/17/13 | $382,093.32 |
| 4. | Illinois Department of Revenue | 12/30/13 | $384,573.15 |
| 5. | Iroquois Federal Savings & Loan | 12/11/13 | $134,507.00 |
|   |   | 12/13/13 | $7,000.00 |
| 6. | Regions Bank | 12/10/13 | $5,159,751.89 |
| 7. | US Small Business Administration | 12/10/13 | $1,722,713.57 |
| 8. | World Business Lenders, LLC | 12/11/13 | $482,960.57 |
|   | **TOTAL** |   | $8,352,149.67 |

The total amount of disbursements from the Skeff Sale Proceeds, including those made pursuant to the Sale Order and those made pursuant to the Disbursement Order, aggregated $8,811,041.78.

## B.     Sale of Other Assets.

After the Petition Date, the Debtor continued to operate the UPS stores for a period of time.  On June 19, 2015, the Debtor filed its motion seeking authority to sell its UPS store assets, and on August 19, 2015, the Court entered its order granting the Debtor's motion to sell those assets.  The Debtor's Champaign, Illinois UPS Store franchise was sold in December 2015, and the Danville UPS Store was closed effective February 29, 2016.

The Debtor's warehouse, located at 1803 Georgetown Road, Tilton, Illinois (including the land, improvements, fixtures and related personal property at the premises, the "Warehouse Property"), was used by the Debtor prior to the Petition Date in connection with its business operations, including its distribution business.  The Warehouse had been acquired from a company owned by Paul Offutt in April 2009 for a purchase price of $5,587,993.04.  The Warehouse Property had been part of a larger parcel of real property located at the intersection of Ross Lane and Georgetown Road (Illinois State Route 1).  The seller retained the beneficial ownership interest in those portions of the real property not sold to the Debtor.  At the time of the sale to the Debtor, the seller failed to convey access of record to the Debtor, and did not grant an express easement for access to the Warehouse.

Accordingly, the Debtor initiated an Adversary Proceeding against Offutt and his companies, among others, in part to solve the access issue at the Warehouse Property in order to make the property marketable for sale (the "Offutt Adversary Proceeding"), as well as to address claims against Offutt in connection with efforts to cut off access to the Warehouse Property following the Petition Date. The parties to Offutt Adversary Proceeding negotiated a settlement which resolved the claim and access issues as more fully described below, and the Debtor was then able to market the Warehouse Property for sale.

13

With authority of the Court, the Debtor retained Binswanger Midwest of Illinois, Inc. and Gerald P. Norton as real estate broker to market the Warehouse Property. Binswanger marketed the Warehouse Property through November 2016. Subsequently, the Debtor obtained Court authority to retain Hilco Real Estate, LLC as real estate broker to list, market and offer the Warehouse Property for sale. On March 3, 2017, the Debtor filed a motion with the Court requesting approval of bidding and auction procedures for the sale of the Warehouse Property, and on March 31, 2017, the Debtor filed an amended motion to sell the Warehouse Property. On March 24, 2017, the Court entered its Order Approving Bid and Other Procedures for Sale (the "Bid Procedures Order"). Following a hearing held on May 10, 2017, the Court entered an Order on May 19, 2017 granting the amended motion to sell. The Debtor did not receive a qualified bid for the Warehouse Property as outlined Bid Procedures Order, and accordingly revised its bid procedures and filed a revised notice of intent to sell. A Revised Bid Procedures Order was entered by the Court on June 15, 2017 and on July 6, 2017, the Court entered a Second Sale Order granting the Debtor's request to sell the Warehouse Property free and clear of liens and other interests as set forth therein.

On July 18, 2017 the Debtor and Hilco conducted an auction of the Warehouse Property. Subsequently, on September 7, 2017, the Debtor filed a motion for an order supplementing the second sale order and seeking approval of certain modified terms of the sale of the Warehouse Property and approval of the negotiated Purchase and Sale Agreement. The SBA objected to this motion, the Debtor replied to the SBA's objection, and on October 23, 2017, the Court entered an order granting the supplemental relief sought by the Debtor. On November 7, 2017, the sale of the Warehouse Property closed, and on November 22, 2017, the Debtor submitted its Report of Sale of the Warehouse Property. The purchase price paid by the purchaser, Security Ventures, Inc. (an entity affiliated with Paul Offutt), prior to prorations and closing adjustments, was $1,185,000.00, of which $1,134,900.00 was allocated for the real estate and $50,100.00 was allocated for personal property located on the Warehouse Property. At closing, the real estate taxes not yet billed for tax year 2017 were prorated between the Debtor and the purchaser according to the terms of the Purchase and Sale Agreement, thereby resulting in a credit to the purchaser in the amount of $43,922.44, which reduced the total balance of purchase price paid at closing to $1,141,077.56. The net amount received by the Debtor, after applicable prorations and disbursements for the broker's commission and for real estate taxes, was $894,891.14. All closing costs, transfer taxes, recording costs, fees of purchaser's counsel and the premium for title insurance (a total of $6,658.00) were borne by the purchaser.

### C.   Adversary Proceedings.

During the Case, the Debtor commenced a total of twelve (12) Adversary Proceedings. The cases were brought in order to recover assets of the Estate or, as noted below, to resolve issues related to assets of the Estate. Following is a summary description of the Adversary Proceedings:

1. **Bank of America.** Early in the Case, the Debtor filed an Adversary Proceeding, case no. 13-09019, against Bank of America, where the Debtor held a pre-Petition Date clearing account, seeking turnover of funds in the account. The matter was quickly resolved with Bank of American complying with the Debtor's request.

14

2. **Eric Gaudio, Dennis Gaudio, 1803, LLC, and Gaudio Diversified, LLC.** The Debtor filed Adversary Proceeding no. 14-09010 against Eric and Dennis Gaudio and their related business entities seeking avoidance and recovery of fraudulent transfers and damages for conversion by the defendants. The matter involved a number of difficulties, including complex issues, and, with Court approval, a mediator was retained to assist with the possible resolution of the matter. Ultimately, this matter resulted in a default judgement against the corporate defendants and settlement with the individual defendants that provided a $150,000 recovery to the Estate and Claims waivers.

3. **Dennis Gaudio.** The Debtor filed Adversary Proceeding no. 15-09017 against Dennis Gaudio in connection with Mr. Gaudio's Claims in the aggregate amount of $767,632.29, seeking to expunge those Claims. This Adversary Proceeding was resolved together with the Adversary Proceeding against Eric and Dennis Gaudio and related business entities.

4. **Paul Offutt.** The Debtor filed Adversary Proceeding no. 14-09043 against Paul Offutt and related entities in order to resolve issues related to obstruction by Mr. Offutt at the Warehouse Property and to solve the problems related to access to the Warehouse Property as well as Claims between Offutt and the Debtor. This matter was resolved through a negotiated settlement that included resolution of the access issues and reduction of Mr. Offutt's Claim, a significant portion of which became a Subordinated Claim.

5. **American Express.** The Debtor filed Adversary Proceeding no. 15-09022 against American Express for avoidance and recovery of fraudulent and/or preferential transfers. This Adversary Proceeding resulted in a settlement that provided a $99,000 recovery to the Estate and a Claims waiver.

6. **Citibank, N.A.** The Debtor filed Adversary Proceeding no. 15-09023 against Citibank for avoidance and recovery of fraudulent transfers. This Adversary Proceeding resulted in a settlement that provided a $90,000 recovery to the Estate and Claims waiver.

7. **Discover Bank.** The Debtor filed Adversary Proceeding no. 15-09021 against Discover Bank for avoidance and recovery of fraudulent transfers. This Adversary Proceeding resulted in a settlement that provided a $42,500 recovery to the Estate and a Claims waiver.

8. **Regions Bank.** The Debtor filed Adversary Proceeding no. 15-09027 against Regions Bank to avoid guaranties purportedly executed by the Debtor and for recovery of certain payments made on the guaranties. This adversary proceeding resulted in a settlement that reduced and resolved Regions' secured Claims against the Estate.

9. **Specialty Distributors of Illinois.** The Debtor filed Adversary Proceeding no. 15-09024 against Specialty Distributors of Illinois for avoidance and recovery of fraudulent transfers. This Adversary Proceeding resulted in a settlement that provided a $35,000 recovery to the Estate and resolution of the amount of Specialty's Claim.

10. **JP Morgan Chase.** The Debtor filed Adversary Proceeding 15-09026 against JP Morgan Chase for avoidance and recovery of fraudulent transfers. This

Adversary Proceeding resulted in a settlement that provided a $60,000 recovery to the Estate and Claims waiver.

11. **World Business Lenders.** The Debtor filed Adversary Proceeding no. 15-09020 against World Business Lenders ("WBL") for avoidance of the WBL mortgage, turnover of property of the Estate, avoidance and recovery of preferential transfers, objecting to WBL's Claim, and for determination of secured status of WBL's Claim. This Adversary Proceeding resulted in a settlement that provided a $99,500 recovery to the Estate, release of WBL's mortgage on the Debtor's property, and a Claims waiver.

12. **U.S. Small Business Administration**. The Debtor filed Adversary Proceeding No. 15-09025 against United States Small Business Administration seeking turnover of Estate property, objecting to the SBA's Claim and for determination of the Secured Status of SBA's Claim. The Debtor and the SBA have engaged in settlement discussions and the Debtor anticipates that this Adversary Proceeding will be resolved by settlement agreement, including a payment by the SBA to the Debtor in the amount of the SBA Settlement Payment; however the SBA Adversary Proceeding is currently ongoing.

## VII.   SELECTED FINANCIAL DATA

The Debtor has filed its monthly operating reports regularly throughout the Case, all of which are available on the Court's docket of the Case. The monthly operating reports provide detailed information regarding the Debtor's operating and financial data post-Petition Date. The Debtor's most recent operating reports are attached collectively as **Exhibit C**.

The Debtor believes that, but for the proposed subordination of payment of certain Professional Fees of the Custodian and Debtor's Counsel, described in this Disclosure Statement and set forth in the Plan, the Debtor's Estate is likely to be administratively insolvent, which means that there would not be enough assets in the Estate to pay all of the costs (primarily Professional Fees) of administration of the Case or make distributions to other creditors. One significant reason is that the Warehouse Property, which had been valued very early in the Case at $4,450,000 based on an August 2013 appraisal obtained by the Custodian as well as an appraisal issued in early 2009 which valued the property as of July 31, 2008 at $5,175,000, turned out to have less value. The Warehouse Property had been purchased by the Debtor in April 2009 for $5,587,993.04. Following extensive marketing efforts during the Case, however, the purchase price paid by the purchaser, Security Ventures, Inc., prior to prorations and closing adjustments provided for in the Purchase and Sale Agreement, was $1,185,000.00, of which $1,134,900.00 was allocated for the real estate and $50,100.00 was allocated for personal property. The net amount realized by the Estate, after applicable prorations and disbursements for the broker's commission and for real estate taxes was $894,891.14.

**THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED. THE RECORDS KEPT BY THE DEBTOR WERE UTILIZED IN FORMULATING THE SCHEDULES FILED IN THIS CASE. THE BOOKKEEPING PERFORMED ON BEHALF OF THE DEBTOR DURING THE CASE WAS DONE WITH THE ASSISTANCE OF THE ACCOUNTANTS, WRDR, AND THE DEBTOR AND THE CUSTODIAN HAVE NO REASON NOT TO RELY ON THE ACCURACY**

OF SAID RECORD-KEEPING.  THE DEBTOR AND THE CUSTODIAN ARE UNABLE
TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN
IS WITHOUT ANY INACCURACIES.

## VIII.   DESCRIPTION OF CLAIMS AND SUMMARY OF TREATMENT UNDER THE PLAN

Section 1123 of the Code provides that a plan shall classify the claims of Debtor's creditors.  The Plan divides Claims into Classes and sets forth the treatment afforded to each Class.  Creditors should note that Distributions will be made only on account of Allowed Claims in each Class in accordance with the provisions of the Plan.  **Under the Plan, no Distributions will be made on account of Claims that are not Allowed**.  In accordance with §1123(a)(1) of the Code, Allowed Claims having priority under §507(a)(2) and Claims having priority under §507(a)(8) have not been classified.  **No Distributions will be made except as set forth in the Plan**.

1.   Administrative Expense Claims and Governmental Unit Claims.

Under the Plan, Claims having priority under §507(a)(2) (primarily Professional Fees) and §507(a)(8) (Claims of Governmental Units) of the Code and fees payable under §1129(a)(12) of the Code and under 28 United States Code §1930(a) are Unclassified Claims.

The aggregate amount of the Administrative Expenses Claims that will be Allowed by the Court is not currently known by the Debtor.  The allowed Claims against the Debtor's Estate having priority under §507(a)(2) of the Code include amounts for Professional Fees of: the Custodian; the Debtor's Counsel; special legal counsel to the Debtor, Mercho Caughey & DeLay; the Debtor's accountant, WRDR; legal counsel to the Committee; the Court-appointed mediator; the Debtor's expert, John Lane and Inglewood Associates LLC; and the Debtor's forensic analyst, Protek.  From the Petition Date through the indicated dates, Professional Fees are estimated to be as follows:

**The Custodian**: On June 13, 2014, the Custodian filed its first interim fee application seeking allowance of $442,577.75 in fees and $487.50 in expenses for the period July 19, 2013 to March 13, 2014.  Pursuant to the Interim Procedures Order, the Custodian had been paid $236,621.06 during the period covered by the first interim fee application.  On July 31, 2014 the Court entered an order (the "Custodian's First Interim Order") allowing the fee application and permitting payment on an interim basis of 90% of the fees requested, or $398,409.98, less the $236,621.06 amount paid pursuant to the Interim Procedures Order and $487.50 in expenses.  Subsequently, the Debtor paid the Custodian $161,788.92 in fees and $487.50 in expenses pursuant to the Custodian's First Interim Order.  The amount that was requested in the Custodian's first interim fee application but remains unpaid pursuant to the Custodian's First Interim Order is $44,255.77.

On November 22, 2017, the Custodian filed a second interim fee application seeking allowance of fees in the aggregate amount of $694,773 and reimbursement of expenses in the aggregate amount of $1,704.32 for the period March 14, 2014 through June 15, 2017 on an interim basis, which includes $288,549.89 in payments received prior to the date of the

Custodian's second interim fee application pursuant to the Interim Procedures Order.  In the event the Custodian's second fee application were approved in full, the Custodian would be entitled to payment of $407,927.43 on an interim basis on account of the second interim fee application.

On February 6, 2018, the Custodian filed a third interim fee application seeking allowance of fees in the aagregate amount of $20,940 for the period June 16, 2017 through December 30, 2017 on an interim basis.  No portion of these fees has been paid.  In the event the Custodian's third interim fee application were approved in full, the Custodian would be entitled to payment of $20,940 on an interim basis, on account of the third interim fee application.

If the amounts requested in the Custodian's first, second and third interim fee applications are fully and finally allowed, the amount of the Custodian's unpaid Professional Fees will aggregate $473,123.20 as of December 31, 2017. The Custodian's fees and expenses will continue to accrue through the Confirmation Date.  The Custodian will file additional fee applications for subsequent periods, and a final fee application for final allowance of the Custodian's Professional Fees will be submitted to the Court by the Professional Fee Bar Date.

**Debtor's Counsel**:  On June 13, 2014, Debtor's Counsel filed its first interim fee application seeking allowance of $321,643 in fees and $8,901.03 in expenses for the period July 19, 2013 to March 31, 2014.  Pursuant to the Interim Procedures Order, Debtor's Counsel had been paid $157,958.85 during the period covered by the first interim fee application. On August 21, 2014 the Court entered an order (the "First Interim Order") allowing fees in the amount of $316,831 and authorizing the Debtor to pay to Debtor's counsel the sum of $127,189.05, representing 90% of the allowed fees less the $157,958.85 in payments received prior to the date of the First Interim Order pursuant to the Interim Procedures Order. The First Interim Order also allowed costs in the amount of $3,277.90, and authorized the Debtor to pay that amount to Debtor's Counsel.  Subsequently, the Debtor paid the aggregate sum of $130,466.95 to Debtor's Counsel pursuant to the First Interim Order.  The amount that has been allowed on an interim basis pursuant to the First Interim Order but remains unpaid is $31,683.10.

On November 22, 2017, Debtor's Counsel filed a second interim fee application seeking allowance of Professional Fees for the period April 1, 2014 through November 30, 2016 in the aggregate amount of $1,278,476.00 in fees and $21,568.49 in expenses, aggregating $1,300,044.49 on an interim basis, which includes $130,747.36 in payments received prior to the date of the second interim fee application pursuant to the Interim Procedures Order. In the event the second fee application were approved in full, Debtor's Counsel would be entitled to payment of $1,169,297.13 on an interim basis on account of the second interim fee application.

On February 6, 2018, Debtor's counsel filed a third interim fee application seeking allowance of Professional Fees for the period December 1, 2016 through December 15, 2017 in the aggregate amount of $518,371.50 in fees and $2,632.96 in expenses, aggregating $521,004.46, on an interim basis.  No portion of these fees and expenses has been paid.  In the event Debtor's Counsel's third interim fee application were approved in full, Debtor's Counsel would be entitled to payment of $521,004.46 on an interim basis on account of the third interim fee application.

18

If the amounts requested in Debtor's Counsel's first, second and third interim fee applications are fully and finally allowed, the amount of Debtor's Counsel's unpaid Professional Fees will aggregate $1,721,984.69 as of December 15, 2017. Debtor's Counsel's fees and expenses will continue to accrue through the Confirmation Date. Debtor's Counsel will file additional fee applications for subsequent periods, and a final fee application for final allowance of the Debtor's Counsel's Professional Fees will be submitted to the Court by the Professional Fee Bar Date.

**The amounts already paid as set forth herein to the Custodian and Debtor's counsel are not subject to the subordination of payment described below in this Section.**

**Special Counsel**: The Debtor's special counsel, Mercho Caughey & DeLay, has incurred fees and expenses in the estimated aggregate amount of $8,920.00 in connection with representation of the Debtor in an Adversary Proceeding as to which Debtor's Counsel had a conflict. Mercho, Caughey & DeLay has not received any compensation, and a first and final Fee Application for final allowance of all of Mercho Caughey & DeLay's Professional Fees will be filed by the Professional Fee Bar Date.

**WRDR**: The Debtor's accounting firm, WRDR, has previously filed fee applications for Professional Fees and been awarded $24,712.00, which has been paid to WRDR. In addition, pursuant to the Interim Procedures Order, WRDR has been paid $73,744.45 towards services rendered through July 30, 2015, with unpaid fees and expenses through December 5, 2017 at $78,993.50. A further and final Fee Application for final allowance of all of WRDR's Professional Fees will be submitted to the Court by the Professional Fee Bar Date, which the Debtor understands will include an additional estimated $6,000 in fees for WRDR.

**The Committee**: The Committee's counsel has reported that the firm's gross unbilled fees through October 31, 2017 aggregate $31,089, and unbilled expenses for the same period aggregate $654.90. Committee counsel reports that the firm's prior unreimbursed fees and expenses are in the amount of $17,093.12. Accordingly, through October 31, 2017, unpaid fees and expenses of counsel for the Committee aggregate $48,837.02. Committee counsel has confirmed that its fees and expenses will continue to accrue after October 21, 2017. Debtor anticipates that the Committee will file a final Fee Application for final allowance of all of Committee counsel's Professional Fees by the Professional Fee Bar Date.

**Mediator.** The Debtor sought and was granted authority to retain David H. Kleiman, Esq. (the "Mediator") to serve as mediator in connection with one of the Adversary Proceedings. The fees and expenses of the Mediator were shared equally between the Debtor and the Defendants in the Adversary Proceeding. The Debtor's share of the Mediator's fees and expenses, in the amount of $4,625, have been allowed by the Court on interim basis, and have been paid on an interim basis. The Debtor will file a Fee Application seeking final allowance of the Mediator's Professional Fees by the Professional Fee Bar Date.

**Expert Witness**: The Debtor sought and was granted authority to retain John Lane and Inglewood Associates LLC (the "Expert") to serve as an expert in connection with one of the Adversary Proceedings. The Professional Fees of the Expert in the amount of $49,625 have been allowed by the Court on interim basis, and have been paid on an interim basis. The Debtor will

file a Fee Application seeking final allowance of the Expert's Professional Fees by the Professional Fee Bar Date.

**Forensic Analyst** The Debtor sought and was granted authority to retain Protek International, Inc. ("Protek") to provide forensic analysis in one or more Adversary Proceedings and in the Case. The Professional Fees of Protek in the amount of $9,750 have been allowed by the Court on interim basis, and have been paid on an interim basis.  The Debtor will file a Fee Application seeking final allowance of Protek's Professional Fees by the Professional Fee Bar Date.

**All Professional Fees are subject to final approval and allowance by the Court**.

The Allowed Governmental Unit Priority Claims under §507(a)(8) of the Code are estimated as follows:

| Claimant | Claim Amount |
|---|---|
| IL Dept. of Employment Security | $7,152.36 |
| IDOR Claim 14-1 per Agreed Order (Dkt. 659) | $73,359.78[2] |
| IDOR Claim 13-2 per Agreed Order (Dkt. 659) | $115.00 |
| IRS Claim 9-2/9-3 per Agreed Order (Dkt. 670) | $131,789.72 |

2.      Treatment of Administrative Expense and Governmental Unit Claims.

Except as specifically otherwise provided in the Plan with respect to unpaid Allowed Professional Fees of the Custodian and Debtor's Counsel, Allowed Unclassified Claims will be paid in full, or shall receive such payment as the Holder of any such Allowed Unclassified Claim may agree, according to the priority of such Allowed Unclassified Claim under §507 of the Code, from Estate Assets, on the later of (i) the date on which such Unclassified Claim becomes Allowed and (ii) the Effective Date.  Unless the Holder of an unsecured Allowed Claim having priority under § 507(a)(8) of the Code otherwise agrees, its Claim must be paid in full on or before the date which is five years after the Petition Date. ***Notwithstanding the forgoing, however,*** unless otherwise agreed by the applicable Professional, unpaid Allowed Professional Fees shall be paid on the Effective Date or, if later, on the first business day that is five days after the date that the applicable request for allowance of Professional Fees has been resolved by Final Order, and ***provided further, however,*** the Allowed Professional Fees of the Custodian and of Debtor's Counsel, ***excluding*** (i) amounts of professional fees of the Custodian and the Debtor's Counsel that, as of the date of the filing of the Plan, have been previously paid on an interim or

---

[2] IDOR has reserved the right to assert that an Illinois bulk sales law interest has superpriority in the distribution of the proceeds of the sale of the Debtor's Warehouse Property, and the Debtor, on its behalf and on behalf of all parties in interest has reserved the right to object to such assertion and interest.

final basis either pursuant to an order entered in the Case allowing fees on an interim or final basis, or pursuant to the Interim Procedures Order allowing interim payments of professional fees and expenses, will be paid Pro Rata (or as otherwise agreed by and between the Custodian and Debtor's Counsel) on a subordinated basis after Distributions are made as provided in the Plan on account of the following Allowed Claims: (a) the other unpaid Allowed Unclassified Claims (including any unpaid Allowed Professional Fees of the Custodian and Debtor's Counsel not subject to the foregoing subordination); (b) the unpaid Allowed Secured Claims classified in Class A, (c) the unpaid Allowed Employee Benefit Claims classified in Class C, (d) the unpaid Allowed Priority Wage Claims classified in Class D, and (e) the unpaid Allowed General Unsecured Claims classified in Classes E and F, all as described in the Plan and herein.

3. <u>Unimpaired Secured Claims.</u>

The Plan provides for the classification and treatment of Unimpaired Secured Claims as follows:

<u>**Class A**</u> **(Allowed Secured Claims other than SBA Allowed Secured Claim):** Class A consists of the Secured Claims other than the SBA Allowed Secured Claim, which is classified in Class B. Holders of unpaid Allowed Secured Claims in Class A shall be paid in full in Cash on the Effective Date. The only unpaid Allowed Secured Claim to be paid in Class A of which the Debtor is aware is the Allowed Secured Claim of the IRS, Claim no. 9-2, in the Allowed amount of $197,017.36

<u>**Class B**</u> **(SBA Allowed Secured Claim):** The SBA asserted a secured Claim secured by a mortgage lien on the Warehouse Property. The Allowed amount of the SBA Allowed Secured Claim was litigated in the SBA Adversary, and as a result of a settlement reached in the SBA Adversary, the SBA's Allowed Secured Claim will have been paid in full by the Effective Date. Accordingly, there will be no distribution to the SBA on account of the SBA's Secured Claim. The SBA Unsecured Claim, which is a deficiency Claim in the amount of $600,000.00, is classified included in Class F.

The Debtor is unaware of any other unpaid Allowed Secured Claims.

4. <u>Unimpaired Priority Claims.</u>

The Plan provides for the classification and treatment of Unimpaired Priority Claims as follows:

<u>**Class C**</u> **(Allowed Employee Benefit Claims):** The Debtor was permitted by the Wage Order to pay and satisfy all amounts under its existing benefit programs, which are the Allowed Employee Benefit Claims. To the extent not paid prior to the Effective Date pursuant to the Wage Order, the Debtor shall pay the Allowed Employee Benefit Claim amount in full in Cash on the Effective Date or as soon thereafter as practicable, which amount shall be equal to 100% of the unpaid and outstanding contributions and applicable earnings for the employee benefits as of the date of payment, in full satisfaction of the Allowed Employee Benefit Claims. The aggregate amount of the Allowed Employee Benefits Claims is estimated by the Debtor to be approximately $130,512.

21

**Class D (Allowed Priority Wage Claims):** The Debtor was permitted but not required by the Wage Order to pay and satisfy all wages, salary and other compensation due to its employees. Under the Plan, the Debtor shall pay each Holder of an unpaid Priority Wage Claim the amount of such Holder's unpaid Allowed Priority Wage Claim in Cash on the Effective Date, or as soon thereafter as practicable, on account and in full satisfaction of such Holder's unpaid Priority Wage Claim. The aggregate amount of the Allowed Priority Wage Claims is estimated by the Debtor to be $31,199.93. The amount of each Holder's Allowed Priority Wage Claims is as set forth on the Debtor's Schedule E, attached to this Disclosure Statement as **Exhibit D**.

     5.    <u>Impaired Claims.</u>

The Plan provides for the classification and treatment of the following impaired Claims:

**Class E (General Unsecured Claims other than Subordinated Claims):** This Class of Claims consists of all general unsecured non-priority claims that are not Subordinated Claims. As a result of the proposed subordination of payment of certain Professional Fees of the Custodian and Debtor's Counsel, described in this Disclosure Statement and set forth in the Plan, the Debtor is making the General Unsecured Distribution amount available for distributions to Holders of General Unsecured Claims other than General Unsecured Claims that are or become Subordinated Claims. The Debtor believes that, without the proposed subordination of payment of certain of the allowed Professional Fees of the Custodian and the Debtor's Counsel, the General Unsecured Distribution amount would not be available to make a distribution to Holders of General Unsecured Claims in Class E. Under the Plan, Holders of unpaid Allowed General Unsecured Claims in Class E will receive a Distribution of their Pro Rata share of the General Unsecured Distribution on account of such unpaid Allowed General Unsecured Claims.

**Class F (SBA Unsecured Claim):** The SBA Unsecured Claim is the SBA's deficiency claim pursuant to the terms of the settlement agreement resolving the SBA Adversary. As a result of the proposed subordination of payment of certain Professional Fees of the Custodian and Debtor's Counsel, described in this Disclosure Statement and set forth in the Plan, the Debtor is making the General Unsecured Distribution amount available for a distribution on account of the SBA Unsecured Claim. The Debtor believes that, without the proposed subordination of payment of certain of the allowed Professional Fees of the Custodian and the Debtor's Counsel, the General Unsecured Distribution amount would not be available to make a distribution on account of the Class F Claim. Under the Plan, the Holder of the unpaid SBA Unsecured Claim in Class F will receive a Distribution of its Pro Rata share of the General Unsecured Distribution on account of the SBA Unsecured Claim.

**Class G (Subordinated Claims):** This Class of Claims consists of all Claims that are Subordinated Claims, subordinated to the Claims of other creditors. Paul Offutt holds a Subordinated Claim in the amount of $230,437.50. In addition, the Debtor believes that the general unsecured claims of the Insiders are subject to subordination and/or recharacterization as equity, and the Debtor or the Committee will seek such subordination/or reclassification by the Court. All Claims of Insiders Dennis Gaudio and Eric Gaudio have already been waived by a Final Order. The Debtor believes that the only remaining Insider Claim is the unpaid Claim of Earl Gaudio asserted by Helen Gaudio in the amount of $708,175.56 (the "Earl Gaudio Claim"). The Debtor anticipates that it or the Committee will seek subordination and/or recharacterization

of the Earl Gaudio Claim. Claims that are Subordinated Claims shall be treated in Class F of the Plan, and Claims that are reclassified as equity shall be treated in Class G of the Plan. The Debtor does not anticipate that there will be any Estate Assets remaining after the payment of the Allowed Claims of higher priority pursuant to the terms of the Plan, and accordingly the Debtor anticipates that Holders of Claims in Class F shall receive no Distribution under the Plan. In the event there are Estate Assets available to make a Distribution to Holders of Allowed Subordinated Claims in Class G, then those Holders would receive their Pro Rata share of the amounts available for Distribution, if any, on account of such unpaid Allowed Subordinated Claims.

**Class G (Interests of the shareholders of the Debtor):** This Class of Claims consists of the Interests of the Insider shareholders of the Debtor, including as a result of recharacterization to equity of any Claim asserted by an Insider. The Interests of the Insider shareholders shall receive no Distribution under the Plan and such Interests shall be deemed extinguished as of the Effective Date.

The Debtor and Custodian anticipate that all Distributions provided for under the Plan on account of unpaid Allowed Claims will be made on or shortly after the Effective Date. The Debtor, by and through the Custodian, shall determine the timing and amount of all Distributions on account of Allowed Claims not otherwise satisfied on or shortly after the Effective Date. Distributions shall be made solely from Cash. Any tax Claims that might otherwise be entitled to payment of interest pursuant to § 511 of the Code shall be paid in full on the Effective Date and no interest shall be paid on any such tax Claims.

## IX.   MEANS OF EXECUTION OF THE PLAN

### A.   General Provisions.

All payments and other Distributions of consideration described in the Plan will be made as set forth in the Plan. Under the Plan, all payments and other Distributions provided for by the Plan will be made from the Estate Assets. Distributions shall be made to the Holder of any Allowed Claim at the address set forth either in the Debtor's Schedules or in any Proof of Claim filed by such Holder. A notice of a Holder's change of address will be valid if, and only if, such notice is filed with the Court, in accordance with Bankruptcy Rule 3001, if applicable, and served upon the Debtor and the Custodian. Any notice of change of address should be sent to the Debtor and Custodian as set forth in Article XIV, sections K and L of the Plan.

### B.   Objections to Claims; Estimation of Claims.

As of the date of this Disclosure Statement, the Debtor believes that all objections to Claims asserted against the Debtor's Estate have been filed and resolved, with the exception of (i) the objection to the Earl Gaudio Claim described in this Disclosure Statement and approximately three to five additional objections that the Debtor will file prior to the date for voting on the Plan; and (ii) SBA Adversary, however, under the Plan the Debtor reserves the right to review and, if appropriate, pursue additional objections to Claims asserted against the Debtor's Estate in accordance with the Code, as well as any proceedings brought for the purpose of estimating the amount of any Allowed Claim under §502 of the Code. The Debtor also may

request or permit the Committee to pursue such objections. The Plan fixes a time limitation by which any such objections to Claims or estimation proceedings must be filed. Specifically, any and all objections or estimation proceedings to Claims must be filed by the later of (i) forty-five (45) days after the Confirmation Date or (ii) forty-five (45) days after the last date on which a Claim must be filed pursuant to this Plan or any applicable order of the Court.

### C.    Post Confirmation Fees and Reports.

The Plan provides that, following Confirmation, through the closing of the Case under §350 of the Code and entry of a final decree pursuant to Bankruptcy Rule 3022, Debtor will pay fees payable under 28 U.S.C. §1930(a)(6), and will timely file with the Court and serve one or more reports, of the actions taken, the progress made toward the consummation of this Plan, and the time frame anticipated until a final report and motion for the entry of a final decree can be filed with the Court.

### D.    Executory Contracts and Unexpired Leases

The Code gives a Chapter 11 debtor the power, subject to the approval of the Court, to assume or reject executory contracts or unexpired leases. Rejection or assumption may be effected either pursuant to a plan or by order of the bankruptcy court entered upon application of the Debtor after notice and a hearing. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages incurred by reason of its rejection. However, the amount of damages may be limited under the Code.

The Debtor believes that all of its executory contracts and unexpired leases have previously been addressed, but the Plan provides that all executory contracts and unexpired leases that have not previously been assumed or rejected in the Case will be deemed rejected as of the Petition Date, and any claim arising from such rejections will be included in Class E of the Plan. Confirmation will constitute approval by the Court of any and all such rejections. Any Claim arising out of the rejection of an executory contract shall have thirty (30) days following the Confirmation Date to file a Proof of Claim with the Court, and that Debtor has reserved the right to object to any such Claims.

### E.    Finalization of all Outstanding Matters by Custodian

The Plan provides that following Confirmation, the Custodian will continue to act as the representative of the Debtor's Estate, to address the SBA Adversary, any other Claims objections, and to complete other matters as may be required under the Plan. On behalf of the Debtor's Estate, the Custodian may, in the Custodian's sole discretion, determine to prosecute or release any such remaining matters, may compromise and settle such remaining matters on such terms as the Custodian deems reasonable with no further notice to Holders of Claims being necessary, and may retain such professionals as the Custodian may determine, and on such terms and conditions as the Custodian may determine, without the need for approval by the Court under §327 of the Code, or otherwise. Any professional so retained may be compensated, and expenses may be reimbursed without the need for approval by the Court under §330 or 331 of the Code, or otherwise, as set forth herein.

24

F.    **Statutory Committee and Cessation of Fee and Expense Payment**

On the Effective Date, the Committee shall dissolve and all of its members, Professionals and agents shall have no further duties, responsibilities, obligations, and authority in connection with the Debtor, the Case, the Plan, or its implementation, except with respect to applications for Professional Fee Claims.  In addition, the Debtor will pay the fees and expenses of the Custodian and of Debtor's Counsel and any other professional, if any, incurred on and after the Confirmation Date upon invoice, and shall reserve, prior to making distributions under the Plan, up to an aggregate amount of $15,000 for the fees and expenses of professionals the Debtor may incur through the closing of the Case.

G.    **General Provisions**

The Plan provides that Confirmation shall constitute authorization by the Court for the use of Estate Assets to meet any cash requirements in this Case in accordance with the terms of the Plan.  Additionally, the Plan provides that, notwithstanding any other provision of the Plan specifying a date or time for the payment or Distribution of consideration thereunder, payments and Distributions with respect to any Claim which at such date is disputed, unliquidated or contingent, will not be made until such Claim becomes an Allowed Claim, whereupon such payments and Distributions will be made promptly, or as otherwise provided for in the Plan.  Thus, any Claim as to which an objection is pending at the time a payment or Distribution is due under the Plan, will not receive such payment or Distribution until the objection to the Claim has been resolved by a Final Order.

Under the Plan, all obligations of the Debtor thereunder are expressly contingent upon Confirmation and the occurrence of the Effective Date.  The Debtor is permitted by the terms of the Plan, for any reason, at any time prior to Confirmation, to withdraw as the proponent of the Plan by filing a notice of such withdrawal with the Court.  If that were to occur, the Plan would be immediately withdrawn from consideration for Confirmation, and Debtor would not have any further obligations under the Plan.

The Plan provides that notwithstanding any provision to the contrary therein, no Distribution shall be made to any Holder of an Allowed Claim if the amount of such Distribution would be less than five dollars ($5.00).  The Plan further provides that all Distributions shall be made to the Holder of any Claim at the address set forth either in the Debtor's Schedules or in any Proof of Claim.  A notice of any change of address will be valid if, and only if, such notice is filed with the Court, in accordance with Bankruptcy Rule 3001, if applicable, and served upon the Debtor and the Custodian.   Under the Plan, notwithstanding any statute, law, rule or regulation to the contrary, if any Distribution under the Plan is returned as undeliverable, or if any check evidencing a Distribution remains uncashed for ninety (90) days after the date on which the check was issued and there has been no written notice actually received by the Debtor or the Custodian advising of the Holder's then-current address within said ninety-day period, then such Distribution shall be deemed unclaimed property under Code §347(b) and the underlying Claim shall be deemed to be waived.  Unclaimed funds shall be paid into the Court as set forth in Code §347(a) and shall be disposed of under  chapter 129 of Title 28, United States Code, unless otherwise agreed by and among the Debtor, the Committee, and the Office of the United States Trustee.

CO\5775599.4

## X.     RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction over any and all matters arising out of or related to the Case and all Adversary Proceedings, and any and all Entities with respect to all matters arising out of or related to the Case and all Adversary Proceedings, the Debtor and the Plan to the fullest extent as is legally permissible. The Court shall retain non-exclusive jurisdiction to hear any other matter not inconsistent with the Code.

## XI.     MODIFICATION OF THE PLAN

Pursuant to the Plan, the Debtor may propose amendments or modifications to the Plan, and reserves the right to amend or modify the Plan pursuant to and in accordance with the terms of the Code and the Bankruptcy Rules.

## XII.     COMPARISON OF PLAN TO ALTERNATIVES

The Debtor believes that the Plan affords creditors the potential for the greatest recovery from the Debtor's remaining assets and, therefore, that Confirmation of the Plan is in the best interests of the creditors. As of December 31, 2017, Estate Assets primarily consist of Cash and Treasury Bills in the aggregate amount of $1,541,620.98 (market value) plus the Debtor's interest in any recovery from the SBA Adversary. The Debtor anticipates the recovery in the SBA Adversary will be in the amount of the SBA Settlement Payment.

The Debtor projects that Administrative Claims and the Allowed Claims of Governmental Units having priority under §507(a)(8) of the Code will exceed the Estate Assets held by the Estate on the Effective Date. The Debtor has considered converting the Case to Chapter 7, however the Debtor has concluded that the Plan provides a significantly greater return to creditors, due in large measure to the Debtor's proposal to pay certain Professional Fees on a subordinated basis. The Debtor projects that the proposed subordination of payment provided for in the Plan will permit Priority Claims in the estimated amount of $351,595.79 to be paid in full, and will permit a dividend of approximately 8% to be paid to Holders of Allowed General Unsecured Claims in Classes E and F. Without the proposed subordination under the Plan, the Debtor projects that allowed Professional Fees would leave little or nothing to pay unpaid Priority Claims or General Unsecured Creditors. Therefore, the Debtor believes that it is in the bests interests of Creditors and more efficient from a time and cost perspective to proceed under the Plan.

Conversion of the Case to Chapter 7 of the Code would entail the appointment of a Trustee in the Case who would have no experience or knowledge of the Debtor's financial situation, its records, or assets. An additional waiting period would be required for any Chapter 7 Trustee to effectively wind up the Case. The value of the Debtor's assets would be reduced in a liquidation scenario because of the potential increased expenses associated with a Chapter 7 Trustee. In addition, the Plan, which proposes the consensual subordination in payment of certain Professional Fees of the Custodian and Debtor's Counsel, would not be available in a liquidation under Chapter 7 of the Code.

CO\5775599.4

If the Plan is not confirmed, and a modified Plan cannot be confirmed, the theoretical alternative is conversion to and liquidation under Chapter 7.

## XIII.  DESCRIPTION OF DEBTOR AFTER CONFIRMATION

On the first day of the month following the month in which the Effective Date occurs or as soon thereafter as the Debtor determines (the "Dissolution Date"), (a) the Debtor shall be dissolved in accordance with applicable non-bankruptcy law, (b) the affairs of the Debtor shall be deemed to have been completely wound up, and (c) the Debtor shall cease to exist as a legal entity. Each of the foregoing actions shall be effective as of the Dissolution Date without the requirement to take any additional action or provide further notice to any person, Holder, or Governmental Unit; provided that the Debtor may, but shall not be required to, file certificates of cancellation or other appropriate instruments evidencing the foregoing actions pursuant to applicable non-bankruptcy law.

## XIV.  PAYMENT OF FEES

The Debtor intends to pay on or promptly after the Effective Date, all fees payable under 28 U.S.C. §1930(a)(6) and 11 U.S.C. §1129(a)(12).  Subsequent to Confirmation, the Debtor will timely file with the Court and serve one or more reports of the actions taken, the progress made toward the consummation of the Plan, and the time frame anticipated until a final report and motion for entry of a final decree can be filed with the Court.  After Confirmation of the Plan, and until the Case is closed, the Debtor will be responsible for timely payments of post confirmation fees incurred pursuant to 28 U.S.C. §1930(a)(6).  After Confirmation, the Debtor will also file with the Bankruptcy Court quarterly post confirmation reports in the format specified by the United States Trustee, for each quarter that the Case remains open.

## XV.  TAX CONSEQUENCES OF THE PLAN

*Creditors and Interest Holders concerned with how the Plan may affect their tax liability are strongly encouraged to consult with their own tax advisors regarding the tax consequences to them, to the Debtor, and to the Estate of the implementation and consummation of the Plan, including federal, state, local and foreign tax consequences.*

The following discussion summarizes certain potential material U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests who are not entitled to vote to accept or reject the Plan.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code" or "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect as of the date hereof.  Because of the newness of the recent changes in the Tax Code as a result of the Tax Cuts and Jobs Act tax bill signed by the President of the United States on December 22, 2017 (the "Tax Bill"), there is little or no guidance available as to how the Tax Bill will be interpreted and applied.  In light of the circumstances of this Case, this summary is subject to further review and revision prior to the hearing to consider approval of the Disclosure Statement.  The Tax Bill and other changes in such statutory and regulatory provisions, as well

27

as or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Plan Proponents do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan.  The discussion below is not binding upon the IRS or the Bankruptcy Courts.  No assurance can be given that the IRS would not assert, or that a Bankruptcy Court would not sustain, a different position than any position discussed herein.  This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC).  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain Holders in light of their individual circumstances.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC.   TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

Cancellation of Debt and Reduction of Tax Attributes.  In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including New Stock) given in satisfaction of such indebtedness at the time of the exchange.  A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a Bankruptcy Court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.

Reporting and Backup Withholding.  The Debtor will comply with applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim.  Additionally, backup withholding may

generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims that receive a distribution under the Plan may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

Recording and Stamp Taxes. Pursuant to section 1146(a) of the Code, transfers of property under a confirmed plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax.

Consequences to Holders of Allowed General Unsecured Claims in Class E

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the General Unsecured Claims classified in Class E, each Holder of an Allowed General Unsecured Claim in Class E shall receive its Pro Rata share of the Distribution to Holders in Class E. To the extent the Distribution to Holders of Allowed General Unsecured Claims in Class E consists of Cash, each such Holder will be treated as exchanging such Claim for Cash in a taxable exchange under section 1001 of the Tax Code. Such Holder would recognize gain or loss equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. To the extent that a portion of the consideration received in exchange for its Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income.

***The foregoing summary has been provided for informational purposes only. All Holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the tax consequences of the Plan.***

## XVI.    RELEASE, INJUNCTION, AND BINDING NATURE OF THE PLAN

### A.    Compromise of Claims.

The Plan provides that, pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall

CO\5775599.4

constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and Holders of Claims and Interests, and is fair, equitable, and reasonable.

### B.        No Liability for Solicitation or Participation.

The Plan provides, as specified in § 1125(e) of the Code, that persons that solicit acceptances or rejections of the Plan are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan. The Plan provides that each Exculpated Party shall not incur and shall not have any liability to any Person or Entity for any act or failure to act on or prior to the Effective Date in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effectuating the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, or any other pre- or post-Petition Date act taken or omitted to be taken in connection with or in contemplation of the Case or the administration of the Estate and/or the Case, excluding to an act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or fraud.

### C.        Creditor Release.

**Under the Plan, except as otherwise specifically set forth therein, in the Confirmation Order or in any other Final Order entered prior to the Confirmation Order, in consideration for the agreements and/or documents to be entered into or delivered in connection with the Plan, (a) each Holder of a Claim that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Entity that receives a distribution on account of its Allowed Claim, or that has held, holds or may hold a Claim or at any time was a creditor of the Debtor and that is not permitted to vote on the Plan, does not vote on the Plan or votes against the Plan, will be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce obligations under the Plan); whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that relate, in any way to the Debtor, the Case, the Estate, or the Plan that such Entity has, had, or may have against any Exculpated Party, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date.**

### D.        Binding Effect of the Plan.

The Plan provides that, upon the Effective Date, the provisions of the Plan are binding on all Persons and Entities to the fullest extent permitted under applicable law, expressly including,

30

without limitation, all Holders of Claims and Interests, and the successors and assigns of the foregoing, whether or not they vote to accept or reject this Plan, were deemed to reject the Plan, or have filed a Claim. The Plan further provides that, unless expressly set forth therein, if the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtor, any Holders or any other Entity; (2) prejudice in any manner the rights of the Debtor, any Holders or any other Entity or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holder of any Claim or any other Entity in any respect.

### E. Injunction.

Under the Plan, all Persons, including but not limited to, all Holders of a Claim or Interest and all of the Debtor's creditors (whether their claims are present, future, contingent, non-contingent, matured, unmatured, secured, unsecured, asserted, unasserted, liquidated or unliquidated), employees, and former employees, and their respective successors and assigns, including any trustee subsequently appointed, are permanently enjoined, restrained and precluded, from asserting, commencing or continuing in any manner any action or other proceeding, including, without limitation, on account of any claim, interest, cause of action, encumbrance, lien, setoff, Claim, Interest, or right of recoupment, against the Debtor, the Estate, or any property of the foregoing, related in any manner to any matter occurring prior to the Effective Date of the Plan.

## XVII. CONCLUSION

It is important that Holders with the right to vote on the Plan exercise that right. It is the Debtor's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims and Interests against the Debtor and that the Plan is preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under Chapter 7 of the Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Earl Gaudio & Son, Inc.
by and through First Midwest Bank, as Custodian

Dated: *March 12, 2018*

By: *Rachael A Gould* VP First
Rachael A. Gould

*Victoria E. Powers*
Victoria E. Powers

31

CO\5775599.4

Tyson A. Crist
ICE MILLER LLP
250 West Street
Columbus, OH 43215
614-462-2700 – Telephone
614-222-3478 – Facsimile
Email: victoria.powers@icemiller.com
        tyson.crist@icemiller.com