UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: ) | |
| ) | Case No. 13-90942 |
| EARL GAUDIO & SON, INC., ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| _____ ) | |

**DEBTOR'S MEMORANDUM IN SUPPORT OF MODIFICATION
TO PLAN**

Now comes the above captioned Debtor and Debtor-in-Possession, by and through First Midwest Bank as Custodian of Earl Gaudio and Son, Inc. (the "Debtor" and "EG&S"), by counsel, and respectfully states the following in support of the Second Amended Chapter 11 Plan of Liquidation of Earl Gaudio & Son, Inc., (Dkt. 785) (the "Second Amended Plan"), which has been filed contemporaneously with this Memorandum:

**I.    Summary of Modification**

1.    The Debtor has filed the Second Amended Plan to return the unsecured deficiency claim of the United States Small Business Administration (the "SBA") to a separate class, Class E-1, in accordance with section 1122(a) of the Bankruptcy Code, as that claim was classified in the Debtor's original Chapter 11 Plan of Liquidation of Earl Gaudio & Son, Inc. filed March 12, 2018 (Dkt. 754) (the "Original Plan").  A copy of the Second Amended Plan blacklined against the First Amended Chapter 11 Plan of Liquidation of Earl Gaudio & Son, Inc., filed herein on May 11, 2018 (Dkt. 773) (the "First Amended Plan"), is attached hereto as Exhibit A.[1]

2.    When it filed its First Amended Plan, in a good faith effort to present a consensual plan and specifically in response to the SBA's objection to the separate classification, the Debtor had amended the Original Plan to, among other things, include the SBA in the same class as

---

[1]  The blacklined copy of the Second Amended Plan is not being served with the U.S. mail service copies of this Memorandum, but will be available to all recipients of ECF service and will be made available upon request.

ordinary general unsecured creditors. It is now apparent, however, that the SBA has no intention of permitting this case to come to a consensual resolution and instead remains intent on holding the Debtor and the other creditors hostage through its de facto veto of the First Amended Plan by voting its improperly classified unsecured deficiency claim to reject.[2] In an effort to permit this case to be resolved as desired by virtually all other creditors pursuant to the terms negotiated with the Committee, the Debtor has now filed its Second Amended Plan, which returns the SBA's deficiency claim to its proper, separate classification, based upon the significant differences between that claim and the general unsecured claims in this case. The Second Amended Plan will inure to the benefit of the creditors in this case by permitting confirmation of a plan that almost all other voting creditors support, to date, and that will facilitate a payout to unsecured creditors through a subordination of professional fees and a carve-out in favor of all unsecured creditors, including the SBA.

3. The modification has no economic impact upon the treatment of the SBA Claim or any other class of claims. In fact, for purposes of distribution, the SBA Claim will share in the General Unsecured Distribution ($300,000, as defined in the Second Amended Plan) Pro Rata (also as defined therein).

## II.    Background on Classification

4. The Debtor filed its Original Plan on March 12, 2018. The Original Plan separately classified the SBA's unsecured deficiency claim of $600,000 (the "SBA Deficiency Claim") from the other general unsecured creditors as required by section 1122(a) of the Bankruptcy Code. Said SBA Deficiency Claim resulted from the settlement of the adversary proceeding seeking turnover of the 2013 overpayment.

---

[2] The SBA, by and through its Attorney, Kate O'Loughlin, returned its Ballot for General Unsecured Claims in Class E, dated June 12, 2018, by which the SBA voted the SBA Deficiency Claim to reject the First Amended Plan.

5. During that time-frame, the Debtor was engaged in discussions with the Official Committee of Unsecured Creditors (the "Committee"), the Office of the United States Trustee ("UST"), and the SBA in an effort to resolve all outstanding matters in the bankruptcy case and to present a consensual plan. The Debtor, the Committee, and the UST reached an agreement resolving all of the outstanding matters as to those parties, including the consensual terms of the First Amended Plan and related first amended disclosure statement (the "First Amended Disclosure Statement") filed by the Debtor on May 11, 2018 (Dkt. 774).

6. The First Amended Plan and First Amended Disclosure Statement were the result of extensive negotiations between the Debtor, the Committee and the UST, as well as the SBA. The Committee and UST agreed to support confirmation of the First Amended Plan and approval of the First Amended Disclosure Statement. The SBA participated in these discussions, and the Debtor's First Amended Plan included concessions to the SBA, including, without limitation, placing the SBA's Deficiency Claim within the general unsecured creditor class, Class E. The settlement agreement previously reached between the SBA and the Debtor did not require this treatment of the SBA Deficiency Claim—this was simply one of a number of good faith efforts on behalf of the Debtor to respond to requests of the SBA and to present a consensual plan to bring this case to a conclusion.

7. On May 11, 2018, the date the First Amended Plan was filed, the SBA indicated that, at that time, it was not in agreement with the settlement reached by the Debtor, the Committee, and the UST, citing the SBA's ongoing issue regarding the Debtor's inability to guaranty the size of the general unsecured claims pool. Nevertheless, in a continued good faith effort to propose a plan acceptable to not only the Committee and the UST, but also the SBA, the

Debtor filed the First Amended Plan without the separate classification of the SBA's unsecured deficiency, contrary to the Original Plan.

### III. Status of Confirmation Process

8. On May 14, 2018, the Court entered an Order (Dkt. 777) (the "Scheduling Order") that, among other things, conditionally approved the First Amended Disclosure Statement and set a hearing on final approval and confirmation of the First Amended Plan for July 11, 2018 at 10:30 a.m. In compliance with the Scheduling Order, the Debtor served its solicitation and ballot package on May 17, 2018. *See* Certificate of Service (Dkt. 778).

9. To date, Debtor's counsel has received 19 ballots. Six of those ballots, all in favor of confirmation of the First Amended Plan, were submitted by priority wage claimants in Class D, a class deemed to accept the plan. All other ballots were cast by creditors holding claims in the voting class, Class E. With the exception of the SBA and one claim for $966.35,[3] all general unsecured claimholders have voted to accept the plan. To date, the Class E ballots cast in favor of the Plan are in the aggregate amount of $264,307.84. The deadline to cast ballots is June 25, 2018.

### IV. Additional Background

10. Debtor Earl Gaudio and Son, Inc. was a beer and food distributor serving East Central Illinois and portions of Indiana and Ohio. On June 12, 2013, Helen Gaudio, as guardian of the estate of Earl Gaudio (the "Earl Gaudio Estate"), commenced a lawsuit against Eric Gaudio, Dennis Gaudio and the Debtor. On June 27, 2013, the Circuit Court for the Fifth Judicial Circuit of Illinois, Vermilion County appointed First Midwest Bank as Custodian of Earl

---

[3] The ballot on this claim did not include the amount of the claim, but it was one of the employee claims for two-thirds of the total postpetition employee bonus amount that the Debtor had earlier sought to pay and which was converted into a prepetition general unsecured claim through the *Order Granting, in Part, Motion for Authority to Pay Bonus to Employees* (Dkt. 136) filed October 8, 2013.

4

Gaudio and Son, Inc. (the "Custodian") and vested the Custodian with all powers, authorities, rights, and privileges previously possessed by the directors and officers of the Debtor. Shortly thereafter, the Debtor filed this bankruptcy case.

11.     The SBA filed a proof of claim, as last amended on October 25, 2013 and docketed in the Bankruptcy Court's claims register as Claim 10-3 (the "SBA Claim"), seeking allowance of a secured claim based upon money loaned as evidenced by a U.S. Small Business Administration Note executed by EG&S, a mortgage on real property located at 1803 Georgetown Road, Tilton, Illinois (the "Real Property"), and a security interest in certain of the Debtor's equipment and fixtures. The SBA Claim consisted of $1,680,156.02 in principal, $25,299.77 in outstanding interest, and $17,257.78 in accrued interest — a total claimed amount of $1,722,713.57 as of October 23, 2013.

12.     On August 15, 2013, the Debtor filed a Motion for Entry of An Order Authorizing the Sale of Operational Assets Free and Clear of Liens, Claims, and Encumbrances and Assignment and Assumption of Executory Contracts (Dkt. 48) (the "Sale Motion") and on September 6, 2013, the Court granted the Sale Motion by its Order Authorizing the Sale of Operational Assets Free and Clear of Liens, Claims, and Encumbrances and Assignment and Assumption of Executory Contracts (Dkt. 78) (the "Sale Order").

13.     On September 12, 2013, the Debtor filed its Motion for Approval of or Authority to Establish Procedure for Disbursement of Sale Proceeds to Purported Lienholders (Dkt. 88) (the "Disbursement Motion"). On September 30, 2013, the Committee filed a limited objection to the Disbursement Motion asserting that "all distributions of sale proceeds authorized by the Court at this time should be deemed interim distributions only without prejudice to the rights of the Debtor, the Committee and any future trustee to object to secured claims at a later date or to

cause an adversary proceeding to be filed if one is required." After a hearing, the Court entered an order granting the Disbursement Motion in part (Dkt. 160) (the "<u>Disbursement Order</u>"). Pursuant to the terms of the Disbursement Order, on or about December 13, 2013, the Debtor paid the SBA Claim in full by check in the amount of $1,722,713.57 (the "<u>SBA Disbursement</u>").

14. In 2015, the Debtor filed a complaint commencing Adversary Proceeding No. 15-09025 against the SBA seeking turnover of estate property, objecting to the SBA Claim, and for determination of the secured status of the SBA Claim (the "<u>SBA Adversary Proceeding</u>"). In essence, the complaint alleged that the SBA received more than the value of its secured claim via the SBA Disbursement, and sought turnover of the SBA Disbursement in the amount that constituted an overpayment from collateral on which it did not hold a security interest, in the total amount of $1,655,231.22. Pursuant to the reservation of rights in the Disbursement Order, the Debtor sought to recover that overpayment, subject to a final sale of the Real Property.

15. In November 2017, the sale of the Real Property closed. Shortly after the sale closed, the SBA filed a Motion to Appoint a Trustee or Examiner under 11 U.S.C. § 1104 or, Alternatively, to Convert to a Chapter 7 Liquidation Proceeding and Appoint a Trustee under 11 U.S.C. § 1112(b) (the "<u>Conversion Motion</u>"), which the Debtor and the Committee opposed. The Debtor and the SBA then filed separate motions for summary judgment in the SBA Adversary Proceeding.

16. After arms-length negotiations, the Debtor and the SBA came to a resolution of the SBA Adversary Proceeding and the Conversion Motion. On March 2, 2018, the Debtor filed a motion to approve the settlement (Dkt. 736) (the "<u>9019 Motion</u>"), which the Court granted by order (Dkt. 770) entered on April 12, 2018, following the April 11, 2018 hearing during which the SBA withdrew its Conversion Motion, as agreed. Pursuant to the settlement, the Debtor and

6

the SBA also agreed that the SBA would return $600,000 of the overpayment to the Debtor and would be entitled to an unsecured deficiency claim for the same amount. The SBA has since made the settlement payment and the SBA Adversary Proceeding has been closed, pursuant to the Stipulation of Dismissal filed therein on May 31, 2018 (Dkt. 89, Adv. Pro. No. 15-09025).

17. Pursuant to the authority discussed below, the Second Amended Plan is confirmable and does not require a re-solicitation of votes or a new disclosure statement. The Debtor believes that confirmation of this consensually negotiated plan, as modified, is the best and most efficient result for creditors and the estate. And the Committee does not object. The alternative — filing a new plan, obtaining approval of a new disclosure statement, and restarting the solicitation process — will only add additional expense and unnecessarily further delay resolution of this case.

## V. Legal Argument

### A. The separate classification of the SBA's Deficiency Claim in the Second Amended Plan is warranted by the Bankruptcy Code.

18. A plan proponent has broad discretion in classifying claims. *In re Multiut Corp.*, 449 B.R. 323, 333 (Bankr. N.D. Ill. 2011). "Every plan proponent creates its classification scheme with the goal of maximizing the probability that its plan will be confirmed." *Id.* In other words, a debtor "possesses considerable, but not complete, discretion to classify claims and interests in its Chapter 11 plan of reorganization." *Id.* (citing *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir.1994)).

19. Section 1122(a) "does not expressly require that all substantially similar claims be placed in the same class, nor does it expressly prohibit substantially similar claims from being classified separately." *Multiut Corp.*, 449 B.R. at 333. It only prohibits claims that are not substantially similar from being classified together. *Id.*

7

20. In *Multiut Corp.*, the court provides an excellent summary of the case law surrounding separate classification in the Seventh Circuit. A debtor may separately classify claims if "significant disparities exist between the legal rights" of the holders of those claims. *Id.* at 334 (citing *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995)). The court recognizes that, unlike other circuits, the Seventh Circuit has not endorsed one particular test, but instead focuses on seeking "a result that is reasonable in light of the purposes of the relevant law." *Multiut Corp.* at 334 (citing *In re Crawford*, 324 F.3d 539, 542 (7th Cir. 2003)). The focus is thus not on how classification impacts voting, but on whether claims are substantially similar.

21. In *Matter of Woodbrook*, the Seventh Circuit addressed the issue of separate classification of a deficiency claim. In the underlying bankruptcy case, the debtor separately classified a certain creditor on the grounds that the creditor was not substantially similar to the unsecured creditor class. *Woodbrook Assocs.*, 19 F.3d at 316. The creditor argued that its separate classification constituted improper gerrymandering. *Id.* at 317. The panel analyzed case law from around the country and ultimately declined the creditor's invitation to find that the classification was impermissible solely because it affected the creditor's right to vote. *Id.* at 317 (rejecting the Fifth Circuit's rule in *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) that any reclassification that results in an affirmative vote is impermissible). Instead, the court focused on the fact that a deficiency claimholder, in that case in the section 1111(b) context, has different legal rights than a general unsecured creditor. *Woodbrook Assocs.*, 19 F.3d at 318.

22. Here, the SBA originally asserted a secured claim. As a result of the SBA Disbursement, the secured claim was paid in full on an interim basis. As a result of the

settlement of the SBA Adversary Proceeding, the SBA now holds what is characterized within the settlement agreement that was attached to the 9019 Motion as a general unsecured deficiency claim for the amount of the settlement payment. Like the 1111(b) deficiency claim in *Woodbrook Associates*, the nature of the SBA's deficiency claim in this case is clearly different than those of general unsecured creditors. Two specific aspects of the SBA's legal rights inform this analysis.

23. First, the SBA has, and has had, legal rights that the general unsecured creditors in Class E do not. The SBA's secured claim was paid from the proceeds of sale of estate property in December 2013, in an amount that ultimately exceeded the value of its collateral, and the SBA had the benefit of those funds for over four (4) years, long before the general unsecured creditors could receive a distribution. Through the SBA Distribution, the SBA enjoyed legal rights and benefits that no general unsecured creditor within Class E has enjoyed.

24. Second, the SBA has an enhanced ability to realize upon its remaining SBA Deficiency Claim. The SBA Claim is subject to three guaranties, which gives it the ability to satisfy its claim from sources the general unsecured creditors cannot. *See Wells Fargo Bank, N.A. v. Loop 76 LLC (In re Loop 76 LLC)*, 465 B.R. 525 (B.A.P. 9th Cir. 2012) (guaranteed deficiency claim is sufficiently different from general unsecured claims to warrant separate classification).

25. Combined, these legal rights differentiate the remaining SBA Deficiency Claim from the general unsecured claims in this case.[4] The Debtor separately classified the SBA in the

---

[4] The Committee and the SBA have inquired whether section 1122(a) may require additional creditors to be classified separately from general unsecured creditors in addition to the SBA. For example, creditor World Business Lenders also received an overpayment from which it subsequently returned funds to the estate pursuant to the settlement of an adversary proceeding. Its remaining claim, however, is not subject to a guarantee, as WBL released its guarantees and remaining mortgage under the terms of its settlement agreement. *See* Exhibit 1—Settlement Agreement to the Motion to Authorize Compromise of Avoidance Action Against World Business Lenders, LLC (Dkt. 537). Thus, WBL has no other source of recovery. Accordingly, the Debtor does not currently seek to

Original Plan, and now in the Second Amended Plan, because the SBA claim is not "substantially similar" to general unsecured claims by virtue of its having received the benefit of the overpayment and having the option to recover from a solvent guarantor. Thus, the SBA's Deficiency Claim should not be classified with those claims under section 1122(a), and it was separately classified in the Original Plan.

### B. The Second Amended Plan does not require a re-solicitation of votes or a new disclosure statement.

26. Section 1127 governs modifications of Chapter 11 plans. That section provides that "[t]he proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title." 11 U.S.C. § 1127(a). "After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan." *Id.* Section 1127 further provides that plan proponents must comply with the disclosure requirements of section 1125. 11 U.S.C. § 1127(c). The holder of a claim that has voted to accept or reject a plan is deemed to have accepted or rejected a modified plan unless the claim holder changes their vote. 11 U.S.C. § 1127(d).

27. Courts interpreting the provisions of section 1127 recognize that, while claimholders must be afforded an opportunity to change their vote if a modification "materially and adversely affects" the claimholder's interests, a modified plan does not always require a plan proponent to re-solicit votes or file a new disclosure statement. *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008). In *Sentinel*, the plan proponent sought to reclassify a set of claimholders to be grouped together with unsecured claims. *Id.* at 302. The parties objecting to the modification argued that section 1127(c) required the plan proponents to obtain

---

separately classify them via the Second Amended Plan. In the event that the Second Amended Plan is not confirmed, the Debtor reserves its right to re-classify creditors consistent with section 1122(a).

approval of a new disclosure statement and to re-solicit votes. *Sentinel*, 398 B.R. at 300. After thoroughly analyzing the relevant case law, the court found that, while the modification technically adversely affected the claimholders, the dilution of the relevant claims was so miniscule that it would not affect the claimholders' votes and thus did not require re-solicitation or a new disclosure statement. *Id.* at 302; *see also In re Sherwood Square Assocs.*, 87 B.R. 388, 390 (Bankr. D. Md. 1988) ("If modifications made to a plan prior to confirmation (but after the ballots have been counted) are minor, impact only a creditor who has been fully involved, and do not adversely impact any other creditor, then it is not necessary to solicit new acceptances."); *In re Concrete Designers, Inc.*, 173 B.R. 354, 356 (Bankr. S.D. Ohio 1994) ("[A] new disclosure statement is not required in every instance where a modification is made; if the modification is minor, the existing disclosure statement will suffice.").

28. The facts of the instant case are analogous to those in *Sentinel* and mandate the same result. Here, the Second Amended Plan makes absolutely no change to the distributions to any creditor—it merely provides for the reclassification of one creditor in a manner permitted by the Bankruptcy Code. From a technical standpoint, there is little if anything that Debtor would change in a new disclosure statement. The current disclosure statement provides adequate information regarding distributions that claimholders will receive and how the plan will be implemented. From a practical standpoint, the Second Amended Plan will not change any votes. The only adverse effect the proposed amendments might have is to eliminate the windfall one creditor would receive from being classified with other creditors not substantially similar. Those other creditors, to date, have voted in favor of the plan and are better off via the elimination of the windfall, so they will not be adversely affected.

29. The SBA has been consistently involved in this bankruptcy case, through and including the genesis of the First Amended Plan. The modification Debtor proposes is simply not significant enough to require either re-solicitation or a new disclosure statement. And while it will eliminate the SBA's windfall, the modification is nonetheless in accordance with the classification provision of the Bankuptcy Code, as interpreted within this Circuit.

## VI. Reservation of Rights

30. The Debtor expressly reserves the right to file a memorandum in support of confirmation of the Second Amended Plan and to address all issues at the confirmation hearing. This memorandum is solely intended to address the matters set forth herein and to aid the Court and the parties in this case.

## VII. Conclusion

WHEREFORE, based upon the foregoing, the Debtor respectfully submits that the Second Amended Plan should be confirmed because it properly classifies the SBA separately from the other general unsecured creditors.

Respectfully submitted,

ICE MILLER, LLP

By: /s/ Tyson A. Crist
    Victoria E. Powers
    Daniel M. Anderson
    Tyson A. Crist
    250 West Street
    Columbus, OH 43215
    (614) 462-2700 – Telephone
    (614) 462-5135 – Facsimile
    Victoria.Powers@icemiller.com
    Tyson.Crist@icemiller.com
    *Counsel to Debtor and Debtor in Possession*