**SIGNED THIS: July 10, 2018**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 13-90942 |
| EARL GAUDIO & SON, INC., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## O P I N I O N

Before the Court are the Second and Third Interim Applications for Compensation filed by Ice Miller LLP, as attorneys for the Debtor, and the Second and Third Interim Applications for Compensation filed by First Midwest Bank, as custodian for the Debtor. For the reasons set forth in detail herein, the applications will be allowed, in part, and denied, in part.

### I. Factual and Procedural Background

On July 19, 2013, Earl Gaudio & Son, Inc., ("Debtor") filed its voluntary

Chapter 11 petition. The Debtor primarily operated as a beer distributor for Anheuser-Busch InBev, Inc. ("Anheuser-Busch"), serving East Central Illinois, as well as parts of Indiana and Ohio. The distributorship operations were conducted from a warehouse located at 1803 Georgetown, in Tilton, Illinois ("Tilton warehouse"), which the Debtor had purchased several years before filing bankruptcy. In addition, the Debtor owned and operated two UPS franchise stores, one in Champaign, Illinois and the other in Danville, Illinois.

Management of the Debtor was kept largely within the family. When the long-time president, Earl Gaudio, retired in 2010, his son Dennis Gaudio and grandson Eric Gaudio took over the business. By 2013, however, there was a falling out, and Helen Gaudio, Earl Gaudio's wife and the company's largest shareholder, sought to remove Dennis and Eric from their positions for violating their fiduciary duties to the business. As a result, through proceedings in state court, First Midwest Bank ("FMB") was appointed custodian of the Debtor. Not long after, the Debtor's bankruptcy petition was filed.

To represent it in the bankruptcy, the Debtor, through its custodian, FMB, hired the attorneys of Ice Miller LLP ("Ice Miller") with offices in Illinois, Indiana, and Ohio, among other places.  Ice Miller Attorney John Burke signed and filed the petition for the Debtor and filed all of the initial motions in the case. Ice Miller Attorney Ben Caughey entered an appearance on behalf of the Debtor shortly thereafter and completed the filing of the Debtor's schedules and other required documents. Both Mr. Burke and Mr. Caughey were, at the time, working at the Ice Miller offices in Indianapolis. After Ice Miller's retention was approved, the appointment of FMB to continue in its role as custodian was also approved. The

orders approving the retention of the attorneys and the custodian provided that the fees of both entities remained subject to court approval.

In October 2013, an order was entered approving certain compensation procedures whereby professionals retained by the Debtor or the Official Committee of Unsecured Creditors ("Creditors Committee") could send monthly invoices to the Debtor's attorneys, the custodian, Creditors Committee, and the United States Trustee ("UST"), and, in the absence of a timely objection, a predetermined percentage of the undisputed amounts of fees claimed would be paid by the Debtor subject to later court approval.

The Debtor's primary asset, the distributorship with Anheuser-Busch, along with related equipment and inventory—but not the Tilton warehouse—was sold shortly after the case was filed. The sale closed on September 20, 2013, at a final purchase price of $9,569,700.73. Prior to the closing, Attorney Caughey filed a motion seeking to establish procedures for the disbursement of sale proceeds. The motion included information regarding lien priorities and the amounts claimed to be due to various secured and priority creditors. The motion proposed a plan for maintaining a reserve for administrative expenses and distributing the balance to creditors, and a procedure for objections to the proposal to be filed. A number of creditors objected to the motion, but on October 24, 2013, after a hearing at which all parties present stated that an agreement had been reached, an order was entered establishing procedures for disbursement of the sale proceeds. Notably, one provision of the order was that the distributions, with limited exceptions, were interim in nature and were made without prejudice to the filing of litigation to determine the actual extent, validity, and priority of the

- 3 -

secured claims being paid through the distributions.

In June 2014, Ice Miller filed first interim fee applications on behalf of itself and FMB. The applications were filed by Attorney Caughey and drew objections from both the UST and the Creditors Committee. At a hearing on the applications, issues were raised about the accuracy of the applications, and Attorney Caughey supplemented both applications in mid-July. After the Ice Miller application was supplemented two further times at the request of the Court, the applications were finally allowed, in part, in the amounts of $316,831 for Ice Miller and $398,409.98 for FMB. In allowing the applications, the Court noted Ice Miller and FMB's success in promptly selling the beer distributorship thereby maximizing the potential recovery for unsecured creditors. Both entities were admonished, however, that the first interim applications contained serious errors and that future fee applications must be more detailed and proofread for inaccuracies before filing. Both Ice Miller and FMB were warned that in the future, discrepancies would simply be resolved against them, and the Court would not issue repeated requests for supplements and corrections as it had done with the first interim requests.[1]

Beginning in late 2014 and continuing through 2015, Ice Miller filed a number of adversary proceedings to recover money or property on behalf of the estate and to resolve other issues. Although Attorney Caughey filed the first of the

---

[1] The first interim applications were the first contested matters heard by this Court after being assigned the case upon the retirement of Judge Gerald Fines on May 31, 2014. Because the Court was not familiar with the history of the case, Ice Miller was repeatedly asked to supplement its application to clarify its work and to correct mistakes. When, after three supplements were filed, Ice Miller still had not resolved all discrepancies, a 10% across-the-board deduction was made to both the Ice Miller and FMB requests.

adversary proceedings, Attorney Victoria Powers of Ice Miller's Columbus, Ohio office began filing the adversary proceedings in 2015. Attorney Powers also became the principal filer of all other documents on behalf of the Debtor in early 2015. On September 25, 2015, Attorney Powers filed a document she labeled as a supplement to the original application to employ Ice Miller in which she disclosed that Attorney Caughey was no longer with Ice Miller and that she and several other attorneys, all apparently in the Columbus, Ohio office, would be representing the Debtor. No mention was made in the supplement of Attorney Burke who filed the case and remains of record for the Debtor but, apparently, ceased his active involvement in the case within weeks of the filing.

One adversary proceeding filed by the Debtor was against Paul Offutt, the individual who had sold the Tilton warehouse to the Debtor and remained the owner of adjacent property. Mr. Offutt had restricted access to a route of ingress and egress to the Tilton warehouse, and the action was filed to resolve the resulting disputes with Mr. Offutt and the Village of Tilton. Adversary proceedings were also filed against the Small Business Administration ("SBA") and World Business Lenders to determine the extent of their secured liens and to recover portions of the distributions made to them pursuant to the order entered after the sale of the distributorship. Dennis Gaudio, Eric Gaudio, and several related entities were also sued to avoid transfers made to them, to recover property, to disallow their claims, and for other relief. Finally, several creditors were sued to recover alleged fraudulent transfers. All of these adversary proceedings have been resolved—some with significant benefit to the estate and some, as will be discussed in more detail below, at significant expense and with little, if any,

benefit to the estate.

On June 19, 2015, almost two years after the case was filed, the Debtor filed a motion to sell the UPS stores. The sale of the Champaign UPS Store closed on December 15, 2015, for a sale price of $152,000. But the Danville UPS store never sold, and efforts were undertaken to wind up its operations and close the store. In March 2016, the Debtor filed a motion to sell the inventory and equipment from the Danville UPS store for $1500. But in September 2016, after several months of apparent discussions with the prospective purchaser, the Debtor reported that the sale had fallen through and would not close.

In January 2016, the Debtor sought to employ Binswanger Midwest of Illinois, Inc., and Gerald P. Norton as the real estate broker to market and sell the Tilton warehouse. No sale was ever made through Binswanger. In December 2016, after the listing agreement with Binswanger had expired, the Debtor sought to employ Hilco Real Estate, LLC as the real estate broker to market and sell the Tilton warehouse. Hilco's employment was approved, and, on February 21, 2017, the Debtor filed a motion to sell the property and establish bidding procedures.

In addition to setting a bid deadline, time and location for an auction to be held, and an objection deadline, the motion to sell set forth several qualifications for bidders. According to the motion, to have a "Qualified Bid," prospective bidders were required to, among other things, offer at least $2,000,000 for the property and draft, execute, and present both a confidentiality agreement and a purchase agreement satisfactory to the Debtor. At a hearing held on March 23, 2017, the Court questioned whether such burdensome requirements were necessary given that the property to be sold was an empty warehouse. Specifically, the Court

suggested that requiring prospective bidders to incur substantial legal fees to draft legal documents for the Debtor's approval and to keep all information about the property confidential would deter rather than draw in prospective buyers.[2] Nonetheless, the procedures proposed in the Debtor's motion were approved, and the auction was scheduled to occur on May 25, 2017. On June 9, 2017, the Debtor filed a motion acknowledging that no qualified bids had been received at the initial auction and seeking to revise the bidding and auction procedures to lower the reserve amount for qualified bids to $1,200,000 and extend the bidding deadline and auction date. The motion was granted and the new date set for the auction was July 18, 2017.

The auction date came and went, and, on September 7, 2017, the Debtor filed another motion related to the sale, this time asking that the Court approve a $70,000 reduction to the reserve amount for qualified bids. According to the motion, Paul Offutt, the sole participant in the auction, bid the $1,220,000 reserve amount. The sale had not closed, however, largely because the Debtor would not agree to Mr. Offutt's proposed allocation of the purchase price for real and personal property.[3] Ultimately, the parties agreed to a reduced purchase price of $1,185,000—$50,100 of which was allocated to personal property. The motion

---

[2] At the hearing, an Ice Miller attorney stated that his firm did have draft agreements that they were using and that prospective bidders would not be required to draft their own documents. But the bidding procedures unquestionably gave the impression that a prospective bidder was required to draft both a confidentiality agreement and a purchase agreement. At the very least, the procedures were unclear.

[3] Mr. Offutt's concern about the allocation of his bid between the real estate and personal property had been memorialized in a letter docketed by his attorney after the initial auction wherein he stated that he had bid a total of $1,220,000 and wanted $520,000 of the amount allocated to personal property.

was granted, and, on November 22, 2017, the Debtor filed its Report of Sale of the Tilton warehouse.

On the same day, Ice Miller filed Second Interim Applications for Compensation ("Second Interim Applications") on behalf of itself and FMB. The Second Interim Application of Ice Miller sought compensation of $1,278,476 and expense reimbursement of $21,568.49 for the period of April 1, 2014, through November 30, 2016.  FMB's Second Interim Application sought compensation of $694,773 and expense reimbursement of $1704.32 for the period beginning April 1, 2014, and ending June 15, 2017. Both applications drew objections from the SBA, the Illinois Department of Revenue ("IDOR"), the Creditors Committee, Helen Gaudio, and the estate of Earl Gaudio. At the request of the parties, the hearing on the Second Interim Applications was continued several times.

On February 6, 2018, Ice Miller filed Third Interim Applications for Compensation ("Third Interim Applications") on behalf of itself and FMB. The Third Interim Application of Ice Miller sought compensation of $518,371.50 and expense reimbursement of $2632.96 for the period from December 1, 2016, to December 15, 2017. The Third Interim Application of FMB sought approval of $20,940 in fees incurred between June 16, 2017, and December 31, 2017. Both applications also drew multiple objections. Generally, the objections asserted that the estate was insolvent and that both Ice Miller and FMB had run up huge amounts of fees without generating much positive return for the estate.

Hearing was finally held on the Second and Third Interim Applications of Ice Miller and FMB on April 11, 2018.  At that hearing, Attorney Powers appeared for Ice Miller and FMB. She admitted that the estate was insolvent. She stated that

after collection of a $600,000 settlement from the SBA, the custodian would have a little more than $2.1 million on hand, and she estimated that the remaining secured claims, administrative expense claims other than those of Ice Miller and FMB, and priority claims totaled $775,000. She also stated that, in a recently filed liquidating Chapter 11 Plan, the Debtor had proposed a carve-out for unsecured creditors of $150,000. Attorney Powers confirmed that, in the proposed plan, Ice Miller and FMB were agreeing to subordinate their administrative expense claims for compensation to the other administrative, secured, and priority creditors, and to the carve-out for unsecured creditors. She calculated that approximately $1.2 million would be left to pay the $2.5 million in fees and expenses sought by Ice Miller and FMB.

After hearing from the objectors and Attorney Powers, the matters were taken under advisement. Shortly thereafter, a First Amended Chapter 11 Plan was filed by the Debtor, increasing the proposed carve-out for unsecured creditors to $300,000 and, correspondingly, reducing the amount available to pay Ice miller and FMB. Confirmation of the First Amended Plan and approval of the related disclosure statement remain pending.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving the administration of the estate, the allowance of claims against the estate, and the adjustment of the debtor-creditor relationship are core

proceedings. 28 U.S.C. §157(b)(2)(A), (B), (O). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III. Legal Analysis

Section 327 of the Bankruptcy Code provides for the employment, with the court's approval, of disinterested professional persons by the trustee to represent or assist the trustee in carrying out the trustee's duties. 11 U.S.C. §327(a). Generally, a Chapter 11 debtor in possession has many of the same rights, powers, and duties of a trustee. 11 U.S.C. §1107(a). This includes the right to employ attorneys and other professionals. *See In re Copenhaver, Inc.*, 506 B.R. 757, 761 (Bankr. C.D. Ill. 2014).

"Section 330 of the Bankruptcy Code provides the statutory authority for awarding compensation for the services and reimbursement for the expenses of properly employed professionals." *In re Gvazdinskas*, 2010 WL 1433308, at *2 (Bankr. C.D. Ill. Apr. 8, 2010) (citing 11 U.S.C. §330). Here, the employment of Ice Miller as counsel for the Debtor and FMB as custodian for the Debtor was approved on August 29, 2013. Generally, a court may award professionals reasonable compensation for services rendered and reimbursement of actual and necessary expenses. 11 U.S.C. §330(a)(1)(A)-(B).[4] Section 330(a) provides in

---

[4] Custodians have certain duties to the estate when a petition is filed that are governed, at least in part, by §543. And that section provides for the provision of "payment of reasonable compensation for services rendered and costs and expenses incurred" in satisfying those duties. 11 U.S.C. §543(c)(2). But §503, which also applies to compensation awards under §330(a), provides for the allowance of administrative

pertinent part as follows:

> (3) In determining the amount of reasonable compensation to be awarded . . . , the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

> (A) the time spent on such service;

> (B) the rates charged for such services;

> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

> (4)(A) [With exceptions not relevant here], the court shall not allow compensation for—

> > (i) unnecessary duplication of services; or

---

expenses for "actual, necessary expenses" and "compensation for the services of" a custodian superseded under §543. 11 U.S.C. §503(b)(3)(E). At least one court has noted that it is within the court's discretion to determine the appropriate standard to apply, but the best use of that discretion is to use the heightened standard of "actual and necessary" as set forth in §503(b)(3)(E) when the compensation requested is to be paid from estate property. *In re Montemurro*, 581 B.R. 565, 575-76 (Bankr. N.D. Ill. 2018). Here, FMB is seeking compensation from estate property, and it would therefore be appropriate to use the "actual and necessary" standard under §503. FMB, however, was employed as a professional under §327 and states in its fee applications that it is seeking compensation under §330. For the purposes of this Opinion, the Court finds no meaningful difference between the standard for compensation under §503(b)(3)(E) and that under §330(a) and will therefore proceed under §330 as requested by FMB.

(ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

. . .

(6) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

11 U.S.C. §330(a).

Before the fees or costs of a properly employed professional can be paid, a fee application must be "filed with the court which details the work done and expenses advanced for which compensation is sought." *In re Vancil Contracting, Inc.*, 2008 WL 207533, at *2 (Bankr. C.D. Ill. Jan. 25, 2008); *see* Fed. R. Bankr. P. 2016(a). Prior to providing any service, professionals "should first scrupulously weigh and assess the necessity and appropriateness of each task for which [they] will be seeking compensation." *Vancil Contracting*, 2008 WL 207533, at *2 (citing *In re Wildman*, 72 B.R. 700, 707 (Bankr. N.D. Ill. 1987)).

The court has an independent duty to examine the reasonableness of fees requested. *Vancil Contracting*, 2008 WL 207533, at *2 (citations omitted). The ultimate burden of proving entitlement to the requested fees is on the applicant, and fee applications "must provide sufficient information for a court to understand what services were actually provided and to determine whether the fees requested are reasonable and the services rendered were necessary and beneficial." *Gvazdinskas*, 2010 WL 1433308, at *2; *see also Vancil Contracting*, 2008 WL 207533, at *2-3. "A court reviewing a fee application is not required to search

through volumes of pleadings in the bankruptcy case and related adversary proceedings in an attempt to find justification for the legal services rendered and the fees requested." *Gvazdinskas*, 2010 WL 1433308, at *2 (citing *In re Taylor*, 66 B.R. 390, 393 (Bankr. W.D. Pa. 1986) (A court "will not indulge in extensive labor and guesswork to justify a fee for an attorney who has not done so himself.")).

To aid the court in determining whether a fee request is reasonable, applicants should include separate sections for distinct project categories, as well as a narrative that explains the need for a particular service, the results obtained, and the compensation requested. *Gvazdinskas*, 2010 WL 1433308, at *3 (citing *Wildman*, 72 B.R. at 711). One running, chronological list of all tasks or services combined without distinction, however, is not adequate. *Id.*

The actual time spent on each task should also be recorded. *Vancil Contracting*, 2008 WL 207533, at *4. Tasks should not be "lumped" together within a single entry to avoid any minimum time or detail requirements. *Id.* Likewise, "[r]ecords which give no explanation of the activities performed are not compensable." *Id.* at *3 (citing *Wildman*, 72 B.R. at 708). Entries for "telephone calls" or "conference," even those identifying with whom the conversation was held, are insufficient. *Id.* Generally, work should be done without the need for "incessant conferring." *Wildman*, 72 B.R. at 709-10.

### A. Ice Miller's Fee Applications

Through its Second and Third Interim Applications, Ice Miller seeks approval of $1,796,847.50 in fees and reimbursement of $24,201.45 in expenses. The applications raise a number of issues regarding the awarding of fees and costs

to professionals.

### 1. Redactions

A threshold issue with all of the applications is that they are heavily redacted. Between its Second and Third Interim Applications, Ice Miller redacted 566.9 hours. The estimated charges resulting from those redacted entries amounted to approximately $215,711.12.[5]

Ice Miller contends that the entries were redacted to protect privileged information. And billing records may be subject to privilege to the extent such records disclose confidential communications. *Coyle v. Coyle (In re Coyle)*, 538 B.R. 753, 762 (Bankr. C.D. Ill. 2015). But the duty of an attorney to protect privilege or prevent dissemination of other confidential information does not override the court's duty to review fees in the bankruptcy context. *In re Las Vegas Monorail Co.*, 458 B.R. 553, 558 (Bankr. D. Nev. 2011). Were it otherwise, privilege could be asserted to "prevent the court from fulfilling its responsibilities under Section 330(a)(4)(A)." *Id.* Of course, fee applicants are not without any recourse to protect confidential information. They may seek relief under §107 or Bankruptcy Rule 9018 to keep the information protected or otherwise request an *in camera* review. 11 U.S.C. §107; Fed. R. Bankr. P. 9018; *Coyle*, 538 B.R. at 762; *Las Vegas Monorail*, 458 B.R. at 558-59. Or perhaps, if the redactions are limited in scope, the court's ability to properly assess the fees might not be impeded and fees may be allowed notwithstanding redactions. But when the description of work

---

[5] The Court used a blended rate of $380.51 per hour for Ice Miller to calculate the amount charged for redacted entries. As stated , this Court will not engage in a scavenger hunt to justify the applicants' fee requests.

performed itself is redacted, and it is impossible to determine whether a billing entry is reasonable or necessary, the court must disallow the fees. *Las Vegas Monorail*, 458 B.R. at 558 (citing *In re Tri-State Plant Food, Inc.*, 273 B.R. 250, 267 (Bankr. M.D. Ala. 2002)). Ultimately, "[p]rofessionals may not properly avoid scrutiny of their fees by redacting the description of the billing entry." *Id.*[6]

Here, no request was made for an *in camera* review or to otherwise file the billing invoices under seal. Nor does it seem that the redactions were carefully tailored to balance the professionals' interest in maintaining confidentiality with the Court's duty to evaluate the reasonableness and necessity of the fees requested. Between Ice Miller and FMB, more than 1100 of the total hours billed were redacted in some way. Of those entries affected, even the most modest redactions made it impossible for the Court to glean the substance of what was performed and determine whether the work performed was reasonable or necessary. For instance, one entry from April 8, 2015, in the invoices attached to Ice Miller's Second Interim Application, shows 0.8 hours billed at $420 per hour by Attorney Ben Caughey for a "[l]engthy call regarding ███████." This entry, and others like it, are prevalent throughout all of the applications and provide nothing to aid the Court in justifying the charge. In fact, as far as the Court can tell, all of the redactions in both Ice Miller and FMB's applications went to the substance of the work being done, leaving the Court to determine whether entries like "conferred with client team █████" and "prepared correspondence to client

---

[6] At least one court has applied this standard to requests for compensation of custodians. *In re 444 North Northwest Hwy, LLC*, 2013 WL 122527, at *6-8 (Bankr. N.D. Ill. Jan. 8, 2013) ("[M]ost of the billing entries . . . are redacted such that the Court cannot determine what those services were and how they were reasonable and necessary.").

■■■■" show that the work performed was reasonable and necessary.

It is also important to note that much of what was redacted may well not have been confidential in the first place. The disclosure on a billing record that an Ice Miller attorney talked to a specific person at FMB about a topic such as the sale of an estate asset or the progress of a particular adversary proceeding would not, in and of itself, reveal the confidential information exchanged in the conversation. And, because the sales have been closed and the adversary proceedings resolved, it is hard to imagine, at this point, why Ice Miller and FMB felt the need to so heavily redact the time entries. Absent any compelling explanation for the redactions, the time reported by the redacted entries cannot be compensated.  As stated throughout this Opinion, it is the applicant's burden to show it is entitled to the fees requested, and the Court will not engage in a scavenger hunt to justify the fees on an applicant's behalf. As such, the fees charged by Ice Miller based on time entries that were redacted in the amount of $215,711.12 will be disallowed.

## 2. General Mistakes and Carelessness

Ice Miller's Second Interim Application requests approval of $1,278,476 in fees for the period beginning April 1, 2014, and ending November 30, 2016. Adding together the totals for each billing invoice, however, amounts to only $1,044,025.50 in fees. In other words, $234,450.50 of the fees that Ice Miller requests were either not included in the billing invoices or were never actually earned. Whatever the case, the charges are wholly unsubstantiated and cannot be allowed. In addition, Ice Miller will be surcharged a penalty for this and other

careless errors discussed in detail below.

In tracking the time entries that were redacted, it became apparent to the Court that there were multiple mathematical errors throughout the applications. Some errors were as simple as charging for time that, according to the time entry itself, was not to be billed. Others were purely arithmetic errors. In some of the more egregious examples, Ice Miller's bad math resulted in double billing. For instance, in an entry dated June 7, 2017, in invoice no. 1473478 attached to Ice Miller's Third Interim Application, Attorney Powers recorded 0.7 hours on the matters described therein, noting "[NO CHARGE .70]" at the end of the description. But, instead of not charging for the 0.7 hours recorded, Ice Miller charged for the 0.7 hours recorded, as well as an additional 0.7 hours that was not recorded. As a result, 1.4 hours were billed when it appears that no time should have been billed at all. Mathematical errors found by the Court resulted in the estate being overcharged $10,803.50 by Ice Miller. These charges, which are wholly unsubstantiated and were not actually incurred, cannot be allowed.

And, again, those are just the overcharges that were found. Without going through each entry and calculating the charges and cross-referencing them with the invoice totals, it cannot be determined whether all charges are substantiated. And even if the Court were willing to undertake such an investigation, it would be complicated by other problems that stem from Ice Miller's sloppy timekeeping.

In nearly every invoice, for example, time entries are included in the wrong billing category. And while it appears that Ice Miller endeavored to adjust its totals for each billing category and invoice to account for this, it did not "show its work" in removing a charge from one category and adding it to another. As a result, the

already tedious task of double-checking Ice Miller's math would be further complicated by having to also account for charges wrongly included or excluded from a particular billing invoice. But without doing so, the Court has no way of knowing whether the charges for each category in every invoice are accurate.

Similarly, invoice no. 1447532, attached to Ice Miller's Second Interim Application, lists each entry chronologically within categories and identifies who spent how much time on a specific entry. It does not, however, state the hourly rate or the amount charged for each entry. Rather, it lists the total amount charged—$191,009—as well as the hourly rates of each professional, at the end of the invoice. The problem this creates is best shown by example. On June 15, 2016, Attorney Powers recorded 6.20 hours to travel to and attend a hearing and speak with an adverse party afterward. But, according to Ms. Powers' time entry, the hearing and meeting only took 1.2 hours. The time for travel was noted as "4.2 total unbilled time, bill only 2.0[.]" Setting aside the ambiguity of whether the "bill only 2.0" language refers to the entire entry or just the time billed for travel, it appears that, at most, 3.2 hours should have been billed, rather than the 6.2 hours noted. To determine whether the estate was, in fact, overcharged, the Court would have to calculate the number of hours billed at Ms. Powers' hourly rate and compare that to the total amount charged for that invoice period. Assuming those figures are consistent, the Court would then need to compare that total to the total charges based on what it determines to be the correct number of hours. Had the hourly rates and amounts billed been shown for each entry, calculating the overcharge could be as simple as calculating the correct number of hours to charge, multiplying that number by the applicable hourly rate, and comparing the

result to the charges listed in the entry.

Another problem worth noting is the generic descriptions of services rendered in Ice Miller's billing invoices. Throughout its Second and Third Interim Applications, Ice Miller's professionals recorded time for work described in only generic terms. Common examples include "conferred with client team ■■■■," "communication with First Midwest ■■■■■," "reviewed emails with client ■■■■," or the like. Entries such as these provide very little, if any, information about the service being provided and raise other concerns about what seems to be "incessant conferring." And, clearly, the redactions only make matters worse. Other common descriptions include "worked on motion for summary judgment" or "considered trial strategy issues," which by themselves are not necessarily problematic. But, when numerous entries, amounting to several hours of time over the course of months, bear the same description, questions arise. Still other entries, like an attorney's "[a]ttention to defendant's bankruptcy," are blatantly insufficient. Based on the number of careless mistakes in Ice Miller's Second and Third Interim Applications, the Court cannot assume that the work described in time entries like these is reasonable. Significant reduction is required.

This Court has consistently made clear that it is unwilling and certainly not required to scour the record to justify fees of attorneys or other professionals. For that reason, applicants should take steps to organize the information in their fee requests in a manner that will aid the Court in its review thereof. Such steps normally include separating billing entries into distinct project categories and delineating the time, purpose, and amount of all charges. The attorneys from Ice Miller that were retained to represent the Debtor in this case are experienced

bankruptcy professionals who should understand their burden in justifying their fees. To the extent they did not know before, they should have learned from this Court's criticism of the first interim applications of both Ice Miller and FMB.

Both Ice Miller and FMB were previously admonished in the orders entered on their first interim fee applications that greater care must be taken in future fee applications to justify the compensation sought. Specifically, the Court explained that the work done must be described in more than generic terms, that the applications needed to be carefully proofread, and that any discrepancies would be resolved against the applicant. That, however, is not what happened here, and the Court is, apparently, expected to assume—contrary to its duty under §330—that all charges were reasonable and necessary or to search through the entire record for justification of the fees—something the Court is not required or willing to do. The better alternative is to reduce the fees of Ice Miller that remain after all other reductions by 20%, a figure representative of any unaccounted for errors.[7]

The 20% reduction will also serve to offset amounts sought for time that is plainly not compensable. The clearest example of this is the time billed for calling the Court's chambers for various reasons. On at least three occasions, Ice Miller Attorney Tyson Crist billed for time in which he says he "conferenced with Judge Gorman's chambers" regarding electronic filing issues (0.4 hours), deadlines set by the Court (0.1 hours), and the status of documents that were filed (0.2 hours).

---

[7] A 20% reduction also represents a step-up from the 10% reduction assessed for similar problems in the first interim applications of both Ice Miller and FMB. The earlier reduction was apparently not enough to get the attention of Ice Miller and FMB and, accordingly, the percentage must be increased.

As a preliminary matter, the Court notes that it strictly adheres to Bankruptcy Rule 9003, which is incorporated into the Court's procedures, and prohibits *ex parte* contacts. Further, the substance of the communication, at least as far as the billing invoices indicate, was not legal work for which Ice Miller could be compensated. To the contrary, it was clerical work. But it gets worse. Assuming the time entries are otherwise accurate, the Court is quite confident that the time billed is not. If and when a party calls chambers, those calls rarely last more than a few minutes. Billing for even one-tenth of an hour, let alone four-tenths of an hour, is completely unreasonable. Given these entries and others like them, a reduction of only 20% is more than fair.

Finally, Ice Miller seeks $144,151 for time spent drafting and preparing fee and employment applications during the second and third interim application periods. This includes not only its own applications but those of FMB—also seeking $488 for time spent on the fee applications—and other professionals.

Implicit in the reference in §330(a)(6) to compensation awarded for the preparation of a fee application is that such charges may be allowed. 11 U.S.C. §330(a)(6). Amounts charged for preparing fee applications may only be allowed, if at all, to the extent they are reasonable. Courts in this circuit have concluded that "3% of the total fees requested [is] the reasonable amount that should be allowed for preparation of the fee application." *In re Spanjer Bros., Inc.*, 191 B.R. 738, 750 (Bankr. N.D. Ill. 1996) (citing *In re Pettibone Corp.*, 74 B.R. 293, 304 (Bankr. N.D. Ill. 1987)). But "[d]isproportionate applications will not be allowed nor will fees be allowed for non-informative applications or repeated revisions and supplements of applications that should have been done right originally."

*Wildman*, 72 B.R. at 711.

Here, the amounts charged by Ice Miller for preparing the applications is roughly 7% of the total fees requested by Ice Miller and FMB together. Absent some extraordinary circumstance, that amount is unreasonable on its face. But, given the obvious and significant errors and overall lack of justification in the applications, allowing even 3% of the total fees as compensation for preparing the applications is unreasonable. Rather, under the circumstances of this case, Ice Miller will not be compensated for the time it spent preparing the fee applications. The $144,151 attributable thereto will be disallowed.

### 3. Reasonableness and Necessity of Work

Ice Miller spent the majority of its time recovering and disposing of assets. In its recovery efforts, Ice Miller prosecuted, and eventually settled, several adversary proceedings with varying success. As for the disposition of assets, most of Ice Miller's time was spent trying to sell its Tilton warehouse, as well as the two UPS franchise stores.

### a. Adversary Proceedings

Nearly two-thirds of the fees sought by Ice Miller in its Second Interim Application relate to its efforts prosecuting several adversary proceedings or otherwise recovering assets. Between April 2014 and November 2016, Ice Miller recorded more than 1773 hours for those efforts and seeks compensation for an additional 53.7 hours in its Third Interim Application. The bulk of those hours are attributable to proceedings against the former managers of the Debtor, Eric and

Dennis Gaudio, related corporate defendants, Paul Offutt, and the SBA. Because each of the adversaries raises independent issues, they will be discussed separately.

### i. Dennis and Eric Gaudio and Related Entities

The two proceedings against the former managers and related corporations were settled together for $150,000 and a waiver of claims against the estate.[8] In the process of resolving these lawsuits, however, Ice Miller recorded roughly $270,360 in fees that are substantiated in some form.[9]

The necessity of services for which fees are sought "must be justified under a cost/benefit analysis, and the narrative included in the fee application should contain sufficient information to make that analysis." *In re Minich*, 386 B.R. 723, 728 (Bankr. C.D. Ill. 2008). This involves weighing the potential cost of legal services against the size of the estate, the potential recovery if successful, and the potential loss if unsuccessful. *Id.* (citing *Wildman*, 72 B.R. at 707). That is not to say that professionals cannot collect fees for pursuing an adversary that turns out

---

[8] Case no. 14-09010 was filed in this Court against Eric and Dennis Gaudio, as well as 1803 LLC and Gaudio Diversified Ventures, LLC. The reference was later withdrawn and the case proceeded in the District Court. The Debtor later filed a separate adversary that was assigned case no. 15-09017 against Dennis Gaudio objecting to his claim in bankruptcy of $767,632.29. In the District Court, the Debtor then obtained a default judgment of nearly $3,000,000 against the seemingly defunct corporate defendants, and the case proceeded against the Gaudios individually. Before resolution on the merits, the Debtor and the Gaudios entered into a global settlement for payment of $150,000 and waiver of Dennis Gaudio's claim. It is unclear whether the settlement also nullified the default judgment against the defunct corporate defendants, but, in any event, it appears that the judgment was either uncollectible or resulted in no funds for distribution to the Debtor's creditors.

[9] This does not take into account the $152,311.50 itemized by FMB on the same matters, which will be addressed in greater detail below.

to be unsuccessful or in which the amounts collected do not cover the fees and costs incurred. But, just as attorneys for the estate have a fiduciary duty to exercise care, diligence, and skill in deciding which claims to prosecute, they have a reciprocal duty in deciding how far to prosecute a claim. *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995). In other words, once it becomes "reasonably obvious that further litigation would cost more than it [is] likely to bring into the estate[,]" an obligation to abandon the litigation arises. *Id.*

Here, the Court cannot say exactly when it became "reasonably obvious" that the costs of litigating the Gaudio adversaries outweighed the potential benefit to the estate. But it certainly came before incurring more than $270,000 in fees and realizing that the default judgment against the seemingly defunct corporate defendants was uncollectible. Maybe most telling is the fact that the adversaries were filed against the former managers of the Debtor and related corporations that were most likely at or nearing insolvency themselves. It is quite apparent that Ice Miller did not think through these issues at the time it filed the adversaries. Regardless of the merit of these suits, there was clearly a question of whether it would cost the estate more to collect on any judgment than it hoped to gain from doing so. A review of Ice Miller's billing invoices shows that this was a question that was not pondered beforehand. Several hours were spent researching the enforcement of judgments in federal court after the District Court entered the default judgment against the corporate defendants in January 2016. And several more hours were spent preparing and recording judgment liens with county clerks, which, from what the Court can glean, never resulted in assets for the estate to liquidate and distribute.

Other examples of the lack of foresight include spending dozens of hours drafting summary judgment motions when answers to the amended complaint had only just been filed and before default judgment was entered against the corporate defendants, only to reevaluate six months later when Eric Gaudio announced that he would be seeking bankruptcy protection. At that point, with the prospect of any recovery becoming increasingly doubtful, Ice Miller accrued thousands of dollars more in fees to negotiate a global settlement of the District Court case and the Dennis Gaudio adversary as it also continued its efforts to collect on the default judgment and prepare summary judgment motions against the remaining parties. Perhaps the $150,000 settlement amount would not have been obtained without Ice Miller's negotiation efforts. But by then, the estate was insolvent and Ice Miller had run up hundreds of thousands of dollars in fees, which, at best, might have been covered by whatever settlement was obtained. In short, there was a lot of work done with little self-monitoring or antecedent adjustment of the litigation strategy.

Of course, hindsight is 20/20. But the fact that Ice Miller was employed on an hourly basis, rather than on a contingency-fee basis, does not justify the fees requested as necessary and reasonable. At some point early on, it should have been apparent to Ice Miller that, while it may have had a meritorious case, the cost of prosecution and collection on the judgment would greatly outweigh the potential recovery to what would become an insolvent estate. Had Ice Miller exercised the discretion required, it may have saved itself a lot of time and the estate a lot of money. Assuming Ice Miller would have incurred some fees before it realized there would be a net loss to the estate, 30% of the fees requested for the

Gaudio lawsuits will be allowed. Accordingly, $189,252 will be disallowed.

### ii. Paul Offutt

The adversary proceeding against Paul Offutt, as well as related business entities and the Village of Tilton, was necessary, and the fees incurred are largely justified. The action involved a property dispute related to the Tilton warehouse and access thereto. Had Ice Miller not been able to resolve the matter, the ongoing dispute as to ingress and egress rights to the property would most certainly have negatively impacted the sale of the Tilton warehouse. A significant amount of time was spent prosecuting the matter—about 350 hours—but, given that its resolution was imperative to the sale of one of the Debtor's more valuable assets, the time was justified.[10] Further, the litigation was contentious, forcing all parties to actively defend against and respond to various motions and briefs. As such, to the extent substantiated in itemized billing invoices, the fees requested for Ice Miller's efforts in resolving the issue in the estate's favor will be approved.

### iii. SBA

During the second and third interim application periods, Ice Miller recorded 244.3 hours and $116,612 in fees for time spent on the turnover action against the SBA.[11] Like the Offutt litigation, the litigation against the SBA was

---

[10] FMB recorded at least an additional 48.7 hours and $10,257.50 in fees on the Offutt lawsuit. This figure, however, does not take into account any fees sought in uncategorized invoices. Both issues are discussed in detail below.

[11] FMB also recorded at least 24.2 hours and $5302 in fees for its involvement in the SBA litigation. As with the other adversaries, some additional time may be recorded in uncategorized invoices that is not included in this calculation, which is discussed

contentious. More than any other party, the SBA has challenged every action of the Debtor throughout the pendency of the bankruptcy. It is no surprise then that the SBA challenged the Debtor's attempts to recover amounts previously paid in accordance with the sale procedures related to the distributorship rights. Like other matters in this case, dealing with the SBA could have been handled differently with a bit of forethought.

The SBA had a mortgage lien on the Tilton warehouse, but it was paid the value of its lien based on the estimated value of the warehouse from the sale proceeds of the distributorship upon which it had no lien. Because the Tilton warehouse sold at a price far below what was initially anticipated, the Debtor was forced to recoup a portion of the money paid to the SBA for its lien. While it was necessary to clawback the overpayment to the SBA, the original decision by Ice Miller to propose to pay the SBA's lien before selling the asset upon which it had a lien was highly questionable. By any measure, the process ended up costing the estate.

The Debtor was ultimately able to settle with the SBA for a $600,000 payment to the estate, the withdrawal of the SBA's then-pending motion to convert case or appoint trustee, and the allowance of a $600,000 general unsecured deficiency claim for the SBA. Because, under any scenario, the Debtor would have had to work with the SBA to administer the estate's assets and would have incurred some fees, Ice Miller's fees for prosecuting and settling its lawsuit against the SBA will be allowed, except to the extent otherwise reduced for redactions or other penalties discussed elsewhere in this Opinion. Ice Miller could have been

below.

penalized here for the faulty judgment in paying the lien with proceeds from the initial sale in which the SBA had no interest, but the SBA bears great responsibility for the significant costs here. The unfortunate high cost of this litigation cannot be completely blamed on Ice Miller.

### iv. Other Adversary Proceedings

Of the remaining adversaries, many were settled for a surplus to the estate, due, in part, to the modest amount of time spent by Ice Miller to resolve them. For instance, the Debtor dismissed the adversaries against American Express, Citibank, and Discover Bank in exchange for a total of $231,500 in payments, with Ice Miller accruing less than $25,000 in fees.[12] The benefit to the estate cannot be argued.

In other proceedings, the surplus was not as great, but Ice Miller will be given the benefit of the doubt. For instance, the adversary proceeding against World Business Lenders resulted in a $99,500 payment to the estate. And while Ice Miller accrued $81,297 in fees to obtain that result, the effort was largely necessary.[13] World Business Lenders was one of the purported lienholders paid from the sale proceeds of the distributorship subject to the Debtor later challenging the security interest and pursuing repayment of amounts improperly paid. As with the SBA, Ice Miller's judgment in proposing to pay creditors with the

---

[12] Not taking into account any time recorded in uncategorized invoices, FMB accrued additional fees of $2196 for American Express, $1438.50 for Citibank, and $928 for Discover Bank. Their fees will be discussed below.

[13] FMB accrued at least another $4636 in fees on 21.8 hours spent on the World Business Lenders lawsuit.

right to later sue to get the money back was questionable. Still, the Court cannot say that it was apparent that the litigation would cost what it did, and, ultimately, Ice Miller was able to resolve the lawsuit with at least some benefit to the estate.

Similarly, the Debtor was able to resolve its lawsuit against Specialty Distributing of Illinois, LLC ("Specialty Distributing") for $35,000 and allowance of a $125,000 unsecured claim while accruing $14,682.50 in fees on 38.4 hours.[14] The proceeding was commenced in order to recover more than $200,000 in prepetition transfers made by the Debtor on behalf of another entity. While the $35,000 recovery is significantly less than the $200,000 sought, Ice Miller's decision to settle the matter before racking up tens of thousands of dollars more in fees was a reasonable one. As such, Ice Miller will be given the benefit of all doubt, and its fees for the Specialty Distributing case will be allowed.

The Regions Bank litigation, however, was not so straightforward. It involved the Debtor's attempt to avoid liability on $473,220.68 in guaranties signed for the debts of Gaudio Diversified Ventures, as well as a challenge to Regions Bank's claim for attorney fees. Ice Miller charged $18,293 on 44.3 hours before settling the matter for the waiver of claims in exchange for a $17,500 payment by the estate to Regions in satisfaction of its remaining secured claims.[15] Importantly, Regions Bank was one of the lienholders paid from the sale proceeds of the distributorship. According to the adversary complaint, Regions Bank had filed a

---

[14] The $37,893 on 201.9 hours recorded by FMB, however, is another story. And, again, that figure does not take into account any charges that may appear in uncategorized invoices.

[15] FMB also charged at least $2850.50 on 13.8 hours in prosecuting the action against Regions Bank.

proof of claim asserting a secured claim of $5,662,163.32.[16] Through the payment procedures for the sale proceeds of the beer distributorship, Regions was to be paid the full amount of its secured claim, as asserted, less a $500,000 holdback to be distributed only upon further order from the Court. In exchange for the holdback amount, the net amount received on the sale of the beer distributorship was deemed a final and not an interim distribution. Ultimately, it seems that the Debtor's objection to the portion of the debt stemming from the guaranties was well taken, and the Debtor was able to settle the matter in exchange for payment of the unchallenged portion of the holdback amount. The fees for this work will be allowed.

### b. Disposition of Assets

Another major billing category in Ice Miller's Second Interim Application, and the overwhelmingly largest category billed in its Third Interim Application, relates to the disposition of estate assets. In both applications combined, Ice Miller billed $367,925 on 907.8 hours, $271,588.50 of which was charged in the Third Interim Application, for disposing of assets.[17] Most of those charges related specifically to the sale of the Tilton warehouse, as well as the sale of the Debtor's Champaign UPS store and the closing and attempted sale of the personal property

---

[16] The original and all amended proofs of claim filed by Regions, as well as the motion to establish procedures for the distribution of sale proceeds, list the debt at $5,495,598.27 rather than $5,662,163.32—a difference of $166,565.05.

[17] In its Second and Third Interim Applications, FMB recorded 345.8 hours for $72,190 in fees related to the disposition of assets. This, of course, does not take into account any charges that might be found in uncategorized invoices. Roughly $10,000 of those fees were charged in the third interim application period and can be attributed to the sale of the Tilton warehouse.

of the Debtor's Danville UPS store.

### i. The Tilton Warehouse

The report of sale of the Tilton warehouse was filed in November 2017 after a lengthy marketing and sale process. It was sold to Paul Offutt for $1,185,000, leaving $894,891.14 available to the estate after payment of costs. The Debtor began actively marketing the property after employing Binswanger as real estate broker in early 2016.[18] But it is what happened between that time and the eventual sale to Paul Offutt from which the majority of Ice Miller's fees arose that is most concerning to the Court.

After many months of attempting to sell the property through Binswanger and the retention of Hilco to take over as real estate broker, the Debtor determined that attempting to sell the Tilton warehouse at auction would be the best course of action. In early 2017, the Debtor sought approval of bidding and auction procedures. But the proposed procedures were unnecessarily complicated and likely to deter potential bidders by requiring them to jump through several hoops before even being able to make a qualified bid. For instance, the procedures initially set a minimum bid requirement of $2,000,000 and required prospective bidders to execute and present both a confidentiality agreement and a purchase agreement satisfactory to the Debtor. Despite the Court expressing its concerns that the proposed procedures would discourage rather than encourage prospective buyers, especially given the uncomplicated nature of an empty warehouse, the

---

[18] Presumably, a broker was not employed sooner due to the pending litigation against Paul Offutt that would have severely hindered the sale of the property.

procedures were approved at Ice Miller's insistence.

After the originally scheduled auction date had passed, the Debtor sought to revise the bidding and auction procedures to extend the bidding deadline and auction date and lower the minimum bid amount, reporting that it had received only one bid, and that bid did not meet the minimum dollar threshold. That motion was granted, and new dates were set. Several weeks after the new auction date, the Debtor filed another motion, this time asking for approval of a reduction to the qualifying bid amount, so that the Debtor could close the sale with the highest and only bidder, Paul Offutt. Apparently, Mr. Offutt bid the minimum amount, but, due to a dispute about how the sale price would be allocated between real and personal property, the parties could not close the sale. Ultimately, the parties agreed on a reduction in the purchase price and the sale closed in late 2017.

Most of Ice Miller's efforts in this matter derived little to no benefit to the estate. Approximately half of the $271,588.50 billed in the Third Interim Application was accrued during the period between Hilco's employment and the eventual auction date. And most of the time billed in that period related to preparing, drafting, finalizing, and then redrafting and finalizing the sale motion and the complicated bidding and auction procedures that the Court had expressed concerns about. Unsurprisingly, only one offer was made, and that offer did not meet the minimum dollar threshold. Also not surprising is the fact that the only bidder was already familiar with the property.

Perhaps the complicated procedures are not to blame for the lack of interest in the warehouse. It could very well be that there simply was not a market for the

building and real estate. But even if that were the case, it is unclear how procedures designed to severely limit bids were at all beneficial or reasonable when the property drew no serious interest—or at least no interest satisfactory to the Debtor—after nearly a year of marketing it for private sale.

The other half of the $271,588.50 billed in the Third Interim Application relates to the period covering the auction itself and the eventual sale closing. Most of those fees stemmed directly from the dispute over the allocation of the purchase price for tax purposes that delayed the closing and resulted in a lower final purchase price. But the dispute was largely preventable. The bidding procedures outlined several sale terms that prospective bidders had to agree to in order to qualify. None of those terms addressed the allocation of purchase price for tax purposes. If the issue was important to the Debtor, it could have easily been included as a prerequisite to making a qualified bid. And it is not as if Ice Miller was unaware of Mr. Offutt's proposed allocation of the purchase price. Mr. Offutt had, apparently, made several offers to purchase prior to becoming the successful bidder at auction and, at least one of those offers, dated May 9, 2017, and attached to correspondence filed by his attorney in June 2017, clearly stated how he wanted the purchase price to be allocated.

Absent a clear benefit to the estate, it was up to Ice Miller to justify the necessity of its fees—something it failed to do. With regard to the closing dispute, Ice Miller merely stated that it "addressed" the real estate transfer tax issues. As to the bidding procedures themselves, Ice Miller's attorney conceded at hearing that most of the terms included in the bidding and auction procedures and related documents were boiler plate language taken from documents used in other cases

and were not necessarily tailored to the needs of this case. This was evident from Ice Miller's inability to explain why a confidentiality agreement was necessary, let alone beneficial, or what, in fact, was confidential about an empty warehouse. And the fact that Ice Miller simply pulled language from documents used in other cases to prepare the documents related to the sale of the Tilton warehouse raises even more questions about the reasonableness of its substantial request for fees attributable thereto.

Ice Miller spent far too much time developing procedures that admittedly were cut and pasted from documents used in other cases and that only served to complicate matters. And to the extent that Ice Miller might have justified its time developing complicated procedures as being necessary to avoid issues down the road, that argument would carry little weight given the failure to take into account the apparently pivotal—and foreseeable, if not actually known—issue of how the purchase price was to be allocated for taxes. As a result, only half of the $271,588.50 in fees sought in Ice Miller's Third Interim Application for the disposition of assets will be allowed. Accordingly, $135,794.25 will be disallowed.

### ii. UPS Stores

Of the $96,336.50 in fees requested for the disposition of assets in Ice Miller's Second Interim Application, more than half of that sum was billed in relation to the sale and closing of the UPS stores.[19] In June 2015, after receiving an offer to purchase the Champaign store for $100,000 and a separate offer to

---

[19] Likewise, about half of the more than $60,000 sought by FMB for the disposition of assets in its second interim application period are attributable to sale efforts related to the UPS stores. Those efforts will be discussed further below.

purchase both the Champaign and Danville stores for $110,000, the Debtor obtained authority to sell the assets at auction. According to the procedures set forth in a supplement to the motion to sell, bidders were free to make offers for the purchase of one or both stores with the understanding that the Debtor, in its sole discretion, would determine the best and highest offer. The auction, held in July 2015, resulted in the sale of the Champaign store for $152,000, which was reportedly higher than any bid for both stores. Unfortunately, the Danville store did not sell at auction or otherwise, and it was eventually closed. In March 2016, the Debtor filed a motion to sell the inventory and equipment of the Danville store to the purchaser of the Champaign store for $1500, only to report several months later that the deal had fallen apart.

In the broadest sense, selling the Champaign store and closing and trying to sell the inventory of the Danville store was not unreasonable. There was an obvious benefit to be gained for the estate. But a closer look at the billing invoices calls the reasonableness of Ice Miller's fees for the work into question. For instance, after the decision was made to close the Danville store, the Debtor sought authority to sell the remaining inventory and equipment for $1500, having received an offer from the purchaser of the Champaign store. Normally, this course of action would be entirely appropriate. The problem is that Ice Miller now asks to be paid $1500 just for preparing and filing the motion to sell. For experienced bankruptcy attorneys to bill time not only for drafting but also for "revising" or "finalizing" a basic motion to sell personal property is unreasonable, especially when there was little, if any, benefit to be gained in the first place. The same can be said of the time spent revising and finalizing the report of sale related

to the Champaign store. A report of sale is not complex. Preparing it should not require any revising or finalizing beyond proofreading the document for typos.

Also problematic was billing more than a fraction of an hour on more than one occasion to review and analyze the "issue" of cancelling cable and internet service and paying the associated cancellation fee for the UPS stores. Without some explanation or justification for the time, the Court must conclude that time spent doing anything other than simply cancelling the service and paying the associated fee is unreasonable.

Similarly, the generic descriptions of services in a number of other time entries make it impossible to evaluate the charges. One entry states that the attorney "considered communication from potential purchaser[,]" but it gives no indication of what the communication was about, who the potential purchaser was, or, most importantly, what asset was at issue. How can the Court credibly determine the reasonableness of charges when it is not even clear what is being described in the time entry? Other examples include "consider[ing] UPS documents" and "review[ing] UPS franchise agreements" on numerous occasions over the course of months without any indication of the purpose for which the documents were being considered or how that purpose was distinct from the time charged previously by the same or other individuals.

Due to the generic descriptions of services related to the sale of assets, coupled with the glaring instances of unnecessarily billing time for simple or pointless tasks, it cannot be assumed that the $96,336.50 in fees sought in Ice Miller's Second Interim Application for the disposition of the UPS stores and their assets is reasonable. It was up to Ice Miller to provide the level of detail necessary

for the Court to make that determination. Ice Miller fell short in this regard. But, because the general course of action in selling the Champaign store and closing the Danville store was not inappropriate, a substantial portion of the fees charged for the disposition of assets in the Second Interim Application will be allowed. A 30% reduction will be applied, resulting in $28,900.95 being disallowed.

### c. Costs

In its Second Interim Application, Ice Miller seeks reimbursement of its out-of-pocket costs in the amount of $21,568.49. Because that figure does not include the cost of photocopies and postage, charges for legal research service providers, and attorney admission fees, among other things, the request is largely justified. There are, however, some costs that will not be reimbursed.

A significant portion of the expenses incurred by Ice Miller stemmed from charges by third parties in responding to subpoenas. And these costs are entirely appropriate as long as it is reasonably clear what the purpose of the subpoena was and who the responding party was. For the most part, such information was provided in the invoices. The one exception is found in invoice no. 1380930, wherein Ice Miller seeks reimbursement of $867.52 for "copies of records in response to subpoena." Unlike the other third-party subpoena costs, the entry in invoice no. 1380930 gives no information that would tie the expense to a particular matter. Ice Miller is entitled only to reimbursement for "the precise expenses incurred, including only claims for fully-documented, actual, out-of-pocket expenses." *Gvazdinskas*, 2010 WL 1433308, at *6 (citing *Wildman*, 72 B.R. at 731; *Vancil Contracting*, 2008 WL 207533, at *6). Without more information, the

- 37 -

Court cannot concluded that the $867.52 charge was actual or necessary, and it must therefore be disallowed. Likewise, several charges were incurred for "courier expense" without any further explanation. The Court has no idea why a courier expense was charged or for what, in fact, a courier was used. As a result, the courier expenses totaling $583.36 will not be allowed. In all, $1450.88 of the $21,568.49 of the costs for which reimbursement is sought in Ice Miller's second application will not be reimbursed.

As for Ice Miller's Third Interim Application, it seeks reimbursement of $2632.96 in costs. Of that amount, another $110.92 is attributable to "courier expenses" and will not be allowed for the same reasons set forth above. In addition, unlike the Second Interim Application, the Third Interim Application seeks reimbursement for unspecified "postage expenses" totaling $1097.71. Here, again, the costs are described in only generic terms and should be disallowed on that basis. In addition, in this Court's view, general postage expenses constitute overhead absent extraordinary circumstances. *In re Nave*, 2016 WL 1254688, at *10 (Bankr. C.D. Ill. Mar. 30, 2016); *In re Convent Guardian Corp.*, 103 B.R. 937, 940 (Bankr. N.D. Ill. 1989). Some of the specific postage charges that Ice Miller seeks reimbursement of are significant. But, because Ice Miller did not provide any detail to justify the costs, the postage expenses must be disallowed. Thus, $1208.63 of the $2632.96 in costs for which reimbursement is sought in Ice Miller's Third Interim Application will not be allowed.

### d. Summary of Ice Miller's Fee Applications

Ice Miller requested a total of $1,796,847.50 in fees in its Second and Third

Interim Applications. From that amount, the following reductions will be made: $215,711.12 for redactions, $245,254 for bad math and unsubstantiated charges; $144,151 for preparation of the fee applications; $189,252 for unreasonable or unjustified fees in the Gaudio adversary proceedings; and $164,695.20 for unreasonable or unjustified fees charged for the disposition of the Tilton warehouse and the UPS stores.

Of the remaining $837,784.18, an additional reduction of 20% will be applied to account for the general carelessness and any unaccounted for errors throughout the Second and Third Interim Applications. After taking this reduction of $167,556.84 into account, $670,227.34 in fees remain. As such, Ice Miller will be allowed fees for its Second and Third Interim Applications in the amount of $670,227.34. Of the $24,201.45 in costs for which reimbursement is sought, $21,541.94 will be allowed. Reimbursement of all other costs will be denied.

As mentioned above, certain compensation procedures were implemented early on in the case whereby Ice Miller and FMB could send monthly invoices to interested parties and obtain prepayment of a portion of its uncontested fees and expenses subject to ultimate court approval upon the filing of an application under Bankruptcy Rule 2016. According to its Second Interim Application, Ice Miller received such prepayments for services rendered and costs incurred during the second interim application period in the amount of $130,747.36—$10,428.98 of which Ice Miller attributes to reimbursement of costs. No prepayments were made during the third interim application period. However the prepayments are allocated, the result is the same. Ice Miller will be awarded $691,769.28 in fees and costs for the periods covering the Second and Third Interim Applications.

Discounting that amount by the $130,747.36 already paid, $561,021.92 remains to be paid from the estate.

## B. FMB's Fee Applications

Through its Second and Third Interim Applications, FMB seeks approval of $715,713 in fees and $1704.32 in expenses. Like Ice Miller's applications, FMB's applications raise a number of issues regarding the awarding of fee and costs to professionals.

### 1. Redactions

As with Ice Miller, FMB's billing invoices are heavily redacted. Between its Second and Third Interim Applications, FMB redacted 600.3 hours that amount to fees of $56,252.20.[20] For the same reasons that Ice Miller's redacted time entries will be disallowed, the fees charged by FMB based on time entries that were redacted, which the Court calculates to be $56,252.20, will not be allowed.

### 2. Reasonableness and Necessity of Work

Nearly half of the time billed by FMB relates to the adversaries prosecuted by Ice Miller and the general recovery and disposition of assets. This is concerning for two reasons: first, it raises questions about what appears to be a duplication of services; and, second, it places a heavy burden on FMB to justify its fees for work that the Court has determined was largely unreasonable.

---

[20] The Court used a blended rate of $187.32 per hour for FMB to calculate the amount charge for redacted entries.

According to the narrative included with its applications, FMB "oversaw all of the operations of the Debtor, the adversary proceedings, and the sale of the [D]ebtor's assets." FMB also states that it "has worked closely with retained legal counsel in this case, but throughout, [FMB] and counsel have closely monitored their work in order to avoid duplication of effort." FMB's applications suggest, however, that a significant amount fo the work they are charging for is not work FMB was hired to do and, in fact, was duplicative of work done by other professionals.

### a. Adversary Proceedings

Specifically, FMB states that it "prosecuted [the] adversary proceedings in order to recover assets to the estate." But Ice Miller was retained to represent the Debtor in all legal matters, and it appears that the bulk of services provided by FMB in the adversary proceedings was legal work for which Ice Miller was retained. Examples of such services include reviewing, revising, and editing pleadings, contracts, and other legal documents; attending depositions; and participating in settlement negotiations and legal strategy meetings.

FMB states in its applications that, along with Ice Miller, it worked very carefully to avoid the duplication of services, but nothing in its applications makes that clear. In essence, FMB asks the Court to trust that the services it provided were necessary and not a duplication of services otherwise provided by itself or others. While participation by more than one professional can be justified in complex matters, many courts have emphasized the difference between duplication and coordination of services. *E.g.*, *In re Chicago Lutheran Hospital*

*Ass'n*, 89 B.R. 719, 736 (Bankr. N.D. Ill. 1988). But in either instance, courts cannot assume that the requested fees are reasonable; some explanation is necessary.

Assuming that FMB could justify its services in the adversary proceedings as distinct from the legal work of Ice Miller, those services would still need to be justified as necessary or beneficial. As to the more significant proceedings against Dennis Gaudio, Eric Gaudio, and related entities, FMB billed 1147.89 hours for $152,311.50 in fees. As described by FMB in its applications, the services provided largely consist of legal work that Ice Miller was retained to provide. Significantly, the amount of time spent on these proceedings was nearly twice as much as that of Ice Miller, which, as explained above, was unreasonable under the circumstances. FMB has provided no justification for the time spent on the Gaudio proceedings, and, in light of the Court's determination that most of the amounts charged by Ice Miller for the same or similar actions were unreasonable, a significant reduction in FMB's fees is also warranted. Only 20% of the fees charged on this matter will be allowed and, accordingly, $121,849.20 will be disallowed.

With regard to several other proceedings that resulted in a surplus to the estate, much of Ice Miller's fees were justified as being beneficial. The same cannot necessarily be said for the time that FMB spent on these matters. As a practical matter, the extent to which FMB's fees for these matters are allowed will have a corresponding impact on the monetary benefit realized by the estate. In some cases, like American Express, Citibank, and Discover Bank, a substantial surplus would remain even with the allowance of FMB's fees. In other cases, like World

-42-

Business Lenders, allowing FMB's $4636 in fees would only further diminish what little surplus was obtained. And in a couple of cases, like Regions Bank and Specialty Distributing, allowing FMB's fees would result in a net loss to the estate. As a whole, even if FMB's fees related to the adversary proceedings are allowed only in part, the fees still represent a significant cost to the estate. Based on this, as well as the fact that the services provided were largely legal in nature and duplicated what Ice Miller was retained to do, whatever benefit there might have been is not evident. The burden remained on FMB to explain how its services were necessary or beneficial, which, again, it failed to do.

Not including any charges that may be in uncategorized invoices, which are discussed below, FMB seeks approval of $83,783 that can be attributed to work done on adversary proceedings other than the Dennis and Eric Gaudio lawsuits. Of that number, $65,501.50 is itemized into distinct invoices categorized by lawsuit. The remaining $18,281.50 is lumped into an "asset analysis and recovery" category that is not subdivided by lawsuit. Despite the organizational inconsistencies and lack of substantiation, FMB will be given the same benefit of doubt extended to Ice Miller, and its fees on the adversary proceedings not otherwise reduced will be allowed.

## b. Disposition of Assets

In its narrative included in the applications, FMB merely states that "[d]uring the Second Interim Period the UPS stores were shut down and the saleable assets were marketed and disposed of" and that it "worked with counsel to and the professionals worked hard to resolve access issues that limited the

value of the Debtor's warehouse property and then to market and identify a buyer for that property." A review of the invoices shows that, in addition to assisting with the drafting and preparation of legal documents like motions to sell and purchase agreements, FMB's time consisted of supervising the packing and removal of personal property, as well as maintenance and contractor work; communicating and meeting with prospective buyers regarding offers to purchase; and reviewing and signing off on marketing strategies, among other things. But as with the legal work, much of the services provided by FMB related to disposing of assets consisted of work that other professionals—like Binswanger and Hilco—were hired to do. As with the services provided in the adversary proceedings, the Court cannot simply take FMB's word that it avoided the duplication of services. Again, even if it were to do so, FMB would still have the burden of establishing that its work was necessary or beneficial.

The problems associated with the sale of the Tilton warehouse and the UPS stores have already been discussed and will not be repeated here. Suffice it to say that the problems created by the burdensome sale procedures and inability to figure out how to sell modest assets without incurring significant costs apply equally to FMB. Those problems are compounded by the fact that FMB seeks compensation for what appear to be overlapping services that have already been determined to be unreasonable. And to the extent services do not overlap with those provided by Ice Miller, they appear to largely overlap with the services provided by either Binswanger or Hilco. Perhaps FMB could have justified all of its fees as necessary or beneficial. A fair portion of its time was spent doing security checks on the Debtor's real property, attending open houses and

inspections, and monitoring repairs done on the properties. Generally speaking, those types of services may be compensable. But FMB recorded more than 130 hours at professional rates between $225 and $265 an hour, amounting to more than $30,000 in fees, for what can only be described as ministerial tasks. If there was more to the story, FMB should have filled in the details. But based on the information presented, approval of FMB's fees, as requested, cannot be justified as being either necessary or beneficial to the administration of the case.

It was up to FMB to justify the necessity of its services, and that included explaining why it was necessary to perform work that other professionals were employed to provide or how the services it provided were distinct. At a minimum, the applications needed to make clear why FMB is entitled to receive what it seeks. That, however, did not happen. FMB merely recited, in generic terms, the services it provided and stated that it was careful to avoid the duplication of services. As a result, the Court is left with three years of billing invoices that appear to consist largely of overseeing or performing the work of other hired professionals or supervising non-professional work at professional rates with no explanation of how the services it provided were independently reasonable. Based on the Court's calculations, FMB devoted 345.8 hours to the disposition of assets, amounting to $72,190 in fees for which approval is sought. That number will be reduced by 70%, resulting in $50,533 being disallowed.

### 3. Other Issues

Many of the careless errors and sloppy timekeeping issues present in Ice Miller's applications are also present in FMB's applications. Like Ice Miller, FMB

made numerous mathematical errors. For example, in an entry dated July 13, 2015, in invoice no. 10390 attached to FMB's Second Interim Application, $675 was billed for 2.7 hours at an hourly rate of $250. But the actual times recorded for the three discrete tasks listed amount to only 1.4 hours, a difference that would have cost the estate more than $300. Multiple mathematical errors resulted in the estate being overcharged $6502.25 by FMB. These charges, which are wholly unsubstantiated and were not actually incurred, cannot be allowed.

As with Ice Miller, the Court cannot assume that it caught all of FMB's bad math. And to the extent the Court might have endeavored to do so, its efforts would have been hindered by other carelessness, like miscategorizing time entries and failing to explain the services that were provided in anything but generic terms. As a result, a further reduction to FMB's remaining fees not otherwise disallowed is appropriate.

The same can be said of another troubling aspect of the timekeeping in the applications—recording substantial time in a single entry or by a single person. A number of time entries show several hours of time spent without a break. For example, in an entry dated July 13, 2015, in invoice no. 10373 attached to FMB's Second Interim Application, Kim Klonicki, a certified public accountant, recorded 8.5 hours in a single, continuous entry for the "[c]ontinued reconciliation of Non EGS payments made to D. Gaudio's personal HELCO Iroquois Bk #9738 (2009-2013) relative to vetting potential adversary actions[.]" While it appears from several entries that significant time was dedicated to this matter, billing for 8.5 hours straight—without any indication of a lunch or other break taken—raises concerns about the accuracy of the time entries in general. This is particularly

true given that it is not an isolated incident. In an entry dated March 31, 2016, in invoice no. 10390 attached to FMB's Second Interim Application, Sarah Neill, an attorney, "[r]esearched, reviewed, analyzed and prepared business records and identified documents in preparation of document production in response to discovery requests" for a solid 9.8 hours. Billing several hours in a single day is not necessarily uncommon, but when a full day's work is billed without any break in time, it gives the impression that the person who recorded such time worked on the matter exclusively and continuously for the time stated. The Court is skeptical that this was the case here.

Equally, if not more, troubling, are the time entries by a single person that reflect time spent well in excess of a regular work day. For instance, on July 15, 2015, FMB billed 13.4 hours spent by Michele Morgan on various tasks. Likewise, on September 4, 2015, FMB billed 12.4 hours spent by Rachael Gould on several tasks related to the Eric and Dennis Gaudio litigation. And in two entries dated September 12, 2015, in invoice no. 10383 attached to FMB's Second Interim Application, Angela Hart recorded 13.9 hours spent on the Earl and Dennis Gaudio litigation, although only 6.5 hours of that time was actually billed. Examples like these are peppered throughout the applications and appear to be nothing more than the padding or inflating of time. There are, of course, instances where exigency demands action and professionals have no choice but to respond by working extra hours. But, there is nothing in the record to suggest that there were ever any such urgent circumstances in the Eric and Dennis Gaudio litigation or other matters. And even if there had been some urgency that compelled FMB employees to work 13 hour days, the charges should have been explained in some

way, either through the detail included in the time entries themselves, the narrative of services provided as part of the applications, or otherwise. Here, neither the narrative included in the applications nor the time entries themselves provide insight into or justification for the time billed.

To account for the lack of justification of what appear to be padded or inflated time entries and for the general carelessness in recording, calculating, and explaining the fees requested, some reduction to the fees not otherwise disallowed is warranted. And, because these problems cannot be quantified absent significant effort by the Court, a flat 10% reduction will be applied to the portion of FMB's fees not otherwise specifically disallowed herein. Like the 20% reduction to Ice Miller's fees, the 10% reduction to FMB's fees also takes into account services not compensable to FMB, including, but not limited to, the time billed for "litigation consulting" and preparation of fee and employment applications.

For all of their problems, FMB's billing invoices are generally broken down into separate categories of the tasks performed or services provided. Invoice no. 10059, attached to FMB's Second Interim Application, however, lists all entries chronologically, without dividing them into distinct categories of tasks or services. However burdensome it would have been for the Court to independently investigate the reasonableness of the fees charged in other invoices, evaluating the charges billed in invoice no. 10059 would be exponentially more difficult. Determining whether the $158,540 charged in that invoice is reasonable would require the Court, on its own, to scrutinize each entry, separate and categorize those entries that are justified, and compare those totals to the work actually done. Not only would this be burdensome, it would be all but impossible. As the

Court has continuously made clear, the burden is on the applicant to show that it is entitled to fees. The Court will not engage in extensive efforts to justify fees where the applicant has not taken the time or put forth the effort to do so.

Assuming the same problems associated with the rest of FMB's requested fees are present in invoice no. 10059, a significant reduction is warranted. But, again, rather than attempting to calculate the precise degree to which invoice no. 10059 comports with the requirements for compensation, especially when FMB has not taken the time to justify the charges, the Court will simply disallow the $158,540 billed in invoice no. 10059 in its entirety. This is particularly appropriate, given that FMB has not taken the time to justify the charges despite being forewarned that any questions about the substantiation or justification of fees requested after the first interim period would be resolved against it.

### 4. Costs

In its Second Interim Application, FMB seeks reimbursement of $1704.32 in costs incurred. Those charges appear to be appropriate and will be allowed in the amount requested. FMB does not seek reimbursement of any costs in its Third Interim Application.

### 5. Summary of FMB's Fee Applications

Through its Second and Third Interim Applications, FMB requests approval of $715,713 in fees. As with Ice Miller, several reductions will be applied. They include: $56,252.20 for redactions; $172,382.20 for fees not justified as necessary and reasonable; $158,540 for the invoice that did not categorize time entries by

task; and $6502.25 for general mistakes and mathematical errors. After taking these reductions into account, $322,036.35 in fees remain. From that figure, an additional 10%, or $32,203.64, will be disallowed for general carelessness and any unaccounted for errors. As a result, only $289832.71 of the fees requested in FMB's Second and Third Interim Applications will be allowed. The entire $1704.32 in costs will be approved.

During the second interim application period, FMB received prepayment of $288,549.89 in fees and costs pursuant to the compensation procedures discussed previously. Of that amount, FMB attributes $904.01 to reimbursement of costs. But prepayment of those amounts was not final and remains subject to this Court's approval. No prepayments were made during the third interim application period. Applying the $288,549.89 already paid to the $291,537.03 in fees and costs approved herein leaves $2987.14 that remains to be paid by the estate.

## IV. Conclusion

Properly employed professionals are entitled to "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses." 11 U.S.C. §330(a)(1)(A)-(B). Whether the time spent and fees charged are reasonable, however, is for the Court to decide. *Vancil Contracting*, 2008 WL 207533, at *4. And it is a duty that this Court does not take lightly. At the hearing on the applications, Attorney Powers was told that the Court would go through all of the applications line-by-line, and, unfortunately for both Ice Miller and FMB, the Court has done just that. But the Court is not required to engage in efforts to

justify fees for a professional. *Gvazdinskas*, 2010 WL 1433308, at *2. The burden of showing entitlement to fees rests solely with the professional seeking compensation. *Id.* To meet that burden, professionals must present an application that is well-organized, clear, and detailed in a manner that shows the court that the fees requested are fully justified as reasonable. *Id.* at *2-3.

Ice Miller is a well-respected, national law firm, and all of the Ice Miller attorneys who have appeared in the case are well-credentialed. But, for reasons that are not clear, they did not focus on this case as required and failed to efficiently resolve the many issues presented. Attorney Burke filed the case and then immediately turned it over to Attorney Caughey. Attorney Caughey completed the sale of the beer distributorship—a challenging project that most likely was what interested Ice Miller in the case in the first place—and then left the firm. Thereafter, the case was shuffled off to attorneys in a more distant office with no connection to or interest in Central Illinois. Selling an empty warehouse, closing two modest UPS stores, and pursuing a handful of fraudulent conveyance actions was less interesting work and resulted in half-hearted efforts by the attorneys. Perhaps most telling was the insistence of Ice Miller attorneys on the use of their form sales documents, which included strict confidentiality requirements for the sale of the Tilton warehouse even though they were never able to identify even one detail about the warehouse sale that was confidential. It was easier to insist that they knew what they were doing and to run up huge fees preparing complicated, albeit recycled, documents than to figure out how things might best be done in Central Illinois. And Ice Miller never hired local counsel, a move that most certainly would have reduced the cost of court appearances and other activities

and might have provided them with insights into local practice and procedure that would have resulted in more efficient administration of the estate.

Ice Miller's preparation of the Second and Third Interim Applications for itself and FMB also evidences the lack of attention to detail paid to the case. Literally hundreds of thousands of dollars in compensation were requested in the applications either without any documentation whatsoever or based on documentation riddled with mathematical errors. Further, the exhibits to the applications were heavily redacted, and Ice Miller made no effort to mitigate the effect of the redactions by seeking to file unredacted copies under seal or through an *in camera* review. The Ice Miller attorneys most certainly know that a court cannot grant relief based on documents with critical information redacted and that the burden was on them to provide the required information to this Court. The submission of heavily redacted time records without making any attempt to provide unredacted information to the Court shows a disdain for the process and a lack of interest in the case that justifies the significant reduction in requested fees here.

FMB is also not without blame for the results here. Due to the fractured relationships in the Gaudio family, FMB was appointed custodian for the Debtor in pre-petition state court litigation and continued in that role post-petition. Thus, FMB was essentially standing in the shoes of the Debtor and, without question, owed a fiduciary duty to the Debtor and its creditors. Yet, FMB's time records show no meaningful analysis or preparation of a game plan to efficiently administer the estate after the sale of the distributorship. It did nothing to keep attorney fees in check; to the contrary, it ran up huge fees reviewing the work of

its own attorneys. Under its watch, $2.5 million in fees were accrued with substantially less than that being recovered through sales and adversary proceedings. FMB's Second and Third Interim Applications provide little justification for its fees, and no attempt was even made in those applications to claim that there was any net benefit to the estate from the work that was done. FMB went along with Ice Miller and, apparently, condoned Ice Miller charging $1500 to prepare a motion to sell the inventory of the Danville UPS store for $1500. If FMB employees have expertise in the disposition of assets, why did they not see that abandonment of that inventory was the cheapest way to conclude the matter? That and many other similar questions would have needed to be answered for FMB to receive the fees it requested. In the absence of any answers, FMB's fees are properly reduced.

Here, both Ice Miller and FMB accrued hundreds of thousands of dollars in fees over a three-year period. Unfortunately, neither entity did much to justify the fees in their applications beyond stating that they did the work they billed for. The Court's ability to evaluate those fees was complicated by the substantial amount of redactions and organizational defects present throughout the applications. Other errors and the general carelessness with which the applications were prepared raised further doubts about the accuracy and reasonableness of the fees.

In the end, the failure of Ice Miller and FMB to justify their own fees comes at a great cost to themselves. Had they heeded the Court's earlier warnings about the care and attention required for the allowance of fee applications, the outcome here might have been different. But they did not pay attention to prior admonitions, and their requested fees must be significantly reduced and

disallowed.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###
