**SIGNED THIS: March 29, 2019**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 13-90942 |
| EARL GAUDIO & SON, INC., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## O P I N I O N

Before the Court is the Fourth and Final Application of Ice Miller LLP, Counsel to the Debtor, for Allowance and Payment of Compensation and Reimbursement of Expenses for the Period December 16, 2017 to September 5, 2018, and Final Application for Allowance and Payment for All Prior Fee Periods (#880) and the Fourth and Final Application of First Midwest Bank, Custodian for the Debtor, for Allowance and Payment of Compensation and Reimbursement of Expenses for the Period January 1, 2018 to September 5, 2018, and Final Application for Allowance and Payment for All Prior Periods (#881). For the

reasons set forth in detail herein, both applications will be allowed, in part, and denied, in part.

## I. Factual and Procedural Background

On July 19, 2013, Earl Gaudio & Son, Inc., ("Debtor") filed its voluntary Chapter 11 petition. The Debtor primarily operated as a beer distributor for Anheuser-Busch InBev ("Anheuser-Busch"), serving East Central Illinois, as well as parts of Indiana and Ohio. The distributorship operations were conducted from a warehouse located at 1803 Georgetown, in Tilton, Illinois ("Tilton warehouse"), which the Debtor had purchased several years before filing bankruptcy. In addition, the Debtor owned and operated two UPS franchise stores, one in Champaign, Illinois, and the other in Danville, Illinois.

Management of the Debtor was kept largely within the family. When the long-time president, Earl Gaudio, retired in 2010, his son Dennis Gaudio and grandson Eric Gaudio took over the business. By 2013, however, there was a falling out, and Helen Gaudio, Earl Gaudio's wife and the company's largest shareholder, sought to remove Dennis and Eric from their positions for violating their fiduciary duties to the business. As a result, First Midwest Bank ("FMB") was appointed custodian of the Debtor on June 27, 2013.[1] The following day, attorneys from Ice Miller LLP ("Ice Miller"), with offices in Illinois, Indiana, and Ohio, among other places, appeared in the state court proceedings on FMB's behalf. Less than three weeks later, the Debtor's bankruptcy petition was filed.

---

[1] The proceeding that resulted in FMB's appointment as custodian was filed in the Vermilion County Circuit Court and assigned case number 2013-MR-120.

On July 24, 2013, the Debtor, through its custodian, FMB, sought to hire the attorneys of Ice Miller. In its employment application and related Bankruptcy Rule 2014 disclosures, Ice Miller gave a brief history of the Debtor's roots and explained that it had represented FMB after its appointment as custodian for the Debtor in Vermilion County Circuit Court and that its knowledge of the business made it well-qualified to represent the Debtor. And while Ice Miller did acknowledge that it held an unsecured claim against the Debtor and represented certain creditors of the Debtor, it unequivocally denied owning or representing any interests materially adverse to the estate of the Debtor, its creditors, or other interested parties and affirmatively stated that it had no present connection with the Debtor's estate, its creditors, or any other party-in-interest in this case. Ice Miller acknowledged its responsibility to supplement its disclosures in the event connections were discovered. The firm also disclosed $15,000 paid to it as a retainer for its services in the bankruptcy.

While Ice Miller's employment was pending, an application was filed to employ FMB as custodian for the Debtor and to confirm the scope of authority granted in the Vermilion County removal action. Disclosing only that it held an unsecured claim against the Debtor related to its prepetition services as custodian, FMB asserted that it "has no connection with the Debtor, the Debtor's estate, their creditors, or any other party-in-interest or their attorneys or accountants concerning this engagement[.]" No mention of any prepetition payments was made, and the application included a request that FMB be excused from any requirement to provide detailed descriptions of the services it provided as a prerequisite to approval of any fees.

- 3 -

The employment of Ice Miller and FMB was approved on August 29, 2013. The orders approving the retention of the attorneys and the custodian provided that the fees of both entities remained subject to court approval, and the order approving FMB's employment specifically denied its request to be excused from reporting requirements. The order employing Ice Miller specifically instructed that the $15,000 retainer could only be applied to satisfy the firm's fees and expenses approved by the Court and only to the extent there were insufficient assets in the estate to pay the allowed fees.

In October 2013, an order was entered approving certain compensation procedures whereby professionals retained by the Debtor or the Official Committee of Unsecured Creditors ("Creditors Committee") could send monthly invoices to the Debtor's attorneys, the custodian, the Creditors Committee, and the United States Trustee ("UST"). And, in the absence of a timely objection, a predetermined percentage of the undisputed amounts of fees claimed would be paid by the Debtor subject to later court approval.

The Debtor's primary asset, the distributorship with Anheuser-Busch, along with related equipment and inventory—but not the Tilton warehouse—was sold shortly after the case was filed. The sale closed on September 20, 2013, at a final purchase price of $9,569,700.73.

In June 2014, Ice Miller filed first interim fee applications on behalf of itself and FMB, drawing objections from both the UST and the Creditors Committee. At a hearing on the applications, issues were raised about the accuracy of the applications, and both applications were supplemented in mid-July. After the Ice Miller application was supplemented two additional times due to mistakes and

inconsistencies, the applications were ultimately allowed, in part, in the amounts of $320,108.90 for Ice Miller and $443,165.25 for FMB. At the applicants' request, 90% of their fees and 100% of their costs were authorized to be paid. The difference, while allowed, was not paid. In allowing the applications, the Court noted Ice Miller and FMB's success in promptly selling the beer distributorship, thereby maximizing the potential recovery for unsecured creditors. Both entities were admonished, however, that the first interim applications contained serious errors and that future fee applications must be more detailed and proofread for inaccuracies before filing. Both Ice Miller and FMB were warned that, in the future, discrepancies would simply be resolved against them and that the Court would not issue repeated requests for supplements and corrections as it had done with the first interim requests.[2]

Beginning in late 2014 and continuing through 2015, Ice Miller filed a number of adversary proceedings to recover money or property on behalf of the estate and to resolve other issues. Although Attorney Ben Caughey filed the first of the adversary proceedings, Attorney Victoria Powers of Ice Miller's Columbus, Ohio office began filing the adversary proceedings in 2015. Attorney Powers also became the principal filer of all other documents on behalf of the Debtor in early 2015. On September 25, 2015, Attorney Powers filed a document she labeled as a supplement to the original application to employ Ice Miller in which she disclosed that Attorney Caughey was no longer with Ice Miller and that she and several other attorneys, all apparently in the Columbus, Ohio office, would be

---

[2] The first interim applications were the first contested matters heard by this Court after being assigned the case upon the retirement of Judge Gerald Fines on May 31, 2014.

representing the Debtor. No other disclosures were made at that time.

On December 12, 2014, the Debtor commenced an adversary proceeding against Paul Offutt, the individual who had sold the Tilton warehouse to the Debtor and remained the owner of adjacent property. Mr. Offutt had restricted access to a route of ingress and egress to the Tilton warehouse, and the action was filed to resolve the resulting disputes with Mr. Offutt and the Village of Tilton. Adversary proceedings were also filed against the Small Business Administration ("SBA") and others to determine the extent of their secured liens and to recover portions of the distributions made to them pursuant to an order entered after the sale of the distributorship. Dennis Gaudio, Eric Gaudio, and several related entities were also sued to avoid transfers made to them, to recover property, to disallow their claims, and for other relief. Finally, several creditors were sued to recover alleged fraudulent transfers. All of these adversary proceedings have been resolved—some with significant benefit to the estate and others at significant expense and with little, if any, benefit to the estate.

In 2016, the Debtor increased its efforts to market and sell the Tilton warehouse. And, after nearly two years, two real estate brokers, one complicated set of bidding procedures, and a host of other issues, the Tilton warehouse was sold to Paul Offutt, the original owner and only participating bidder, at a reduced price. The Report of Sale of the Tilton warehouse was filed on November 22, 2017.

On the same day, Ice Miller filed Second Interim Applications for Compensation ("Second Interim Applications") on behalf of itself and FMB. The Second Interim Application of Ice Miller sought compensation of $1,278,476 and expense reimbursement of $21,568.49 for the period of April 1, 2014, through

November 30, 2016.  FMB's Second Interim Application sought compensation of $694,773 and expense reimbursement of $1704.32 for the period beginning April 1, 2014, and ending June 15, 2017. Both applications drew objections from the SBA, the Illinois Department of Revenue, the Creditors Committee, and Helen and Earl Gaudio. At the request of the parties, hearing on the Second Interim Applications was continued several times.

On February 6, 2018, Ice Miller filed Third Interim Applications for Compensation ("Third Interim Applications") on behalf of itself and FMB. The Third Interim Application of Ice Miller sought compensation of $518,371.50 and expense reimbursement of $2632.96 for the period from December 1, 2016, to December 15, 2017. The Third Interim Application of FMB sought approval of $20,940 in fees incurred between June 16, 2017, and December 31, 2017. Both applications also drew multiple objections. Generally, the objections asserted that the estate was insolvent and that both Ice Miller and FMB had run up huge amounts of fees without generating much positive return for the estate.

Hearing was finally held on the Second and Third Interim Applications of Ice Miller and FMB on April 11, 2018.  At that hearing, Attorney Powers appeared for Ice Miller and FMB. She admitted that the estate was insolvent. She stated that, after collection of a $600,000 settlement from the SBA, the custodian would have a little more than $2.1 million on hand, and she estimated that the remaining secured claims, administrative expense claims other than those of Ice Miller and FMB, and priority claims totaled $775,000. She also stated that, in a recently filed liquidating Chapter 11 plan, the Debtor had proposed a carve-out for unsecured creditors of $150,000. Attorney Powers confirmed that, in the proposed plan, Ice

Miller and FMB were agreeing to subordinate their administrative expense claims for compensation to the other administrative, secured, and priority creditors and to the carve-out for unsecured creditors. She calculated that approximately $1.2 million would be left to pay the $2.5 million in fees and expenses sought by Ice Miller and FMB. After hearing from the objectors and Attorney Powers, the matters were taken under advisement. Shortly thereafter, a First Amended Chapter 11 Plan was filed by the Debtor, increasing the proposed carve-out for unsecured creditors to $300,000 and correspondingly reducing the amount available to pay Ice Miller and FMB.

On June 8, 2018, while the Debtor's First Amended Chapter 11 Plan and Ice Miller and FMB's Second and Third Interim Applications were pending, the Debtor filed its Objection to Claim 47-1 of Helen Gaudio, Guardian of the Estate of Earl Gaudio ("Objection to Claim 47-1"). The claim, filed by Helen shortly after the bankruptcy was commenced, was based on an entry in the company balance sheet described as "Note Payable - Earl Gaudio" in the amount of $708,175.56.[3] The Objection to Claim 47-1 was based on the lack of documentation or other supporting evidence and asked that the claim be denied or, in the alternative, recharacterized as an equity contribution. The Objection to Claim 47-1 was set for hearing on July 11, 2018.

---

[3] Earl Gaudio was adjudicated a disabled person on April 15, 2013, and Helen was appointed limited guardian. Earl Gaudio died on May 13, 2016. The Petition for Probate of Will and For Letters Testamentary was filed by Helen Gaudio in the Vermilion County Circuit Court on May 17, 2016, and was assigned case number 2016-P-93 ("Probate Action"). Helen Gaudio was appointed to serve as administrator of the decedent's estate in the Probate Action until her removal on December 22, 2017. At that time, Attorney James Brougher was appointed administrator in her stead. This is discussed in greater detail below.

Prior to the hearing on the claim objection, the Debtor filed a Second Amended Chapter 11 Plan. And, on July 10, 2018, the day before the scheduled hearing, the Court entered its Opinion and Order on the Second and Third Interim Applications of Ice Miller and FMB.[4] Ice Miller was awarded $670,227.34 in fees and $21,541.94 in expenses, and FMB was awarded $289,832.71 in fees and $1704.32 in expenses. The awards were substantially less than their collective request of $2,535,806.76 in fees and costs. In broad terms, the reductions were made based on excessive redactions in their billing invoices, numerous mistakes and miscalculations, and their general mishandling of matters and improper billing practices. The order allowing fees further provided that Ice Miller and FMB were to apply the amounts reportedly received as prepayments, totaling $130,747.36 and $288,549.89, respectively, as a credit against the fees and costs allowed. The order prohibited the Debtor from making any further payment for the fees and costs awarded therein until otherwise ordered by the Court.[5]

At the hearing on the claim objection and plan confirmation held July 11, 2018, Jeff Richardson, the attorney representing Earl Gaudio's estate, tentatively proposed a global resolution that would allow Claim 47-1, in part, and clear up existing barriers to plan confirmation. But he was candid about having to discuss the matter with his client before proceeding. The matter was continued to allow the parties to confer and come to a resolution. At a status conference held on July

---

[4] The Court's full findings and conclusions as to FMB and Ice Miller's Second and Third Interim Applications are set forth in detail in *In re Gaudio & Son, Inc.*, 2018 WL 3388917, at *1 (Bankr. C.D. Ill. July 10, 2018).

[5] As Ice Miller explains in its Fourth and Final Fee Application, the outstanding balance has since been paid per the agreed confirmation order entered September 5, 2018. This is discussed in further detail below.

19, 2018, Mr. Richardson informed the Court that, following the July 11th hearing, he learned that the administrator of Earl Gaudio's estate, who had been appointed in the Probate Action to replace Helen Gaudio, had resigned, essentially leaving him without a client. He reported that Helen Gaudio had filed a Motion to Approve Bankruptcy Settlement in the Probate Action, explaining the circumstances and asking for authority to act on the probate estate's behalf in effectuating the settlement in the bankruptcy case. But the state court denied Helen Gaudio's motion, and, without a client authorized to give direction, Mr. Richardson was not in a position to move forward.

In the wake of this new information, on July 25, 2018, Ice Miller and FMB filed supplemental disclosures pursuant to Rule 2014 related to their employment in the Debtor's bankruptcy. Those disclosures revealed, for the first time, that FMB was named as the trustee of two revocable trust agreements (collectively "Trust Agreements") between itself and Earl and Helen Gaudio prior to the filing of the Debtor's Chapter 11 petition. The first revocable trust agreement was executed on November 22, 2011, between Earl Gaudio and FMB. The second revocable trust agreement, concerning the same account and assets, was executed on July 31, 2012, between Earl and Helen Gaudio and FMB. According to FMB and Ice Miller, the former engaged the latter with respect to the Trust Agreements in 2016, thereby beginning their involvement in various state court proceedings.

As FMB and Ice Miller frame it, Paul Offutt filed a complaint in November 2013 in state court against Earl Gaudio, based on Earl's alleged guarantee of

payment on a prepetition loan made by Mr. Offutt to the Debtor.[6] But FMB and Ice Miller say that they did not begin actively participating in state-court litigation between Helen Gaudio, both individually and as a representative of Earl Gaudio's estate, and Paul Offutt until March 14, 2016, when they filed a complaint for declaratory judgment against Helen Gaudio regarding the trust account funds held by FMB.[7] They only became involved in Mr. Offutt's lawsuit against Earl Gaudio in October 2016, after Helen was appointed to represent the interests of Earl's estate in the Probate Action and after she filed a third-party complaint against FMB therein. Mr. Offutt was then allowed to amend his complaint to include claims against FMB, and, eventually, all of the pending state-court cases involving Helen Gaudio, Earl Gaudio's estate, Paul Offutt, and FMB were consolidated into the Probate Action dealing with Earl Gaudio's estate following his death on May 13, 2016.

FMB and Ice Miller's July 2018 supplemental disclosures also reveal that, on December 19, 2016, FMB filed a claim against Earl Gaudio's estate in the Probate Action, seeking indemnification and reimbursement of damages, costs, and fees incurred or assessed in relation to the Trust Agreements and litigation. On December 22, 2017, Helen Gaudio was removed as the representative of Earl's estate in the Probate Action and Attorney James Brougher was appointed to replace her—a result FMB and Ice Miller seem to attribute to Paul Offutt's singular efforts. According to them, Attorney Brougher was allowed to withdraw from his

---

[6] The Offutt lawsuit was filed on November 15, 2013, in the Vermilion County Circuit Court and assigned case number 2013-L-70.

[7] That case was filed in the Vermilion County Circuit Court and assigned case number 2016-MR-94.

appointment at a hearing held in the Probate Action on June 4, 2018, and, on June 15, 2018, an order was entered staying all proceedings until further order of the Vermilion County Circuit Court. Again, all of this was disclosed by FMB and Ice Miller for the first time in their July 2018 supplemental filings.

After extensive negotiations, the Debtor's Chapter 11 plan was confirmed by agreement on September 5, 2018. As part of that agreement, FMB and Ice Miller agreed to hand prosecution of the Objection to Claim 47-1 over to the Creditors Committee, and a limit was placed on FMB and Ice Miller's professional fees. The confirmation order also included a provision that authorized payment to Ice Miller and FMB for the balance of their unpaid fee awards for the second and third interim periods. On October 15, 2018, Ice Miller and FMB withdrew their claims against the Debtor's bankruptcy estate for prepetition fees incurred as state-court custodian. A few days later, FMB and Ice Miller filed their Fourth and Final Fee Applications now before the Court.

The Fourth and Final Application of Ice Miller LLP, Counsel to the Debtor, for Allowance and Payment of Compensation and Reimbursement of Expenses for the Period December 16, 2017 to September 5, 2018, and Final Application for Allowance and Payment for All Prior Fee Periods ("Fourth and Final Fee Application") was filed on October 19, 2018. It seeks final approval of all fees approved during the first, second, and third interim periods and payment of any amounts previously allowed but not paid. Specifically, Ice Miller asks that it be paid an additional $31,683.10, representing the allowed but unpaid portion of its first interim fees pursuant to the hold-back agreement. As for the second and third interim fees that were allowed but not authorized to be paid, Ice Miller

explained that, per the confirmation order, it was paid the $561,021.92 representing the outstanding balance of the fees allowed for the second and third interim periods following confirmation. However, Ice Miller also disclosed that, in preparing the Fourth and Final Fee Application, it realized that it had received an additional interim payment of $120,629.61 in December 2015, which had not been previously disclosed or authorized and resulted in overpayment when Ice Miller paid itself under the terms of the order confirming the Chapter 11 plan. Ice Miller proposes crediting that overpayment against the remaining balance owed under the first interim fee order and the fees and costs awarded for the fourth interim period. With regard to the latter, Ice Miller requests an additional $246,516.50 in fees and $8769.61 in expenses, noting that, pursuant to the confirmation order, the fourth interim fees and expenses are subject to a $211,000 cap.

The Fourth and Final Application of First Midwest Bank, Custodian for the Debtor, for Allowance and Payment of Compensation and Reimbursement of Expenses for the Period January 1, 2018 to September 5, 2018, and Final Application for Allowance and Payment for All Prior Periods ("Fourth and Final Fee Application") was filed on October 20, 2018. It too seeks final approval of all fees approved during the first, second, and third interim periods and payment of any amounts previously allowed but not paid. And, like Ice Miller, FMB specifically requests payment of the amounts held back per its first interim fee request and the order allowing but not authorizing payment of that amount. In doing so, however, FMB notes that the first interim fee award was based on inaccurate figures. According to FMB, in preparing the Fourth and Final Fee Application, it

realized that it had overcharged the Debtor during the first interim period, and
that it actually incurred $437,541 in fees and $233.28 in costs as opposed to the
$442, 677.75 in fees and $487.50 in costs that were awarded. As a result, FMB
requests payment of only $38,876.80, which it views as the amount it is still owed
for the first interim period after making downward adjustments for the inflated
charges and applying a credit of $254.22 for expenses paid but not actually
incurred. As for the second and third interim periods, FMB asserts that it is still
owed the allowed but unpaid balance of $2987.14, which, contrary to Ice Miller's
own assertions, was not paid upon plan confirmation. FMB also seeks allowance
and payment of an additional $23,558.15 in fees and costs incurred during the
fourth interim period, noting that, pursuant to the confirmation order, the fourth
interim request is subject to a $20,000 cap.

　　　　Objections were filed by the UST, the Creditors Committee, and the SBA. In
their Joint Consolidated Objection to the Fourth and Final Fee Applications of Ice
Miller LLP, Counsel for Debtor, and First Midwest Bank, Custodian for Debtor
("Joint Objection"), the Creditors Committee and SBA express general concerns
about misstatements and errors in FMB and Ice Miller's fee applications and
related filings throughout the case. As to the compensation sought for the fees
specifically incurred during the fourth interim period, the Creditors Committee
and SBA argue that FMB's unauthorized payment to Ice Miller in excess of
$120,000, which has never been refunded and, until now, had not been disclosed,
adversely impacted the parties' ability to negotiate resolution of the Debtor's
Chapter 11 case, resulting in significant cost to the estate. The objecting parties
also challenge the propriety of nearly $4000 in fees for the preparation of a

certificate of service for the plan five years into the case and another $35,000 in fees unnecessarily incurred drafting and negotiating the agreed confirmation order.

In terms of overall fee awards for FMB and Ice Miller, the SBA and Creditors Committee contend that reduction is warranted based on FMB and Ice Miller's deficient Rule 2014 disclosures and the negative impact that those disclosures, or lack thereof, likely had on the case. According to the Joint Objection, the UST, SBA, and Creditors Committee only recently learned that FMB had asserted a claim against Earl Gaudio's probate estate and that FMB, through Ice Miller, was and is involved in several unresolved disputes between itself, Paul Offutt, Helen Gaudio, and Earl Gaudio and his estate. Having conducted their own investigation, the SBA and Creditors Committee share a different perspective about the nature of those underlying disputes and FMB and Ice Miller's involvement in the state-court litigation surrounding those disputes.

As the SBA and Creditors Committee describe it, on July 31, 2012, the same day Earl and Helen Gaudio executed the trust agreement with FMB that was presumably intended to replace the earlier trust agreement between Earl Gaudio and FMB that concerned the same accounts and assets, Earl Gaudio also executed a guaranty of a $400,000 debt owed by the Debtor to Paul Offutt and assigned his interest in the trust assets to Mr. Offutt as security for the debt. According to the deposition testimony of FMB employee Amy Bartenschlag, attached as an exhibit to the Joint Objection, evidence of the transaction was delivered to Ms. Bartenschlag, which she refused to record until Mr. Offutt or his attorney returned with a signed and notarized statement from Earl Gaudio

acknowledging the transaction. When Mr. Offutt's attorney provided the requested documentation, FMB put a $500,000 hold on the trust account. Several months later, Mr. Offutt delivered to Ms. Bartenschlag notification that he was calling the note due and asked FMB to remit the funds owed. FMB did not and has not honored Mr. Offutt's demand for payment, apparently on the advice of Earl Gaudio's personal attorney. As the SBA and Creditors Committee see it, these events served as the predicate for the various state-court lawsuits that remain pending and, ultimately, FMB's claim against Earl Gaudio's estate.

With regard to FMB's complaint for declaratory judgment against Helen Gaudio discussed above, the SBA and Creditors Committee characterize it as a challenge to Helen's role as guardian of Earl Gaudio's estate. They point out that, on April 21, 2016, FMB, through Ice Miller, filed a Motion to Appoint a Special Guardian or Guardian Ad Litem for Earl Gaudio in connection with its complaint for declaratory judgment. As a result, a guardian ad litem was appointed. But Earl Gaudio died the following day, and, on May 17, 2016, the Probate Action was commenced in Vermilion County. Aside from the Probate Action, which was disclosed in the July 2018 filing, none of this was disclosed in FMB and Ice Miller's original or supplemental Rule 2014 disclosures.

The Joint Objection also revealed that, on July 13, 2017, FMB filed a Motion to Appoint Special Administrator for Earl Gaudio's estate in the Probate Action, alleging that there was "an actual conflict of interest" between Helen in her individual capacity and in her role as administrator of Earl's estate. The Joint Objection suggests that it was in response to FMB's motion that Paul Offutt filed his own motion asking that Helen be removed as administrator of Earl's estate. In

addition, the SBA and Creditors Committee wonder whether the subsequent appointment and removal of Attorney Brougher as administrator and the staying of proceedings in the Probate Action might explain the timing of the Objection to Claim 47-1, five years after the Chapter 11 case and proof of claim were filed.

In their joint response, filed December 6, 2018, Ice Miller and FMB argue that the Joint Objection is factually incorrect, that they fully and faithfully complied with all disclosure requirements, and that their involvement in the state-court litigation was and is "largely that of an innocent bystander asking to be extracted from the disputes raging between Helen Gaudio and Paul Offutt." They contend that FMB's appearance in the litigation was not as custodian of the Debtor "but as trustee to a particular investment account in which Helen Gaudio, the probate estate[,] and Mr. Offutt have each claimed an interest." And they note that most of the state-court litigation had not been filed when they were retained to represent the Debtor and employed in this case.

FMB and Ice Miller contend that there has never been an actual conflict of interest between them and the bankruptcy estate and that they have taken steps to avoid even the appearance of a potential conflict, including handing prosecution of the Objection to Claim 47-1 over to the Creditors Committee. FMB and Ice Miller try to justify their handling of the bankruptcy case in light of the new information raised in the Joint Objection and explain why they believe that "the circumstances of this case would never have coalesced in a way that would create an actual conflict of interest."

In any event, FMB and Ice Miller say they "do not believe that their involvement in the probate matters ever rose to the level of a 'connection' under

Rule 2014" and that the "[a]ctivity in the probate case had no impact on this case." FMB and Ice Miller point to the Objection to Claim 47-1 as an example. Apparently acknowledging the potential for a connection that "did not begin to crystalize until" settlement fell apart over there not being an administrator for Earl Gaudio's estate, Ice Miller and FMB essentially conclude that the issue is moot because the claim was ultimately denied. They appear to deny having any role in there being no administrator in the Probate Action and the ultimate denial of the Earl Gaudio claim in the bankruptcy. Yet, FMB and Ice Miller acknowledge that they opposed the Motion to Approve Bankruptcy Settlement filed by Helen Gaudio in the Probate Action following the hearing in bankruptcy court on the Objection to Claim 47-1.

Notwithstanding their position that they have done no wrong, FMB and Ice Miller claim that they immediately took steps to gather and disclose the relevant facts to this Court and to avoid any appearance of conflict by "readily" agreeing to hand prosecution of the claim objection off to the Creditors Committee. They urge the Court to accept that whatever perceived delay occurred in disclosing matters to the Court was completely unintentional and "the result of two independent matters being handled by independent personnel[.]" FMB and Ice Miller further argue that the Court has broad discretion to award compensation notwithstanding any finding that their disclosures were inadequate.

Having considered the arguments and positions of the parties, the matter is now ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving the administration of the estate, the allowance of claims against the estate, and the adjustment of the debtor-creditor relationship are core proceedings. 28 U.S.C. §157(b)(2)(A), (B), (O). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

Section 327 of the Bankruptcy Code provides for the employment, with the court's approval, of disinterested professional persons "that do not hold or represent an interest adverse to the [bankruptcy] estate" by the trustee to represent or assist the trustee in carrying out the trustee's duties. 11 U.S.C. §327(a). Generally, a Chapter 11 debtor in possession has many of the same rights, powers, and duties of a trustee. 11 U.S.C. §1107(a). This includes the right to employ attorneys and other professionals. *See In re Copenhaver, Inc.*, 506 B.R. 757, 761 (Bankr. C.D. Ill. 2014).

"Rule 2014(a) facilitates enforcement of section 327(a) by requiring that professionals seeking to represent the [debtor] in a bankruptcy proceeding submit a verification that fully and broadly discloses 'the person's connections with the debtor, creditors, [or] any other party in interest,' among others." *In re Knight-*

*Celotex, LLC*, 695 F.3d 714, 722 (7th Cir. 2012) (second alteration in original) (citing Fed. R. Bankr. P. 2014(a); *In re Gluth Bros. Construction, Inc.*, 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011) (describing "connections" that must be disclosed under Rule 2014(a) as "considerably broader" than those disclosures required for §327(a))).

"Bankruptcy courts have the authority and the responsibility, independent of any objection, to approve employment only of those professionals who meet the minimum requirements set forth in the Code and Rules." *In re THR & Associates, Inc.*, 2018 WL 279741, at *3 (Bankr. C.D. Ill. Jan. 3, 2018) (citations omitted). But it is the applicant, rather than the court or any other party, that is in the best position to discover and produce any and all facts that might be material, no matter how irrelevant or trivial they seem. The purpose of Rule 2014 is to ensure that the bankruptcy court has all information that may be relevant to determining whether the applicant is qualified so that the court can make the determination itself. *In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 845 (Bankr. S.D. Ill. 1993). The rule "removes the decision of what information to disclose from the discretion of the attorney whose judgment may be clouded by the benefits of the potential employment." *Id.* (internal quotation marks omitted).

Thus, the burden of disclosure rests solely with the applicant. The disclosure requirements "apply to all professionals and are not discretionary." *U.S. v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999). "Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P. 2014(a), court-appointed counsel proceed *at their own risk*." *Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir. 1994). This is so because "failure to disclose is sufficient grounds

to revoke an employment order and deny compensation." *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998) (citations omitted). Section 328(c) specifically authorizes the court to deny compensation for services and reimbursement of expenses of a professional "if, at any time . . . , such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." 11 U.S.C. §328(c).

"Section 330 of the Bankruptcy Code provides the statutory authority for awarding compensation for the services and reimbursement for the expenses of properly employed professionals." *In re Gvazdinskas*, 2010 WL 1433308, at *2 (Bankr. C.D. Ill. Apr. 8, 2010) (citing 11 U.S.C. §330). Here, the employment of Ice Miller as counsel for the Debtor and FMB as custodian for the Debtor was approved on August 29, 2013. Generally, a court may award professionals reasonable compensation for services rendered and reimbursement of actual and necessary expenses. 11 U.S.C. §330(a)(1)(A)-(B).

Before the fees or costs of a properly employed professional can be paid, a fee application must be "filed with the court which details the work done and expenses advanced for which compensation is sought." *In re Vancil Contracting, Inc.*, 2008 WL 207533, at *2 (Bankr. C.D. Ill. Jan. 25, 2008); *see* Fed. R. Bankr. P. 2016(a). Prior to providing any service, professionals "should first scrupulously weigh and assess the necessity and appropriateness of each task for which [they] will be seeking compensation." *Vancil Contracting*, 2008 WL 207533, at *2 (citing *In re Wildman*, 72 B.R. 700, 707 (Bankr. N.D. Ill. 1987)).

The court has an independent duty to examine the reasonableness of fees

requested. *Id.* at *2 (citations omitted). The ultimate burden of proving entitlement to the requested fees is on the applicant, and fee applications "must provide sufficient information for a court to understand what services were actually provided and to determine whether the fees requested are reasonable and the services rendered were necessary and beneficial." *Gvazdinskas*, 2010 WL 1433308, at *2; *see also Vancil Contracting*, 2008 WL 207533, at *2-3. "A court reviewing a fee application is not required to search through volumes of pleadings in the bankruptcy case and related adversary proceedings in an attempt to find justification for the legal services rendered and the fees requested." *Gvazdinskas*, 2010 WL 1433308, at *2 (citing *In re Taylor*, 66 B.R. 390, 393 (Bankr. W.D. Pa. 1986) (A court "will not indulge in extensive labor and guesswork to justify a fee for an attorney who has not done so himself.")).

### A. FMB and Ice Miller's Disclosures Under Bankruptcy Rule 2014

FMB and Ice Miller maintain that they fully and timely disclosed all connections in this case. But their filings in the case do not support this position. When FMB and Ice Miller sought to be employed in July 2013, they disclosed only that FMB had been appointed custodian of the Debtor in state court shortly before the bankruptcy filing and that Ice Miller represented FMB in that capacity. Both acknowledged holding prepetition claims against the estate related to FMB's role as custodian and having represented some creditors in other matters but unequivocally denied having any other "connection with the Debtor, the Debtor's estate, their creditors, or any other party-in-interest or their attorneys or accountants[.]"

No mention is made of the revocable trust agreement executed on November 22, 2011, between the Debtor's founding member and principal, Earl Gaudio, and FMB as trustee. Nor is there any mention of the second revocable trust agreement executed on July 31, 2012, between Earl and Helen Gaudio and FMB that apparently covered the same assets as the 2011 trust agreement. Also absent from the professionals' July 2013 disclosures was any mention of Paul Offutt, who was a creditor of the Debtor's estate as well as of Earl Gaudio, or that Mr. Offutt had asserted a claim to the trusts' assets and presented all supporting documentation of his claim to FMB employee Amy Bartenschlag prior to the bankruptcy and FMB's appointment as custodian under state law. The prepetition relationship between FMB and Earl and Helen Gaudio and Paul Offutt was not disclosed until July 25, 2018.

FMB and Ice Miller try to draw a distinction between their roles as custodian and counsel to the Debtor and their roles as trustee and counsel to the trustee of two separate trusts covering the same assets to which the Debtor's creditors might also have claims. But if there was a distinction to be drawn, it was for the Court alone to draw. *See In re Martin*, 817 F.2d 175, 182-83 (1st Cir. 1987). Whether or not FMB's prepetition connections to Earl and Helen Gaudio, individually, and Paul Offutt would ever prove to be problematic is wholly irrelevant for purposes of satisfying the disclosure requirements of Rule 2014. The disclosure rules are applied literally, and violations may result in sanctions regardless of intent or actual harm to the estate. *In re King River Resorts, Inc.*, 342 B.R. 76, 85 (Bankr. E.D. Cal. 2006) (citations omitted). All FMB and Ice Miller had to do was disclose all possible connections. The rest was up to the Court.

-23-

FMB and Ice Miller point out that much of the state-court litigation and their involvement in the disputes between Helen Gaudio and Paul Offutt had not yet occurred when their original Rule 2014 disclosures were filed. But FMB and Ice Miller's characterization of the facts is specious at best. As the SBA and Creditors Committee point out, each of those "post-employment" events related back to FMB's "pre-employment" role and involvement in the Gaudio Trust Agreements and Paul Offutt's claim to the trust assets. In addition, neither FMB nor Ice Miller made additional substantive disclosures until July 25, 2018, five years after their original disclosures and two years after their supposed "involvement" in the state court litigation began.

The fact that certain events had not unfolded at the time of filing their original Rule 2014 disclosures does not excuse FMB's and Ice Miller's failure to disclose those matters as they did unfold. The July 2018 filings state that Ice Miller was first retained to represent FMB with respect to the trust agreements in 2016, and, that beginning in March of that year, the two became "passively" involved in the state-court litigation involving the Trust Agreements. Passive or otherwise, their involvement in those proceedings and the Trust Agreements upon which the litigation was based was not revealed for another two years. The Court fails to see how FMB and Ice Miller's disclosures relating to the Trust Agreements and resulting state-court litigation were timely.

Equally, if not more, concerning is the incompleteness of the disclosures, which in turn raises questions about both applicants' candor as it relates to their employment in this case. Throughout the bankruptcy, FMB and Ice Miller have faced challenges to their fee requests based on inaccuracies and material

misstatements in their applications. Now, more than five years after the fact, FMB and Ice Miller face similar challenges regarding the inaccuracies of their Rule 2014 disclosures. And now, as then, FMB and Ice Miller contend that these were all innocent mistakes that were promptly corrected and had no impact on any matters before this Court.

FMB and Ice Miller try to characterize their July 2018 supplemental disclosures as a sign of their good faith and candidness in executing their statutory duties. Yet, in addition to being tardy, their disclosures continue to lack relevant information. For instance, FMB and Ice Miller conveniently avoid any explanation of what prompted the filings beyond the broad statement that they were "based on information provided . . . by other current or former employees of FMB, attorneys at Ice Miller . . . , and through court records." The failure to adequately explain and justify the delay, beyond bald assertions of ignorance or inadvertence, in making required disclosures is itself grounds for revisiting FMB's and Ice Miller's employment as professionals and denying fees. *See Crivello*, 134 F.3d at 839 (stating that, if there is any evidence to support an inference of intent, then "the court should not fall prey to the professional's story of confusion, miscommunication, or negligence"). And, as the SBA and Creditors Committee point out in their Joint Objection, the timing of and circumstances surrounding the disclosures paint a much more troubling picture.

The July 2018 disclosures were filed less than a week after a status hearing on a potential compromise that would have resolved the Objection to Claim 47-1 of Earl Gaudio and facilitated confirmation of the Debtor's then-pending Chapter 11 plan but for the fact that there was no longer an acting administrator of Earl

Gaudio's probate estate with authority to take action. FMB and Ice Miller act as if this revelation at the status conference was as surprising to them as it was to the Court and other interested parties. But the simple truth is that FMB and Ice Miller were well aware of what was happening in state court because they were actively involved in all matters pending there.

When the Debtor filed the Objection to Claim 47-1 on June 8, 2018, Ice Miller and FMB, to the exclusion of the Court and others, were privy to the fact that, just four days earlier, the court-appointed administrator of Earl Gaudio's estate was allowed to withdraw from his appointment, and the Probate Action and other state court proceedings were stayed pending an appeal by Helen Gaudio. Despite being armed with this knowledge, FMB and Ice Miller chose not to bring it up at the July 11, 2018, hearing when Mr. Richardson unwittingly proposed a settlement that would have resolved the claim objection and the SBA's opposition to plan confirmation.

But before settlement here could be finalized, Mr. Richardson discovered that there was no longer an acting representative of the probate estate. Nevertheless, Helen Gaudio filed a motion in the Probate Action seeking authority to effectuate what was thought to be an agreed resolution among all interested parties in the bankruptcy case, but that motion was denied by the state court. When Mr. Richardson informed this Court of the situation during a subsequent status conference, essentially admitting that he no longer had a client or any ability to represent the interests of Earl Gaudio's estate, FMB and Ice Miller again remained conspicuously silent.

According to the SBA and Creditors Committee, they began investigating

what had occurred in the Probate Action and learned the extent of FMB and Ice Miller's involvement in that and several other state-court matters. This prompted them to raise their concerns with FMB and Ice Miller and, according to the SBA and Creditors Committee, resulted in the filing of the supplemental Rule 2014 disclosures a few days later. FMB and Ice Miller's involvement included efforts to remove Helen Gaudio as guardian and administrator of Earl's estate and opposition to Helen Gaudio's motion to approve bankruptcy settlement filed in the Probate Action while all other interested parties were trying to come to a compromise in the bankruptcy case.

Although FMB and Ice Miller are careful to point out that the order removing Helen Gaudio as administrator was entered on Paul Offutt's motion rather than FMB's motion, they do not dispute the allegation that they too sought to limit her authority in that role. The SBA and Creditors Committee make reference to FMB's Motion to Appoint Special Administrator filed in the Probate Action on July 13, 2017, a copy of which was attached to the Joint Objection. In that motion, FMB details the history of Helen Gaudio's role as guardian and then-administrator dating back to 2013 and her personal interest in the 2012 trust agreement between her husband, herself, and FMB. With regard to the latter, the motion sets forth detailed allegations of Helen's repeated demands for payment from the account subject to the 2012 trust agreement following Earl's adjudication as a disabled person and subsequent passing, which FMB contended was in actual conflict with her responsibilities as administrator. Also mentioned, was the appointment of a guardian ad litem in an earlier state court proceeding based on similar allegations—also at the request of FMB. None of this was ever formally

disclosed. Nor was it even acknowledged in response to the Joint Objection.

Naturally, FMB and Ice Miller dispute the narrative proposed by the SBA and Creditors Committee, but the Court does not need to adopt one precise version of events over another to conclude that FMB and Ice Miller failed to satisfy their obligation to fully and transparently disclose their connections to the Debtor's principals and certain creditors, as well as other matters that could have and ultimately did impact the efficient administration of the Chapter 11 case.

At best, FMB and Ice Miller either failed to adequately investigate or comprehend what connections they had or they were actually aware of the facts but unilaterally determined that they did not rise to the level of being a "connection" that must be disclosed. At worst, FMB and Ice Miller actively withheld relevant information from the Court and interested parties. For purposes of this Opinion, however, the Court need not determine why FMB and Ice Miller failed to satisfy their duty to disclose. Its suffices to say that FMB and Ice Miller's disclosures made pursuant to §327(a) and Bankruptcy Rule 2014(a) were not spontaneous, timely, or complete, which in itself is sufficient basis for the Court to reconsider their employment or deny them fees. *Crivello*, 134 F.3d at 836.

Likewise, FMB and Ice Miller's efforts to parse terms to explain what the Court can only describe as its "connections" are not helpful. Rather, their efforts only highlight the issues that can arise when professionals "whose judgment may be clouded by the benefits of the potential employment" try to usurp the sound discretion reserved for the court. *Granite Sheet Metal Works*, 159 B.R. at 845 (internal quotation marks omitted). Specifically, FMB and Ice Miller argue that they do not have and never have had interests adverse to the estate and that any

"intersection" between themselves as representatives of the Chapter 11 Debtor and the Probate Action and other state-court litigation never rose to the level of a "connection." But FMB and Ice Miller also concede that "connections" that must be disclosed pursuant to Rule 2014(a) are "considerably broader" than the disclosures required for §327(a). *Gluth Bros. Construction*, 459 B.R. at 364.

Again, it matters not whether FMB or Ice Miller viewed their "connections" as rising to a level that demanded disclosure. Neither the Code nor the Rules require such an analysis. All FMB and Ice Miller had to do was disclose any and all facts that could possibly be or become relevant, no matter how unlikely. Instead, FMB and Ice Miller continuously engaged in a practice of unilaterally evaluating which facts they believed warranted disclosure and which ones did not. As a result, FMB and Ice Miller now face questions about their candor before this Court and, potentially, revocation of their employment.

To be clear, there is no question that each of the matters raised and discussed herein at least rose to the level of a "connection." And, save for their brief reference to FMB's appointment as custodian in state court and vague suggestion that they held unsecured claims against the Debtor's estate, none of those connections were disclosed at the time of their employment. Other matters, which did not occur until later but clearly stemmed from previously undisclosed matters, were disclosed in varying degrees, but even those disclosures were inexcusably late and incomplete. Further, some of those connections may have created an actual conflict—the Court cannot say with any confidence that an actual conflict of interest did not and does not exist.

At the heart of any inquiry into whether there is a conflict of interest is "an

objective screening for even the 'appearance of impropriety.'" *Rome*, 19 F.3d at 58 (citations omitted). At a minimum, not disclosing FMB's involvement and potential liability relating to the 2011 and 2012 Trust Agreements, its refusal to recognize Paul Offutt's asserted right to the trust assets, and its efforts to prevent Helen Gaudio from exercising control over the trust assets is suspicious and gives the appearance of impropriety.[8] The appearance of impropriety is compounded by the fact that one of FMB's employees, Amy Bartenschlag, who provided professional services to the Debtor throughout its bankruptcy, was also the point person for FMB's involvement in the creation of the Gaudio Trust Agreements and the handling of Paul Offutt's asserted claim to the trust assets. As a fact witness to the events upon which Paul Offutt's state law claims were based and whose actions in relation thereto potentially exposed FMB to liability in the state-court litigation, Ms. Bartenschlag, and FMB as a whole, appear to have an actual conflict of interest.

Likewise, the Court cannot conclude that FMB and Ice Miller are "disinterested persons" as defined in §101(14) of the Code. Time and again, FMB and Ice Miller have found themselves in the position of having to explain and correct careless errors and misstatements in their applications for compensation.

---

[8] To be sure, the mere appearance of impropriety would not necessarily disqualify a person from being employed as a professional in bankruptcy. *See In re Wheatfield Business Park LLC*, 286 B.R. 412, 421 (Bankr. C.D. Cal. 2002). But whether an appearance of impropriety is dispositive is a wholly different question than whether it is relevant to determining whether a person is qualified to be employed as a professional in a particular case. Often times, the appearance of impropriety serves as the catalyst for closer inspection into matters so that a court can come to its own conclusions about an applicant's qualifications. As such, whether an applicant has connections or interests that create an appearance of impropriety is clearly germane to determining whether a connection rises to a level that warrants disqualification.

And, most recently, they find themselves trying to explain and justify their nondisclosure of several connections to various parties in interest outside the bankruptcy case. Despite FMB and Ice Miller's increasingly familiar efforts to assure the Court that there is "nothing to see here" and that they have faithfully adhered to their statutory duties as employed professionals, at some point, enough has to be enough and the general lack of trustworthiness surrounding their defense of their own employment and compensation has to matter.

For instance, according to the Debtor-In-Possession Monthly Operating Reports ("DIP Reports"), which are discussed in greater detail below, the Debtor, through FMB, borrowed $375,000 from the Earl and Helen Gaudio trust account at issue here in early August 2013, shortly after the bankruptcy filing.[9] Yet FMB would have the Court believe that, in its role as custodian in the bankruptcy case, FMB had no idea that it had a connection to the Gaudio Trust Agreements of which it was trustee. Likewise, FMB and Ice Miller, as representatives of the Debtor, try to distance themselves from their own actions related to the Trust Agreements in state court by ascribing a lack of institutional knowledge to the matters being handled by different personnel from different offices. Even if this were a viable defense, it ignores the fact that at least some of the same employees providing services to the Debtor in this bankruptcy case were also involved in FMB's handling of the Gaudio trusts—namely, Amy Bartenschlag.

How can the Court say with any sort of confidence that FMB and Ice Miller are disinterested when it cannot even trust that they are being honest and

---

[9] The Court makes no finding as to the propriety of the debt or how it was incurred and, for purposes of this Opinion, will assume that the transaction was not inappropriate.

forthcoming? The short answer is that it cannot. What it can say is that, if full disclosure had been made by Ice Miller and FMB in 2016, the Court, with input from all parties, could have considered the issues and decided then whether Ice Miller and FMB could continue in their respective roles. But that did not happen because the disclosures were not made, and Ice Miller and FMB are now placed in the position of having to defend not only their fee requests but also the propriety of their employment over the last several years. Rather than revoking their employment and ordering them to disgorge all fees, the Court will simply deny any and all fees not previously approved, authorized to be paid, and, in fact, paid. Both requests for additional fees not previously approved will be denied. Further, any amounts paid without authorization from this Court must be disgorged.

### B. FMB and Ice Miller's Request for Additional Fees

There are other reasons to deny FMB and Ice Miller's requests for additional fees not previously approved and paid. As previously discussed, FMB and Ice Miller have repeatedly faced issues with the accuracy and reliability of their applications for compensation. Despite the Court's admonishments related to the serious errors contained in their first interim fee applications that future discrepancies might simply be resolved against them, FMB and Ice Miller continued to put their compensation at risk by failing to take corrective action in later applications. Although both parties have experienced significant reductions to their requested fees along the way, they have, to some extent, been given the benefit of doubt and compensated accordingly.

Now, in their Fourth and Final Fee Applications, FMB and Ice Miller seek final approval of all previously awarded fees, as well as a request for newly incurred fees. Unfortunately but not all that surprisingly, their applications again raise serious concerns. One of the more significant problems is a previously undisclosed payment of $120,629.61 made by FMB from the Debtor's funds to Ice Miller in December 2015. Ice Miller contends that the payment was first discovered in the preparation of the Fourth and Final Fee Application and that, although not disclosed in prior fee applications, the payment was, in fact, disclosed in the DIP Report for the December 2015 filing period. Whatever the case, Ice Miller suggests that the amount could simply be credited against what additional fees are awarded, characterizing it as an increased return and benefit to unsecured creditors.

Ice Miller's cavalier attitude toward this issue and its significance is emblematic of its and FMB's approach to this case in general. For each instance in which they have been confronted with questions about the timeliness and completeness of their disclosures and the accuracy of their statements to the Court and interested parties, FMB and Ice Miller have brushed off all concerns and tried to characterize each problem as an innocent mistake that had no impact on the bankruptcy estate or case. In their Joint Objection, the SBA and Creditors Committee question the accuracy of those assertions and what, if anything, FMB and Ice Miller's approach says about what may or may not remain to be unearthed. As to the undisclosed overpayment to Ice Miller, the SBA and Creditors Committee take the position that it "prolonged and unnecessarily complicated" negotiation of a confirmable plan in a case with increasingly limited funds to pay

unsecured creditors.

Going further, the Joint Objection asks whether the undisclosed connections between FMB, Ice Miller, and Paul Offutt—and his prepetition demand for payment on a debt secured by trust assets under FMB's control—delayed resolution of the subsequent adversary proceeding against Mr. Offutt and "increase[d] the acrimony and fees" therein and, more broadly, whether the assertion of claims in state court against or involving FMB by interested parties to the bankruptcy negatively impacted FMB and Ice Miller's objectivity or colored their handling of matters in the Chapter 11 case. FMB and Ice Miller, of course, take issue with the insinuation that they acted improperly or that anything that happened outside of the confines of this bankruptcy had any impact on the case. But the fact of the matter is that, even with the benefit of hindsight, the Court cannot say that FMB and Ice Miller's connections and nondisclosure thereof were benign. To the contrary, the Court clearly recalls that several of the adversary proceedings—most notably the proceeding against Paul Offutt—were unusually and, as far as the Court could tell, unnecessarily contentious. At this point, it would be hard to determine whether the extra time and money spent on contentious litigation here was a direct result of related contentious litigation going on in state court at the same time. But as the SBA and Creditors Committee point out, that inability to know is exactly the problem. Moreover, it begs the question: what else do we still not know?

The SBA and Creditors Committee make several other pointed objections to FMB and Ice Miller's Fourth and Final Fee Applications based on issues that, sadly, have become increasingly common for FMB and Ice Miller. Each of their

objections is well taken.

In seeking final approval of their previously allowed fees for the first interim period, FMB reported that it made an error in calculating the fees and expenses actually incurred during that period. Apparently, the amount requested and approved was $5390.97 more than what was actually earned. While relatively minor in comparison to the $120,000 overpayment to Ice Miller, the result of FMB's sloppy bookkeeping was an overpayment to itself and to the detriment of the Debtor's estate. Along the same lines, the SBA and Creditors Committee object to FMB's request for $2337.50 for accounting and auditing services based on FMB's failure to properly track and account for such overpayments. The Court agrees. Compensation for each of these matters is entirely inappropriate.

Included in Ice Miller's application is a request for $21,306 in fees incurred preparing the third interim fee applications of itself and FMB, and another $6455.50 incurred in preparing final fee applications for other professionals. The SBA and Creditors Committee argue that the request for fees related to the preparation of FMB and Ice Miller's own fee applications is duplicative of the request made and denied in its third interim application and should likewise be denied. Here again, the Court agrees with the SBA and Creditors Committee.

Ice Miller also seeks just under $35,000 in fees it claims to have incurred drafting the agreed confirmation order. The SBA and Creditors Committee criticize Ice Miller for complicating matters by drafting an unnecessarily long order that required lengthy review and negotiation to avoid unintended consequences. The Court agrees. And, although the Court did not participate in the negotiation of the agreed confirmation order, it is apparent that FMB and Ice Miller's deficient

disclosures played a part in extending those negotiations. A major sticking point in the negotiations was the funds that would be set aside to pay unsecured creditors of the insolvent estate. Given that the $300,000 amount ultimately agreed upon was twice that of the $150,000 originally proposed by Ice Miller and FMB, it is easy to conclude that knowledge of an additional $120,000 available at the time would have affected each party's position in the negotiations. Under the circumstances, the Court finds that the $35,000 in fees charged to draft the order is wholly unreasonable.

The SBA and Creditors Committee also object to FMB and Ice Miller's combined request for $1575 in fees incurred to recover $1415.51 in liquidating the Debtor's TD Ameritrade account. Reminiscent of requests for fees incurred in prior periods to obtain an outcome that was obviously going to result in a net loss to the estate, this request is also clearly inappropriate. Finally, the SBA and Creditors Committee object to Ice Miller's request for nearly $4000 for the preparation of the certificate of service for the plan and solicitation package. The SBA and Creditors Committee are absolutely correct that, absent extenuating circumstances, there is no excuse for one or more attorneys to devote 10 hours and several thousands of dollars to create a service list five years into the case.

Although not specifically raised by any party, some additional points warrant further attention in light of recent developments. In an attempt to downplay the import of the $120,000 overpayment to Ice Miller, FMB and Ice Miller point out that, while not disclosed in prior applications for compensation, the payment was listed in the monthly DIP Reports. Naturally, this prompted the Court to review the DIP Reports filed in the case, and, as might be expected, the

review raised more questions than it answered. In addition to the $120,000 overpayment to Ice Miller, several of the DIP Reports include reference to a $15,000 retainer paid to FMB—in addition to the $15,000 paid to Ice Miller that was disclosed at the time of its employment. But no such payment to FMB was ever formally requested, approved, or even disclosed. To the contrary, FMB has repeatedly stated that it did not receive any prepetition payments, in the form of a retainer or otherwise, relating to its employment as custodian to the Debtor. Given the history here, what is the Court to believe is the truth? If FMB did pay itself a retainer, which was not disclosed in its employment application and therefore never approved by the Court, the full amount of that retainer must be disgorged immediately.

The DIP Reports also identify countless charges against the bankruptcy estate's assets for expense reimbursement, travel, wire transfers, and other matters, that, as far as the Court can tell, should have been but never were presented for approval. There is no question that all fees and expense reimbursements were subject to Court approval. That was made clear in the orders allowing their employment, but it is also fundamental bankruptcy law.

Similarly, FMB's admission that its first interim fees were based on erroneous billing invoices prompted the Court to take a closer look at those billing invoices. One small but notable charge was for the review of a "subpoena served on A. Bartenschlag relating to P. Offutt" and the "BK: Offutt Litigation." Importantly, the entry is dated August 27, 2014—almost four months before the Debtor filed its adversary proceeding against Paul Offutt relating to the Debtor's bankruptcy. When reviewing the first fee request, the Court had no idea that FMB

-37-

and Ice Miller were involved in various state-law disputes with Paul Offutt and others, and the charge for reviewing the subpoena was allowed without question. But telling is the fact that the state-court records indicate that Paul Offutt sought to depose Ms. Bartenschlag in his state-court lawsuit against Earl Gaudio on the note and guaranty by filing a notice of subpoena on August 26, 2014.[10] Thus, it appears that the review on August 27th was related to a state-court litigation subpoena issued August 26th and, accordingly, the work should not have been charged to the bankruptcy case. But determining whether this and other charges made in the bankruptcy case were actually incurred in the bankruptcy would require reopening prior orders and revisiting FMB's earlier fee applications. The Court does not have the full state-court record before it, which would allow the type of review necessary to find out whether fees for state-court work were routinely and improperly charged to the bankruptcy case. But this one example, however small it may seem, provides clear justification for the concerns expressed by the SBA and Creditors Committee about the lack of transparency by Ice Miller and FMB regarding their undisclosed state-court activities. And it strongly supports this Court's decision to deny all further fees to both Ice Miller and FMB.

## C. Summary of Applications and Calculation of Fees

In their Fourth and Final Fee Applications, Ice Miller and FMB seek final approval of the fees previously allowed and paid on an interim basis for the first, second, and third interim fee periods, as well as payment and final approval of amounts allowed but held back under the first interim fee awards. In addition, the

---

[10] The notice was filed in Vermilion County Circuit Court case 2013-L-70.

applicants seek allowance, payment, and final approval of fees incurred during the fourth interim period. For the reasons set forth in this Opinion, both parties' requests for additional fees and costs incurred during the fourth interim period will be denied. Likewise, both parties' requests for payment and final approval of fees and costs previously awarded on an interim basis but not authorized to be paid will be denied, except that Ice Miller's unpaid but allowed fees and costs from the first interim period may be paid from its $15,000 retainer and will be approved only to that extent. Both entities' requests for final approval of fees and costs awarded on an interim basis and paid pursuant to court order, reluctantly, will be allowed. Each entities' fees are broken down below.[11]

*i. Ice Miller*

Ice Miller was allowed $316,831 in fees and $3277.90 in costs on an interim basis for the first interim fee period. Payment was authorized for 90% of the allowed fees and 100% of the allowed costs. Ice Miller received payments totaling $288,425.80, leaving a balance of $31,683.10 to be paid. The $288,425.80 previously allowed and paid will be approved on a final basis. As to the remaining $31,683.10, Ice Miller may apply the balance of its $15,000 retainer to pay those fees, and, to the extent covered by the funds held on retainer, they will be finally approved. No further payment is or will be allowed, however, and final approval for any amounts outstanding thereafter will be denied.

---

[11] In denying further payment from the Debtor's estate, the Court notes that this Opinion and the Order entered thereon have no impact on the no-look, flat fee arrangement for FMB and Ice Miller's "Post-Confirmation Fees" as defined and provided for in the confirmation order entered September 5, 2018 (#833).

For the second and third interim periods, Ice Miller was allowed $670,227.34 in fees and $21,541.94 in costs for a total of $691,769.28. Those amounts have been paid in full and will be finally approved. Ice Miller previously asserted that it had been paid only $130,747.36 during that period, leaving an outstanding balance of $561,021.92, which was paid pursuant to the Order Confirming the Chapter 11 Plan. But it is now clear that Ice Miller received an additional payment of $120,629.61 during the second and third fee periods. That payment was never disclosed and never authorized and therefore must be disgorged immediately.

Ice Miller's request for fees incurred during the fourth interim period will be denied.

*ii. FMB*

FMB was allowed $442,677.75 in fees and $487.50 in costs on an interim basis for the first interim fee period. It was paid $398,897.48, leaving a balance of $44,267.77 to be paid. In actuality, FMB overcharged the estate, resulting in the allowance of fees and costs that were never incurred. After making the appropriate adjustments, only $38,876.80 remains outstanding. The $398,897.48 allowed and paid during the first interim period will be approved on a final basis. Final approval of all other amounts will be denied.

For the second and third interim periods, FMB was allowed $289,832.71 in fees and $1704.32 in costs, for a total of $291,537.03. According to FMB, it received payments totaling $288,549.89, leaving a balance of $2987.14 to be paid. The $288,549.89 allowed and paid for the second and third interim periods will

be approved on a final basis. Final approval of all other amounts, including the outstanding balance of $2987.14, will be denied.

FMB's request for additional fees incurred during the fourth interim fee period will also be denied. To the extent that FMB is holding funds on retainer, despite their sworn statements to the contrary, those funds must be disgorged immediately.

## IV. Conclusion

Properly employed professionals are entitled to "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses." 11 U.S.C. §330(a)(1)(A)-(B). The fundamental prerequisite to being compensated, however, is that the professional be properly employed. At this late stage, serious questions exist as to whether FMB and Ice Miller were properly employed in the case in the first place and whether they should have continued to be employed throughout the case. Thus, a legitimate concern exists as to whether either is entitled to any compensation at all.

Both entities failed to disclose relevant information regarding their own connections to interested parties in this bankruptcy. In doing so, each risked not only the denial of further payment from the estate but also the revocation of their employment and disgorgement of amounts previously awarded. The Court has tried to impress upon Ice Miller and FMB the importance of the procedures governing employment and compensation of professionals throughout its tenure in this case. Unfortunately, the Court's words appear to have fallen on deaf ears, and FMB and Ice Miller will lose another significant portion of their requested fees.

In making this decision, the Court is mindful that Ice Miller is a nationally recognized firm and that the attorneys who have appeared in the case all have strong credentials. But Ice Miller's excellent reputation and the strong credentials of its attorneys aggravate the fact that the work here, after the sale of the Anheuser-Busch distributorship, was done half-heartedly and with little concern for maximizing results and minimizing fees. The Court finds it incredible that Ice Miller does not have a time and billing program that would allow the proper tracking of work done, fees to be charged, and payments made. But through four successive fee applications, errors have permeated the requests and a $120,000 payment made in 2015 was not properly accounted for until 2018.  And the Court finds it stunning that no Ice Miller attorney appearing before this Court ever thought that disclosure of multiple state-court actions wherein they represented the custodian here, FMB, was merited, even though the state-court matters involved many of the same players and issues pending before this Court. To be clear, such disclosure was required, and Ice Miller must pay the price for its nondisclosure.

FMB is also to blame for many of the problems here. The Court has not seen FMB actively involved in prior cases and, accordingly, has little knowledge of its reputation or the qualifications of its employees. But its performance here was poor, and its recent disclosure of amounts overcharged and overpaid from years ago represents  more than a bookkeeping error. It was a breach of fiduciary duty. FMB should seriously consider whether it has the expertise to handle complex matters of this type before accepting similar employment. And to be clear, its failure to disclose key information regarding its connections to and interactions

with related persons and entities was its own mistake and one for which it is responsible and must be charged.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###